**25 PAGES**

GARMAN TURNER GORDON LLP
WILLIAM M. NOALL, ESQ. (CA Bar No. 122244)
Email: wnoall@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ. (NV Bar No. 9040)
(*Admitted Pro Hac Vice*)
Email: tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
Fax: 725.777.3112
*Attorneys for Debtor Try Trout
and Industrial, LLC*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | CASE No. 25-24548-B-1 |
| TRY TROUT AND INDUSTRIAL, LLC, | DCN: GTG-7 |
| Debtor.[1] | Chapter 11 |
| | **STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS** |
| | Judge: Hon. Christopher D. Jamie |
| | [No hearing requested] |

Try Trout and Industrial, LLC, debtor and debtor-in-possession ("Debtor") and Builders

Capital Finance, LLC ("BC"), by and through their undersigned counsel, hereby stipulate and

agree as follows based upon the following Recitals:

**RECITALS**

---

[1] The Debtor in this case, along with the last four digits of Debtor's federal tax identification number, is: Try Trout and Industrial, LLC (5535). The Debtor's business address is P.O. Box 2247 Menlo Park, CA 94026.

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT
APPROVED REAL ESTATE BROKERS

A.  Debtor owns two separate development projects in Truckee, California, referred to as Heritage Village and Creekside Village (collectively, the "Projects").  By stipulation, the Projects are being treated as "single asset real estate" under Title 11, United States Code (the "Bankruptcy Code"). *See* ECF No. 46 and Paragraph N, *infra*.

B.  The Heritage Village project is situated within the confines of four assessor's parcels identified as 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000, which contain a total land area of 7.93 acres.  The site is proposed for the development of 108 for-sale condominium units over ground floor retail.  Heritage Village will feature 22 floorplans ranging in size from 433 to 2,997 square feet.

C.  The Creekside Village project is situated within the confines of assessor's parcel 019-421-014-000 and consists of 5.44 acres of vacant land proposed for the development of 49 single-family homes and attached townhomes, which will feature ten floorplans ranging in size from 1,393 to 2,891 square feet.

D.  Secured debt encumbers both projects.

E.  Builder's Capital Finance, LLC ("BC") holds a valid, perfected, first priority secured claim and lien against the projects arising from a September 21, 2024 loan agreement in the original principal amount of $19,126,568.83.

F.  Debtor stipulates to the validity, priority, and extent of BC's first position lien and security interest on the Projects. Notwithstanding the foregoing, Debtor reserves any objections to the calculation of the amount of BC's secured claim or deficiency (if any), except as set forth herein with respect to BC's credit bid rights.

G.  Truckee Development Associates, LLC ("TDA") holds a second position lien and security interest on Debtor's property. TDA is not a party to this Stipulation.

H.  A subordination agreement exists between Debtor, BC, and TDA.

I.  Debtor commenced the above captioned chapter 11 case ("Reorganization Case") in this Court on August 27, 2025 (the "Petition Date").

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT
APPROVED REAL ESTATE BROKERS

2

J.  The Reorganization Case was commenced prior to a foreclosure sale scheduled by BC for August 27, 2025/the Petition Date.

K.  On July 2, 2025, fifty-six (56) days prior to the Petition Date, and within the ninety-day preference period, Keith Dudum recorded an abstract of judgment against the Projects with the Nevada County Recorder in the face amount of $1,374,884.59 (the "Judgment").

L.  Debtor stated in its *First Status Conference Report* that it has been exploring all options to maximize the value of the estate and has determined to file a plan that includes a sale of the Projects, with an alternative restructuring option in the form of a joint venture with a new finance partner.

M.  Debtor continues to manage its property as a debtor and debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108..

N.  Debtor has maintained communication with BC through its counsel. Debtor represents it has also done so with regard to TDA through its counsel.

O.  Debtor has stipulated with BC that for so long as BC's allowed claim against Debtor has not been satisfied, Debtor's primary activity shall be deemed to be the business of owning "single asset real estate" as defined in Bankruptcy Code Section 101(51B), and this reorganization case shall be treated and managed accordingly.

P.  Debtor has negotiated a joint retention agreement ("Brokerage Agreement") with two (2) brokerage firms who will work as a joint team to market and sell the Projects. A true and correct copy of the Brokerage Agreement is attached hereto as **Exhibit 1** and incorporated herein by this reference.

Q.  The real estate brokers are Keen-Summit Capital Partners LLC and Berkadia Real Estate Advisors Inc. (collectively, the "Real Estate Broker Professionals").

R.  The Real Estate Broker Professionals were selected after consultation with BC and TDA.

S.  The Brokerage Agreement is expressly subject to approval by the Court after notice

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

and a hearing and the Court's approval of this Stipulation and Order.

T.  The purpose of this Stipulation and Order is to establish a mandatory framework under which the Projects will be professionally marketed by the Brokers for sale or refinance to close by June 4, 2026, or else immediately close a sale of the Projects to BC pursuant to a credit bid.  Additionally, the purpose of this Stipulation and Order is to provide compensation and expense reimbursement to the Real Estate Broker Professionals in the event that (i) the sale of the Projects yields less than the aggregate value of all valid liens on the Projects plus Debtor's closing fees and costs and/or (ii) Debtor transfers one or both Projects, however such transfer is effectuated, whether by means of a deed in lieu, credit bid, or otherwise to: (x) BC or its assign, or (y) a liquidating trust or other entity created for the benefit of the creditors upon the effective date of a confirmed Chapter 11 Plan, as to which BC reserves all rights.,

### STIPULATION

The Parties stipulate and agree as follows,

1.      The above Recitals are true and correct.

2.      BC agrees that in the event that the Projects, or either of them, are sold with Court approval under either a plan of reorganization or a Section 363 sale during the term of the Brokerage Agreement, other than a sale to BC or its assign for a credit bid only, and the highest and best all cash bid submitted is not greater than the aggregate value of all liens on the Property plus Debtor's share of the closing fees and costs pursuant to the purchase and sale agreement providing for the sale, plus the compensation and expense reimbursement due the Real Estate Broker Professionals under the Brokerage Agreement, then BC agrees that the cash proceeds of the sale shall be used (i) first, to pay Debtor's share of the closing fees and costs pursuant to the Court approved purchase and sale agreement, (ii) second, to pay the compensation and expense reimbursement due the Real Estate Broker Professionals under the Brokerage Agreement at the closing of the sale, and (iii) third, to pay BC and TDA, in accordance with the priority of their claims as provided under the Intercreditor Agreement and as calculated under the Bankruptcy

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

Code.

3.      BC agrees that in the event that the Projects, or either of them, are sold with Court approval under a plan of reorganization or a Section 363 sale during the term of the Brokerage Agreement in a manner consistent with the terms of paragraph III.D.1.a-b of the Brokerage Agreement, then BC agrees that it shall pay, at the closing of the sale, the  compensation and expense reimbursement due the Real Estate Broker Professionals under paragraph III.A.2 of the Brokerage Agreement.

4.      Debtor agrees that the rights of the BC under Bankruptcy Code Section 363(k) to credit bid at any sale of the Projects, or either of them, are preserved.

5.       BC agrees not to object to sales of the Projects based solely on Debtor's inability to satisfy Bankruptcy Code Section 363(f)(3), subject in all respects to BC's credit bid rights. For the avoidance of doubt, BC does not waive any objection rights it otherwise holds, but rather, the intent of this paragraph is to confirm that BC will place a credit bid in excess of any competing all cash bid which is not greater than the aggregate value of all liens on the Projects for purposes of Bankruptcy Code Section 363(f)(3). Without in any way limiting the foregoing, BC expressly reserves and retains any objections to approval of a sale based upon (i) challenges to the Debtor's business judgment in selecting the highest and best offer, (ii) disagreements regarding financing, inspection, or other contingencies requested by a buyer and agreed to by the Debtor, (iii) challenges to the adequacy of marketing efforts by the Brokers; (iv) Debtor's failure to provide all notices of the sale required under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and (v) any proposal to sell property free and clear of the BC's' liens pursuant to Bankruptcy Code Sections 363(f)(1), 363(f)(4), or 363(f)(5).  For the avoidance of doubt, nothing in this stipulation requires BC to consent to any sale or refinance for an amount less than the aggregate value of all liens on the Projects. This paragraph shall be construed in the light most favorable to non-waiver.

. . .

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

6.　　　Debtor stipulates that BC is authorized to make a credit bid in the maximum amount of 100% of its outstanding debt as of the date of any auction or sale of the Property, with any additional interest or charges permitted under the Bankruptcy Code. Debtor's Schedule D disclosed BC's claim as $23,194,036.28 as of the Petition Date, but marked the claim as disputed. BC will file a formal proof of claim on or before January 2, 2026.

7.　　　BC consents to a limited surcharge of its collateral under Bankruptcy Code Section 506(c) solely for the reasonable, necessary costs and expenses incurred by the Broker for the benefit of the Projects, provided however, that (i) BC reserves the right to challenge whether any such costs and expenses were reasonable and necessary to accomplish the purpose of the Brokers' retention, (ii) such costs and expenses and any associated surcharge shall not exceed $40,000, and (iii) Debtor shall not seek to surcharge BC's collateral for any costs or expenses of the bankruptcy estate except as expressly set forth herein.

8.　　　Under any and all circumstances, on or before April 6, 2026, Debtor shall have entered into either (i) a binding asset purchase agreement for a Sale Transaction (as defined in the Broker Agreement) or (ii) one or more binding agreements whereby Debtor will complete a Restructuring Transaction (as defined in the Broker Agreement).

9.　　　If Debtor does not satisfy the conditions of Paragraph 8 of this Stipulation on or before April 6, 2026, then Debtor shall: (i) unconditionally commit to closing a sale of the Property to BC for a credit bid with no further marketing period or (ii) obtain an order of the Bankruptcy Court extending this deadline, as to which BC may object.

10.　　　Under any and all circumstances, on or before June 4, 2026, Debtor shall: (i) have closed a sale or refinance of 100% of the property constituting the Projects in a manner consistent with this Stipulation; (ii) unconditionally commit to closing a sale of the Projects to BC for a credit bid with no further marketing period; or (iii) obtain an order of the Bankruptcy Court extending this deadline, as to which BC may object.

. . .

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

11.     BC has not agreed to any potential stalking horse protections such as break up fees. All details of an auction or sale process not otherwise set forth herein or in the Brokerage Agreement, including (without limitation) the agreed amount of earnest money deposits or the acceptance of contingencies, are subject to Debtor's business judgment after consultation with BC, and otherwise subject to approval by the Bankruptcy Court after notice and hearing.

12.     Except as may be expressly set forth herein, no term of this Stipulation and Order shall be deemed or construed to amend, override, or waive any term of the Intercreditor Agreement, or any other existing agreements between Debtor, BC, Randolph Lamb (including his guarantee of Debtor's obligations to BC), and/or any other third party.

**IT IS SO STIPULATED.**

Dated this 26th day of November 2025.

GARMAN TURNER GORDON                    POLSINELLI PC

By: */s/ Talitha Gray Kozlowski*                    By: */s/ Michael L. Schuster*
    WILLIAM M. NOALL, ESQ.                        MICHAEL L. SCHUSTER, ESQ.
    TALITHA GRAY KOZLOWSKI, ESQ.                1401 Lawrence Street, Suite 2300
    7251 Amigo Street, Suite 210                Denver, CO 80202
    Las Vegas, Nevada 89119

*Attorneys for Try Trout & Industrial LLC*                    *Attorneys for Builders Capital Finance, LLC*

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

7

107271843.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BROKERAGE AGREEMENT**
(Attach)

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT
APPROVED REAL ESTATE BROKERS
8

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

RETENTION AGREEMENT

*Between*
Try Trout and Industrial, LLC

*and*
Keen-Summit Capital Partners LLC and Berkadia Real Estate Advisors Inc.

Date: November 24, 2025

In consideration of the mutual agreements herein contained and subject to the entry of the "Order" (as defined below), "Company" (as defined below) hereby retains "Brokers" (as defined below) to act as Company's real estate advisor upon the terms and conditions set forth herein.

I.   **Definitions**.

The following terms as used herein have the following meanings.

A.   "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of California.

B.   "Berkadia" means Berkadia Real Estate Advisors Inc.

C.   "Brokers" mean Berkadia and Keen.

D.   "Code" means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

E.   "Credit Bid Proceeds" means the Gross Proceeds in the context of a sale pursuant to a Secured Creditor's credit bid under Code Section 363(k), and shall be equal to the lesser of (i) the amount such Secured Creditor is required to offset its secured claim against the purchase price of the Property pursuant to Code Section 363(k) or (ii) the highest all cash bid submitted by a party other than a Secured Creditor, plus the reimbursement of reasonable out of pocket expenses incurred under **Section IV** below

F.   "Company" means Try Trout and Industrial, LLC.

G.   "Effective Date" means the date of mutual execution of this Agreement, subject to entry of an Order.

H.   "Gross Proceeds" means the sum of the total consideration transferred to, or for the benefit of, Company and shall be inclusive of, but not limited to, cash or its equivalent, value of debt assumed or released, liabilities assumed or released, forfeited deposits, and any other consideration, paid or payable, directly or indirectly, in connection with a Transaction.  The computation of Gross Proceeds as well as the computation of Brokers' fee shall not be affected by the costs of advertising, Company's legal fees, break-up fees, Brokers' expenses nor any closing costs and/or adjustments, including but not limited to adjustments and/or payments of whatever kind to lienholders, secured parties or offerors.

I.   "Keen" means Keen-Summit Capital Partners LLC.

J.   "Order" shall mean an Order issued by the Bankruptcy Court approving this Agreement.

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 2 of 17*

K.      "Property" or "Properties" refers individually or collectively to the parcels of fee-owned, real property listed on Schedule "**A**" attached hereto and incorporated by reference, inclusive of all plans, designs, permits, licenses and other intellectual property related or pertaining to the "Property", which list of real property and affiliated intellectual property may be supplemented without a further Order of the Bankruptcy Court.

L.      "Restructuring Transaction" means any transaction, other than a Sale Transaction, involving the Company's pecuniary interests arising from or related or pertaining to Brokers' services rendered under this Agreement, including, but not limited to:

    1.      the restructuring of all or a portion of Company's secured debt, and/or

    2.      the raising of debt and/or equity capital and/or the closing of a joint-venture in order to:

        a)      refinance a Property,

        b)      to recapitalize the Company or an entity owned or controlled by Company,

        c)      to buy all or a portion of the secured debt currently encumbering a Property, and/or

        d)      to fund a plan of reorganization in the Bankruptcy.

For the avoidance of doubt, completion of a Restructuring Transaction requires payment to all Secured Creditors with liens on any Property subject to the Restructuring Transaction in an amount equal to such Secured Creditors' secured claim calculated under Code Section 506, unless otherwise agreed by the Secured Creditor, and without reduction for the Restructuring Transaction Fee.

M.      "Sale Transaction" means the sale or transfer of title of one or more Properties pursuant to Code Section 363, whether within or without a Chapter 11 Plan.

N.      "Secured Creditor" means Builders Capital Finance, LLC and Truckee Development Associates, LLC, separately and collectively.

II.     **Services.**

     **A. Authority**

1.  Brokers shall have the sole and exclusive authority to represent Company, on an exclusive right to sell basis, in the negotiation of Sale Transactions or Restructuring Transactions; provided, however, that the Brokers acknowledge that pre-petition Company retained Lever Capital Partners on a non-exclusive basis to facilitate either a refinancing or a joint venture to pay existing Secured Creditors and administrative claims and to develop the property ("Lever Capital"). Lever Capital shall not be involved in the sale or restructure of the Projects and shall not be entitled to any compensation from property of the estate.

2.  In order to coordinate our efforts with respect to possible Sale Transactions and Restructuring Transactions, during the term of this Agreement neither the Company nor any representative thereof (other than Brokers and Lever Capital) will initiate discussions with a third party regarding a Sale Transaction or Restructuring Transaction except through Brokers.  If the Company, its management, or any of its professional advisors receives an inquiry regarding a Sale Transaction or Restructuring Transaction, it will promptly advise Brokers of such inquiry in order that Brokers may evaluate the inquiry and assist the Company in any resulting negotiations.

3.  Company shall retain the complete discretion to accept or reject any proposed Sale Transaction or Restructuring Transaction.

4.  The Company and each Broker hereby acknowledges and agrees that although Berkadia and Keen are being engaged under this Agreement as co-advisors to Debtor: (i) each Broker's obligations under this Agreement shall be separate from each other and shall not be joint and several, and as such (ii) neither Broker shall be liable to the Company or to any other third parties for the other Broker's acts or omissions related or pertaining to this Agreement and/or the Transaction.

B.  **Marketing Services**

Brokers' services may include those generally described below, as appropriate.  Brokers will:

1.  On request, review pertinent documents and will consult with Company's counsel, as appropriate;

2.  Coordinate with Company in the development of due diligence materials, the cost of which shall be Company's sole responsibility; provided, however, the Brokers may advance the costs to expedite the marketing process in an amount not to exceed $40,000;

3.  Develop, subject to Company's review and approval, a marketing plan and implement each facet of the marketing plan;

4.  Communicate regularly with prospects and maintain records of communications;

5.  Solicit offers for a Sale Transaction or Restructuring Transaction;

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 4 of 17*

6.     Assist Company in evaluating, structuring, negotiating and implementing the terms and conditions of a proposed Sale Transaction or Restructuring Transaction;

7.     Develop and implement, subject to Company's review and approval, an auction plan, including arranging auction logistics, assisting Company's counsel with auction bid procedures, assisting the Company to qualify bidders, and running the auction at the offices of Garman Turner Gordon or such other location that may be designated by the Company;

8.     Communicate regularly with Company and its professional advisors in connection with the status of its efforts; and

9.     Work with Company's attorneys responsible for the implementation of the proposed Sale Transaction or Restructuring Transaction, reviewing documents, negotiating and assisting in resolving problems which may arise.

III.    **Compensation.**

    A.     <u>Sale Transaction Fee.</u>

       1.     IF CASH SALE: As and when Company closes a Sale Transaction, except upon a Secured Creditor's credit bid subject to Section III.A.2 of this Agreement, whether such Sale Transaction is completed individually or as part of a package or as part of a sale of all or a portion of Company's business, then Brokers shall have earned compensation per Sale Transaction equal to: (i) four percent (4%) of the "Gross Proceeds" from the Transaction up to $50 million; plus (ii) eight percent (8%) on the difference between the Gross Proceeds of the Transaction and $50 million (the "Sale Transaction Fee"), to be shared equally between the Brokers, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Sale Transaction Fee shall be paid as a buyer closing obligation on the HUD-1 settlement statement, and the proceeds due to Secured Creditors shall be reduced by the amount of the Sale Transaction Fee.

       2.     IF CREDIT BID SALE: As and when Company closes a Sale Transaction upon a Secured Creditor's credit bid pursuant to Code Section 363(k), whether such Sale Transaction is completed individually or as part of a package or as part of a sale of all or a portion of Company's business, then Brokers shall have earned a Sale Transaction Fee per Sale Transaction equal to: (i) one-half of one percent (0.5%) of the Credit Bid Proceeds from the Sale Transaction up to the maximum amount of such credit bid; plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Sale Transaction Fee shall be paid in cash on or before the closing date by the Secured Creditor who completes the Sale Transaction pursuant to a credit bid.

    B.     Restructuring Transaction Fee.   As and when Company closes a Restructuring Transaction, whether such Restructuring Transaction is completed individually or as part of a package or as part of a restructuring of all or a portion of Company's business, then Brokers shall have earned compensation per Restructuring Transaction equal to: (i) four percent (4%) of the "Gross Proceeds" from the Transaction up to $50 million; plus (ii)

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 5 of 17*

eight percent (8%) on the difference between the Gross Proceeds of the Restructuring Transaction and $50 million (the "Restructuring Transaction Fee"), to be shared equally between the Brokers, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Restructuring Transaction Fee and cost reimbursement shall be paid by the Debtor as part of the Restructuring Transaction, and shall not reduce the amounts which must be paid to satisfy each Secured Creditor's secured claim as calculated under Code Section 506 in order to effectuate the Restructuring Transaction, unless otherwise agreed by such Secured Creditor.

C.      For the purposes of clarity, the Brokers are entitled to the Sale Transaction Fee or Restructuring Transaction Fee in the event that Lever Capital or any third-party produces a Transaction. Neither Lever Capital nor any such third party shall be entitled to any compensation from property of the estate.

D.      "Come Hell or Highwater Fee".

     1.      For the avoidance of doubt, once engaged and work has commenced on one or more of the Properties, then Brokers shall earn either a Sale Transaction Fee or a Restructuring Transaction Fee, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below.

     2.      Unless otherwise agreed in writing by Builders Capital Finance, LLC ("BC") and/or ordered by the Bankruptcy Court after notice and hearing, if Debtor has not closed one or more Sale Transactions resulting in transfers of 100% of the Debtor's interest in the Projects on or before June 4, 2026 (with binding agreements to be executed no later than April 6, 2026), or if Debtor has not closed a Restructuring Transaction on or before June 4, 2026, then Debtor shall promptly close a Sale Transaction pursuant to BC's credit bid under Code Section 363(k), and the Brokers shall thereupon be entitled to their resulting Sale Transaction Fee.

E.      <u>Timing of Payment.</u> All Transaction Fees and expense reimbursements shall be paid simultaneously with the closing or other consummation of each Sale Transaction or Restructuring Transaction. Company hereby authorizes and instructs any escrow agent or counsel (without need for further authorization or permission) to pay Brokers the fees earned in strict compliance with the provisions of this Agreement, time being of the essence, and consistent with all other provisions of this Agreement. The rights provided by this paragraph and the Order approving same shall be deemed to supplement and not supersede other rights provided to Brokers.

F.      <u>Notwithstanding anything to the contrary contained herein, there shall be no payments to the Brokers unless and until the Bankruptcy Court enters an order approving the Brokers' fees and expenses pursuant to Bankruptcy Code Section 328(a).</u>

G.      <u>Survival</u>: In the event Company and any third party should enter into an agreement providing for a Sale Transaction or Restructuring Transaction before the expiration of this Agreement and the closing does not occur until after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Brokers shall be entitled to a fee in accordance with the terms of this Agreement. If Company, after the expiration of said period, arranges for a

Transaction with a third party whom Brokers solicited or otherwise introduced to a Property or introduced to the Company or with whom Brokers dealt in connection with a Property or Company prior to said expiration, and the contract signing or closing takes place within twelve (12) months after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Brokers shall be entitled to a fee in accordance with the terms of this Agreement.

## IV. <u>Expenses.</u>

A. All reasonable out of pocket costs and expenses incurred by Brokers in connection with performing the services required by this Agreement, including but not limited to travel, lodging, FedEx, UPS or other overnight carrier, postage, photocopying charges, and the fees and reasonable expenses of counsel, etc., shall be advanced by Brokers for the benefit of Company and its creditors. Brokers' expenses shall not exceed $40,000, without the prior written consent of Company and BC.

B. With regards to the marketing of a Property, Brokers shall prepare a marketing plan and budget, subject to the Company's review and approval. Brokers shall be under no obligation to incur marketing expenses until such time as Company has approved the marketing plan and budget.

C. BC consents to a limited surcharge of its collateral under Bankruptcy Code Section 506(c) solely for the reasonable, necessary costs and expenses incurred by the Broker for the benefit of the Projects, provided however, that (i) BC reserves the right to challenge whether any such costs and expenses were reasonable and necessary to accomplish the purpose of the Brokers' retention, (ii) such costs and expenses and any associated surcharge shall not exceed $40,000, and (iii) Debtor shall not seek to surcharge BC's collateral for any costs or expenses of the bankruptcy estate except as expressly set forth herein.

D. Brokers shall not be responsible for any out-of-pocket due diligence costs and expenses, if any, including but not limited to updating appraisals, title reports, surveys, environmental reports, property condition assessments, etc.

## V. <u>Company Responsibilities.</u>

A. Upon the Effective Date, Company will deliver to Brokers a list of all brokers, principals, tenants, or other prospects who have expressed an interest in using or acquiring a Property along with all correspondence and other records that relate to any such interest.

B. With respect to the Property, Company warrants and represents that it will immediately inform Brokers as to:

1. any known or suspected risk of environmental hazard or contamination; and

2. any known, existing or pending violation(s) of federal, state or local environmental laws or regulations.

Company shall have the continuing obligation to assess the accuracy of the representations contained herein and to advise Brokers in writing as soon as it becomes aware of any inaccuracy, inconsistency, incompleteness or change of circumstances and

to correct same.  Additionally, if Company has ordered environmental reports or studies, as soon as such become available, Company will immediately provide a true and complete copy of such reports to Brokers and Brokers are hereby authorized to disseminate such reports to prospects.

C.     Company shall maintain the Property and shall furnish utilities and public liability insurance as well as casualty/property insurance covering the Properties.  Company shall cause Brokers to be covered as an Additional Insured under all policies of General Liability insurance and any Umbrella insurance policies and to waive subrogation against Brokers for injury or damage insured under all such casualty and public liability insurance.

D.     Physical Conditions.  Company acknowledges that Brokers are not obligated to and have not made an independent investigation of the physical conditions of the Properties, including, but not limited to, the condition of any improvements on the Properties, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "Physical Conditions").  All documents and materials, investigations, reports and information with respect to the Physical Conditions shall be prepared by or for Company and shall be furnished to prospective purchasers on behalf of Company, who (as between the Company and Brokers) shall be solely responsible for same.  During the Covid-19 pandemic, Brokers reserves the right, in its sole discretion, to determine whether or not to travel to a Property.

E.     Accurate & Complete Information:

1.     Company shall make available to Brokers all information reasonably requested by Brokers for the purpose of enabling Brokers to perform its obligations pursuant to this Agreement.  All information provided by Company shall be materially accurate and complete at the time it is furnished and Company shall, as soon as it becomes aware of any inaccuracy or incompleteness in any information then or later provided to Brokers, promptly advise Brokers in writing of such inaccuracy or incompleteness and correct the same.  In performing its services hereunder, Brokers shall under all circumstances be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all information that has been furnished to it by, or on behalf of, the Company and shall have no obligation to verify the accuracy or completeness of any such information and shall not be responsible for the inaccuracy or incompleteness of any information provided to Brokers.

2.     Company covenants that when Brokers present offering materials to Company for review and approval, Company will promptly and diligently review same for accuracy and completeness and will advise Brokers, in writing, of any corrections or modifications.  Once Brokers has revised such offering materials in a manner consistent with Company's recommendations, Company shall promptly review and approve, in writing, such offering materials before Brokers disseminates same.  Brokers shall be under no obligation: (A) to disseminate offering materials that it has reason to believe are inaccurate or are materially misleading, and (B) to disseminate such offering materials until such time as Brokers receives Company's written approval of same.

F.　　　Within 3 business days of the Effective Date, Company shall file an application with the Bankruptcy Court for, and will use its best efforts to obtain, an Order.  With respect to the application and Order:

　　　1.　　　Company acknowledges that this Agreement in its entirety will be attached to and made a part of Company's application to the Bankruptcy Court and will be referenced to in the Order.

　　　2.　　　The application shall seek an Order authorizing the employment of Brokers as of the date of this Agreement, as professional persons pursuant to Section 327 of the Code (with compensation subject to the standard of review of Section 328(a) of the Code and not any other standard, including that provided in Section 330 of the Code).  The employment application and the Order shall be provided to Brokers sufficiently in advance of their filing, and must be acceptable to Brokers in their sole discretion.  In the event that the Bankruptcy Court does not enter an order acceptable to Brokers, Brokers shall have no further obligations under the terms of this Agreement.

　　　3.　　　Company agrees that an Order approving Brokers' retention incorporates by reference this entire Agreement inclusive of the below provisions even if not specifically mentioned in the Order.  Company agrees that:

　　　　　　a)　　　none of the fees payable to Brokers hereunder shall constitute a "bonus" under applicable law;

　　　　　　b)　　　Brokers are exempt from the requirement to keep time records (unless Brokers services are being billed by the hour);

　　　　　　c)　　　Brokers are exempt from the necessity of filing a fee application;

　　　　　　d)　　　Brokers' fees and expenses shall be treated as administrative expense claims in the Company's bankruptcy case;

　　　　　　e)　　　Brokers' fees and expenses shall be entitled to a carve-out for payment pursuant to the terms of this Agreement;

　　　　　　f)　　　Consistent with Section 504(a) of the Bankruptcy Code, Brokers may not share or agree to share any compensation or reimbursement with another person or any compensation or reimbursement received by another person under Section 502(b)(2) or 503(b)(4) of the Bankruptcy Code;

　　　　　　g)　　　The terms and conditions of this Agreement are "reasonable."  If the Order authorizing the employment of Brokers is obtained, Company shall pay all fees and expenses as promptly as possible in accordance with the terms of this Agreement and the Order without the need for further application to or order of the Bankruptcy Court; and

　　　　　　h)　　　The Bankruptcy Court has and shall retain core jurisdiction to hear and determine all matters arising from the implementation of this Agreement, and neither the Company nor Brokers shall be required

107272173.1

to seek authorization from any other jurisdiction with respect to the relief granted by the Order approving this Agreement.

4.  If Company obtains an order of the Bankruptcy Court authorizing financing or cash collateral use and such order requires the submission of a budget by Company delineating its post-petition expenditures, such budget shall expressly include all amounts projected to be paid to Brokers pursuant to the terms of this Agreement. In addition, any stipulation or order for financing or cash collateral use shall include all amounts to be paid to Brokers pursuant to the terms of this Agreement among any carve-out to be provided professionals in the Company's bankruptcy case.

**5.**  The effectiveness of this Agreement is expressly conditioned upon the entry of an order by the Bankruptcy Court approving the **STIPULATION AND ORDER REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN COURT APPROVED REAL ESTATE BROKERS.** This Agreement shall be null and void if the Bankruptcy Court does not approve the subject stipulation.

6.  The terms of **Section V.F** are solely for the benefit and protection of Brokers and may be waived, in whole or in part, only by Brokers.

## VI.   Miscellaneous.

A.   <u>Terms & Conditions</u>. The terms and conditions set forth on **Schedule B** attached hereto are incorporated by reference. The provisions of this section of the Agreement shall survive the termination of this Agreement.

B.   <u>Notice</u>. Any correspondence or required notice shall be addressed as follows and shall be sent by email and/or by UPS, FedEx, or similar overnight delivery service with proof of delivery. Such notice shall be effective as of the earlier of (i) the date when the recipient confirms receipt of the email, or (ii) the date of actual receipt of the overnight delivery. A notice shall be effective only upon receipt (or refusal by the intended recipient to accept delivery). Any notice which is received on a Saturday, Sunday or legal holiday, or after 5:00 pm prevailing local time at the place of receipt, shall be deemed received on the next business day.Such notice shall be addressed as follows (or to such other address as the parties hereto may designate in writing in the manner set forth herein and as updated from time to time):

> If to Brokers, to:   Keen-Summit Capital Partners LLC
> 15th Floor
> 3 Columbus Circle
> New York, NY 10019
> ATTN: Harold Bordwin
> Telephone: (914) 980-8555
> Email: hbordwin@Brokers-Summit.com

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 10 of 17*

|  |  |
|---|---|
| With a copy to: | Keen-Summit Capital Partners LLC |
|  | 1 Huntington Quadrangle, Suite 2C04 |
|  | Melville, NY 11747 |
|  | ATTN: Matt Bordwin |
|  | Telephone: (646) 381-9202 |
|  | Email: mbordwin@keen-summit.com |

|  |  |
|---|---|
| With a copy to: | Berkadia Real Estate Advisors Inc. |
|  | 1 Post Street #1000 |
|  | San Francisco, CA 94104 |
|  | ATTN: Jason Parr |
|  | Telephone: (415) 407-2106 |
|  | Email: jason.parr@berkadia.com |

|  |  |
|---|---|
| If to Company: | Try Trout and Industrial, LLC |
|  | P.O. Box 2247 |
|  | Menlo Park, CA  94026 |
|  | ATTN: Randolph Lamb |
|  | Telephone: (650) 208-4195 |
|  | Email: randy@lpgdevelopment.com |

|  |  |
|---|---|
| With a copy to: | Garman Turner Gordon LLP |
|  | 7251 AMIGO STREET, SUITE 210 |
|  | LAS VEGAS, NV 89119 |
|  | Telephone: 725 777 3000 |
|  | ATTN : Talitha Gray Kozlowski |
|  | Email: tgray@Gtg.legal |
|  | ATTN: William Noall |
|  | Email: wnoall@Gtg.legal |

If the foregoing correctly sets forth the agreement between the Company and Brokers, please sign, date and return the enclosed copy of this Agreement, whereupon it shall become our binding agreement.

**AGREED & ACCEPTED**                    **AGREED & ACCEPTED**
This ___ day of November, 2025            This ___ day of November, 2025

**KEEN-SUMMIT CAPITAL PARTNERS LLC**     **TRY TROUT AND INDUSTRIAL, LLC**

By: _____      By: _____
Harold J. Bordwin                         Name: Randolph Lamb
as Co-President                           Title: Managing Member of Lamb Partners, LLC,
                                          its Manager

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 11 of 17*

**AGREED & ACCEPTED**
This ____ day of November, 2025

**BERKADIA REAL ESTATE ADVISORS INC.**

By: _____
Name:
Title:

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 12 of 17*

## SCHEDULE A

### Property

**Creekside Village**
Residential Property
11158 Church Street
Truckee, Nevada County, California 96161
APN: 019-421-014-000

**Heritage Village**
Residential Property
11189 Church Street
Truckee, Nevada County, California 96161
APNs: 019-421-011-000, 019-421-012-
000, 019-421-021-000 and 019-421-022-000

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 13 of 17*

**SCHEDULE B**

**TERMS & CONDITIONS**

I.  **Announcement**.   Brokers may, at their option and expense, place announcements and advertisements or otherwise publicize Brokers' role (which may include the reproduction of the Company's logo and a hyperlink to the Company's web site) on Brokers' internet web site and in such newspapers and periodicals and in its marketing materials as it may choose stating that Brokers has acted as advisor to the Company with respect to the Transactions.

II.  **Authority**.  The parties hereto warrant and represent that this Agreement has been approved by all requisite corporate action and that the party executing this Agreement has full power and authority to do so.

III.  **Construction**.

A.  Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

B.  This Agreement shall be construed fairly as to all parties and there shall be no presumption against the party who drafted this Agreement in the interpretation of this Agreement.  By executing or otherwise accepting this Agreement, Company and Brokers acknowledge and represent that they are represented by and have consulted with legal counsel with respect to the terms and conditions contained herein.

IV.  **Counterparts**.This Agreement may be executed in two or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Facsimile and electronic transmission (including the email delivery of documents in Adobe PDF format) of any signed original counterpart or retransmission of any signed facsimile transmission shall be deemed the same as the delivery of the original.

V.  **Dispute Resolution.**

A.  Choice of Law; Jury Trial.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to any principles of conflict of laws.  To the extent permitted by law, the parties to this Agreement waive any right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of Brokers pursuant to, or the performance by Brokers of the services contemplated by, this Agreement.

B.  Attorneys' Fees.  If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and arbitration and/or court costs.

**C.**  Bankruptcy Court Jurisdiction.  The Bankruptcy Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation or

execution of this Agreement. Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from, this Agreement or Brokers' services hereunder, shall be settled by the Bankruptcy Court. The Bankruptcy Court shall be limited to awarding compensatory damages and the parties hereto hereby waive their right to seek punitive, consequential, exemplary or similar types of special damages.

**D.**    <u>Survival</u>. The provisions of this section of the Agreement shall survive the termination of this Agreement.

VI.    **Electronic Communications**. The parties hereto may communicate with each other by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. The parties hereto each accept the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices).

VII.    **Entire Agreement**. This Agreement contains the entire agreement between the parties hereto, and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Agreement will alter the covenants, agreements and undertakings herein set forth. This Agreement shall not be modified in any manner, except by an instrument in writing executed by the parties.

VIII.    **Force Majeure**. Brokers shall have no obligation to travel or engage in in-person meetings if, in the exercise of Brokers' judgement, to do so would create an unacceptable risk of Covid-19 infection. Brokers shall have no liability for delays, failure in performance, or damages due to acts or omissions of civil or military authorities, acts or omissions of communications carriers, acts of god, civil disturbances, epidemics, explosion, fire, fuel or energy shortages, lightning, pandemics, power surges or failures, strikes or labor disputes, telecommunications failure, war, water, or other causes beyond Brokers' control whether or not similar to the foregoing.

IX.    **Good Faith**. The parties hereto shall deal with each other fairly and in good faith so as to allow each party to perform its duties and earn the benefits of this Agreement and shall not interfere, prevent or prohibit the other, in any manner, prior to or during the term of this Agreement from carrying out its duties and obligations under the Agreement.

X.    **Indemnification**.

A.    The Company shall defend, indemnify and hold harmless Brokers and their affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons (Brokers and each such entity or person being an "Indemnified Party") from and against any and all losses, claims, damages, expenses and liabilities (including but not limited to counsel fees and disbursements in connection with the investigation of, preparation for, or defense of any pending or threatened claim) (collectively, "Losses"), as incurred, to which such Indemnified Party may become subject, related to or arising out of activities performed by or on behalf of an Indemnified Party pursuant to this Agreement, any transactions contemplated hereby, the Indemnified Party's role in connection therewith, the Physical Conditions of the Property or Properties, and/or Company's title to the Property or Properties and/or the marketability of such title. The Company shall have no obligation to indemnify and hold harmless an Indemnified Party for any Losses found in a final judgment by a Court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by the Indemnified Party in

bad faith or from the Indemnified Party's gross negligence or willful misconduct in performing the services described.

B.      Bankruptcy Protocol: Notwithstanding anything to the contrary:

1.      All requests of Brokers for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Bankruptcy Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, that in no event shall any Broker be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

2.      In no event shall Brokers be indemnified if the Company or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, a Broker's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

3.      In the event that Brokers seeks reimbursement for attorneys' fees from the Company pursuant to the indemnity provisions in the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in each Broker's own applications for approval of indemnity payments (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of Sections 330 and 331 of the Bankruptcy code without regard to whether such attorney has been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

4.      Broker shall not seek or be entitled to a surcharge of any secured lender's collateral in respect of the Company's indemnity obligations.

C.      The Company also agrees that Brokers, their affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons shall not be liable (whether directly or indirectly, in contract or tort or otherwise) to the Company or its security holders or creditors, for any matter, cause or thing related to or arising out of the engagement of Brokers pursuant to, or the performance by Brokers of the services contemplated by, this Agreement, except to the extent that Brokers are found in a final judgment by a Court of competent jurisdiction to have acted or failed to act in bad faith or with gross negligence or willful misconduct in performing the services described in this Agreement.

D.      The provisions of this **Section X** shall be in addition to any liability that the Company may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Company. These provisions shall be governed by the law of the State of California, without regard to its conflict of law principles, and shall be operative in full force and effect regardless of any termination or expiration of this Agreement.

XI.   **Legal Forms.**  Brokers may provide Company and/or its legal counsel with sample forms of commonly used documents, including but not limited to retention applications, forms of court orders, non-disclosure agreements, bidding procedures, lease modification agreements, lease termination agreements, etc.  If provided, these forms are provided as a courtesy only.  Brokers does not provide legal services.  Any forms provided to Company and/or its legal counsel should be reviewed and amended by Company's legal counsel to reflect the legal advice of Company's legal counsel.

XII.   **Multiple Clients**.  From time to time, Brokers, or one of its related entities, may and shall have the right to advise or provide services to several industry participants, some of which may be competitors of the Company.  The Company, its directors and shareholders, waive any right to commence any action, suit or proceeding or make any demand, complaint or claim against Brokers, its subsidiaries or affiliates, or their partners, directors, officers or other personnel, that arises out of Brokers', or one of its related entities', right to advise or provide services to industry competitors of the Company.

XIII.   **No Time Records**.  The services to be provided by Brokers pursuant to this Agreement are transactional in nature and except with respect to hourly fees, for which Brokers will maintain contemporaneous time records in half-hour increments and not on a project category basis, Brokers will not be billing Company by the hour nor keeping a record of its time spent on behalf of Company.

XIV.   **Relationship**.

A.   Brokers' role shall be as the Company's agent and Brokers hereby acknowledges their fiduciary responsibilities to Company. Nevertheless, Company shall remain fully responsible for all decisions and matters as to which Brokers' advice is sought.  Brokers are assuming no management responsibilities.  Company acknowledges and agrees that its engagement of Brokers hereunder does not and is not intended to confer rights upon any person not a party hereto, including but not limited to any security holders or creditors of Company's bankruptcy estate.

B.   Brokers' duties hereunder run solely to the Company.  All advice, written or oral, provided by Brokers to the Company pursuant to this Agreement is intended solely for the use and benefit of the Company, which agrees that such advice may not be disclosed publicly or made available to third parties without the prior written consent of Brokers. Brokers may condition the granting of such prior written consent upon obtaining a non-reliance letter and release from any such third parties.

C.   The provisions of this section of the Agreement shall survive the termination of this Agreement.

XV.   **Successors and Assigns/Change of Control**.  Upon the commencement of this Agreement, it shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.The Company's obligations hereunder shall survive any change in control or ownership of the Company.In the event the proceeding is converted from the Chapter 11 to Chapter 7, this Agreement shall remain in full force and effect.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

XVI.   **Term of Agreement.**

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 17 of 17*

A.     Subject to the approval of the Bankruptcy Court, the term of Brokers' retention shall be from the date of Company's execution of this Agreement through the confirmation of a plan of reorganization, the closing of all Transactions contemplated by this Agreement or for a period of twelve (12) months, whichever comes first, which term can be extended pursuant to the same terms and conditions and by the mutual consent of the parties without the need for further application to the Bankruptcy Court.

B.     This Agreement shall be binding upon the Company only upon approval of the Bankruptcy Court. If, for any reason, this Agreement is not so approved upon terms acceptable to Brokers, then this Agreement shall be deemed to be terminated and Brokers shall have an allowed *quantum meruit* claim for its services. The provisions of this section of the Agreement shall survive the termination of this Agreement.

107272173.1