**40 PAGES**
GARMAN TURNER GORDON LLP
WILLIAM M. NOALL, ESQ. (CA Bar No. 122244)
Email: wnoall@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ. (NV Bar No. 9040)
(*Admitted Pro Hac Vice*)
Email: tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
Fax: 725.777.3112
*Attorneys for Debtor in Possession*
*Try Trout and Industrial, LLC*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>TRY TROUT AND INDUSTRIAL, LLC, a California limited liability company,<br><br>          Debtor in Possession. | CASE No. 25-24548-B-1<br><br>DCN: GTG-6<br><br>Chapter 11<br><br>Judge: Hon. Christopher D. Jamie<br><br>Place: Courtroom 32, 6th Floor<br>      Sacramento Division<br>      501 I Street<br>      Sacramento, CA 95814 |

## DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S
## AMENDED PLAN OF REORGANIZATION

DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S AMENDED PLAN OF REORGANIZATION

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................... 1

II. INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT ............... 4

III. REPRESENTATIONS ........................................................................................ 5

IV. DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN ....................... 6

    A.   Treatment of Administrative Claims. ..................................................... 7

    B.   Treatment of Priority Tax Claims. .......................................................... 8

    C.   Class 1 – Builders Capital Claim. ........................................................... 9

    D.   Class 2 – The TDA Secured Claim. ....................................................... 10

    E.   Class 3 – Sortis Secured Claim. ............................................................ 11

    F.   Class 4 – Secured Tax Claims. .............................................................. 13

    G.   Class 5 – Priority Unsecured Claims. ................................................... 13

    H.   Class 6 – TDA Unsecured Claim, Class 7 – Sortis Unsecured Claim, and

          Class 8 – General Unsecured Claims. .................................................... 14

    I.   Class 9 – Equity Securities. .................................................................. 16

V. SUMMARY OF VOTING PROCESS ....................................................................... 16

    A.   Who May Vote to Accept or Reject the Plan. ........................................ 16

    B.   Summary of Voting Requirements. ....................................................... 16

VI. INFORMATION ABOUT DEBTOR'S Assets AND THE CHAPTER 11 CASE ............... 18

VII. DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN ............................ 19

    A.   Means of Implementation of the Plan. .................................................. 19

    B.   Executory Contracts and Leases. .......................................................... 22

         1.   Executory Contracts. ..................................................................... 22

         2.   Approval of Assumption or Rejection. ........................................... 22

         3.   Cure of Defaults. ........................................................................... 23

         4.   Objection to Cure Amounts. .......................................................... 23

         5.   Confirmation Order. ...................................................................... 24

         6.   Rejection Damages Claim Bar Date. .............................................. 24

C.  Conditions to Confirmation and Effectiveness of the Plan..........................................24

D.  Title to Property. ..................................................................................................25

E.  Discharge, Injunction, and Exculpation.................................................................25

VIII. RISK FACTORS......................................................................................................27

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCE.................................................. 30

X. CONFIRMATION OF THE PLAN....................................................................................32

A.  Confirmation of the Plan........................................................................................32

B.  Objections to Confirmation of the Plan. .................................................................33

1.  Best interest of Creditors and liquidation analysis. ........................................... 33

2.  Feasibility........................................................................................................ 35

3.  Accepting impaired class. ................................................................................. 35

4.  Acceptance of Plan. ......................................................................................... 36

5.  Confirmation over a dissenting Class ("Cram Down"). ...................................... 36

6.  Allowed Claims. .............................................................................................. 36

7.  Impaired Claims and Equity Securities.............................................................. 37

8.  Voting procedures............................................................................................. 37

XI. ALTERNATIVES TO THE PLAN....................................................................................38

XII. RECOMMENDATION AND CONCLUSION .................................................................. 39

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

ii

## I.
## INTRODUCTION

On August 27, 2025 (the "Petition Date"), Try Trout and Industrial, LLC, debtor in possession ("Debtor"), filed its voluntary Chapter[1] 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "Bankruptcy Court"), thereby commencing case number 25-24548-B-1.

Debtor has prepared this Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of votes on *Debtor's Amended Plan of Reorganization* (as may be amended, the "Plan")[2] to treat the Claims of Creditors of Debtor and the Persons holding Equity Securities in Debtor. The various exhibits to this Disclosure Statement included in the Appendix are incorporated into and are a part of this Disclosure Statement. The Plan is included as **Exhibit "1"** in the Appendix. The information provided in this Disclosure Statement is based on the best information available to Debtor. After having reviewed the Disclosure Statement and the Plan, any interested party desiring further information may contact:

Garman Turner Gordon LLP
Attn: Talitha Gray Kozlowski, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
(725) 777-3000 Telephone
Email: tgray@gtg.legal

Interested parties may also obtain further information from the Bankruptcy Court at its PACER website: http://www.caeb.uscourts.gov.

The remainder of this section provides a summary overview of the Plan. The full discussion of the treatment of Claims and Equity Securities is described in the Plan and this Disclosure Statement and Holders of Claims and Equity Securities are advised to closely read the entire Disclosure Statement and Plan.

---

[1] Unless otherwise indicated herein, all references to "Chapters" or "Sections" refer to Title 11 of the U.S. Code (the "Bankruptcy Code").

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

Debtor owns two properties, referred to as Heritage Village and Creekside Village (the "Properties"). Heritage Village is Debtor's property located in Truckee, Nevada County, California, and situated within the confines of four assessor's parcels identified as 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000, which contain a total land area of 7.93 acres. The site is proposed for the development of 108 condominium units over ground floor retail. Creekside Village is Debtor's property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel 019-421-014-000 with the working address of 11158 Church Street, Truckee, Nevada County, California, 96161. This property contains 5.44 acres of vacant land proposed for the development of 49 single-family homes and attached townhomes. Based on Debtor's 2023 and 2026 appraisals, the fair market value of the Properties exceeds $65 million.

Debtor also solely owns all of the outstanding stock in Tahoe Railyard Devco Corp. ("Tahoe Railyard"). Tahoe Railyard owns The Landing, which is real property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel numbers 019-421-005-000 and 019-421-006-000, which contain a total land area of 2.15 acres.

The Plan contemplates paying all Allowed Claims in full through either a Sale Transaction (i.e., a sale of the Properties)[3] or a Restructuring Transaction (i.e., a refinancing of the Properties, a recapitalization of the Debtor, a sale of the secured debt, or an alternative transaction that produces sufficing value to allow Debtor to repay its debt in full).[4] To effectuate

---

[3] The Plan defines a "Sale Transaction" as "a sale or transfer of title of one or more of the Properties pursuant to Section 363 of the Bankruptcy Code, solely excluding a Credit Bid Transaction."

[4] The Plan defines a "Restructuring Transaction" as "[a]ny transaction, other than a Sale Transaction, involving the Debtor's pecuniary interests arising from or related or pertaining to (i) the restructuring of all or a portion of the Debtor's Secured Claims, and/or (ii) the raising of debt and/or equity capital and/or the closing of a joint-venture in order to: (a) refinance the Properties, (b) to recapitalize Debtor or an entity owned or controlled by Debtor, (c) to buy all or a portion of the Secured Claims currently encumbering the Properties, and/or (d) to an alternative transaction in an amount sufficient to fund the Plan. For the avoidance of doubt, completion of a Restructuring Transaction requires, subject to Section 12.8, payment to all Secured Claims with Liens on any Properties subject to the Restructuring Transaction in an amount equal to such Secured Creditors' Allowed Secured Claims calculated under Section 506 of the Bankruptcy Code, unless otherwise agreed by the Secured Creditor, and without reduction for the Broker's Restructuring Transaction Fee (as defined in the Broker Agreement). The Restructuring Transaction shall comply with the requirements of the Bankruptcy Code and shall be effectuated pursuant to Section 363 of the Bankruptcy Code and one or more orders of the Bankruptcy Court authorizing the transaction. For the avoidance of doubt, a Restructuring Transaction shall not include The Landing Personal Property, unless consented

the Sale or Refinancing Transaction, Debtor has engaged the real estate brokerage firms of Berkadia Real Estate Advisors Inc. ("Berkadia") and Keen-Summit Capital Partners LLC ("Keen," and together with Berkadia, the "Brokers") who have extensive experience effectuating such transactions. The Brokers were selected after consulting with Debtor's secured lenders, Builders Capital Finance, LLC ("Builders Capital") and Truckee Development Associates, LLC ("TDA").

Debtor selected Keen because of Keen's excellent reputation in bankruptcy industry with respect to financially stressed commercial real estate. Further, Keen's principal, Harold J. Bordwin's extensive experience in bankruptcy court and in the real estate restructuring industry, Debtor believes Keen will be an invaluable professional that is able to timely and competently effectuate a Sale Transaction. Accordingly, Debtor believes that Keen has the necessary capabilities and expertise to serve as one of the Brokers.

Berkadia will serve as the local commercial real estate expert. The primary broker, Jason Parr, resides in Truckee and is knowledgeable regarding the local developers and the local market. Jason Parr is a Senior Managing Director for Berkadia's Investment Sales Platform and provides buy- and sell-side advisory services for the acquisition and disposition of commercial real estate with a focus on, among other things, multifamily housing and land sectors.[5]

As discussed more fully below, Debtor and Builders Capital have entered into a Court-approved stipulation that includes the following milestone dates pertinent to effectuating a sale or restructuring transaction as contemplated in the Plan [ECF Nos. 64 and 90] (the "BC Stipulation"), which dates may be extended by an order of the Bankruptcy Court:[6]

(i) **on or before April 6, 2026**, Debtor shall have entered into either (a) a binding asset purchase agreement for a Sale Transaction, or (b) one or more binding agreements whereby Debtor will complete a Restructuring Transaction; and

_____ (continued)
to in writing by Sortis."

[5] Additional information regarding Keen and Berkadia is available at ECF Nos. 69-74.

[6] Should Debtor seek an extension of these deadlines, Debtor will serve such motion or stipulation on all creditors.

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

3

(ii) **on or before June 4, 2026**, Debtor shall have closed a sale or refinance of 100% of the Properties.

Debtor believes that it will be able to effectuate either a Sale Transaction or a Restructuring Transaction (collectively referred to as an "Effectuating Transaction") within these timeframes and that such transaction will enable Debtor to pay all Allowed Claims against Debtor in full.

Debtor is requesting a confirmation hearing and a Plan balloting deadline after April 6, 2026, to ensure that all Creditors have visibility into whether a binding asset purchase agreement for a Sale Transaction or Restructuring Transaction has been entered into prior to voting on the Plan.

Should Debtor fail to meet the foregoing deadlines or fail to obtain an extension of the deadlines, Debtor has agreed to proceed with a sale of the Properties through which Builders Capital may credit bid, which transaction is referred to as the Credit Bid Transaction and described more fully below. In the case of a Credit Bid Transaction, the Plan will not become effective and all Creditors' rights will be unaltered.

## II.
### INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT

The objective of a Chapter 11 case is the confirmation (i.e., approval by the bankruptcy court) of a plan of reorganization for a debtor. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against, and Equity Securities in, a debtor. After a plan has been filed, the holders of such claims and equity securities that are Impaired (as defined in Section 1124) are permitted to vote to accept or reject the plan. Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about Debtor and the Plan to enable Creditors and Equity Security Holders to make an informed

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

4

decision in exercising their rights to vote to accept or reject the Plan. This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 and has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of this Disclosure Statement, and it does not mean that the Plan itself has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether it should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including but not limited to Section 1129. The Bankruptcy Court will also receive and consider a Ballot Summary that will present a tally of the votes of Classes accepting or rejecting the Plan that are cast by those entitled to vote. Once confirmed, the Plan will be treated essentially as a contract binding on all Creditors, Holders of Equity Securities, and other parties-in-interest in the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY SECURITIES, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL SUPERSEDE AND CONTROL.

### III.
### REPRESENTATIONS

Unless otherwise specifically noted, the financial information in this Disclosure Statement has not been subject to audit or review. Instead, this Disclosure Statement was prepared using Debtor's internal business records.

Other than as stated in this Disclosure Statement, Debtor has not authorized any representations or assurances concerning Debtor and its operations or the value of its assets. Therefore, you should scrutinize any information received from any third-party, and you assume any risk resulting from reliance upon such unauthorized information. In deciding whether to

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

accept or reject the Plan, you should not rely on any information relating to Debtor or the Plan other than that contained in this Disclosure Statement or in the Plan itself.

**IV.**
**DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN**

The following is a general overview of the treatment of Claims and Equity Securities under the Plan and is qualified in its entirety by reference to the provisions of the Plan. The Plan's treatment of each Class of Claims is summarized in the following table:

| Description | Impairment/Voting | Amount of Claims Asserted as of the Petition Date[7] |
|---|---|---|
| Class 1: Builders Capital Claim | Impaired; Solicitation required. | $25,887,017.00 |
| Class 2: TDA Secured Claim | Impaired; Solicitation required. | $ 6,994,241.37 |
| Class 3: Sortis Secured Claim | Impaired; Solicitation required. | Value of The Landing Personal Property |
| Class 4: Secured Tax Claims | Impaired; Solicitation required. | $ 960,365.92 |
| Class 5: Priority Unsecured Claims | Impaired; Solicitation required. | $ 0.00 |
| Class 6: TDA Unsecured Claim | Impaired; Solicitation required. | The TDA Claim is set forth above in Class 2 |
| Class 7: Sortis Unsecured Claim | Impaired; Solicitation required. | The amount by which the Sortis Claim exceeds the sum of the value of The Landing and The Landing Personal Property, calculated as of the date of the Confirmation Hearing |
| Class 8: General Unsecured Claims | Impaired; Solicitation required. | $ 6,625,601.36 |
| Class 9: Equity Securities | Impaired; Solicitation required. | n/a |

. . .

. . .

---

[7] The amounts listed in this chart are based upon Debtor's current understanding of the Claims *asserted* by the respective Creditors. Debtor does not admit that these are the amounts due and owing. Debtor is evaluating these Claims and will file objections seeking the disallowance of the disputed portion of any Disputed Claims. Debtor reserves all rights and nothing herein shall be construed as an admission of any liability or amount owed by Debtor.

## A.      Treatment of Administrative Claims.

Administrative Claims are as defined in the Plan as "any Claims for any cost or expense of administration of the Chapter 11 Case allowed under Sections 503(b) or 507(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, but not limited to: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (ii) all Taxes arising between the Petition Date and the Effective Date, including those Taxes for which returns are not yet due; and (iii) all Professional Fees[8] approved by the Bankruptcy Court pursuant to interim and final allowances. To the extent that a Claim is allowed pursuant to Sections 365(d)(3) and (d)(5) of the Bankruptcy Code, such Claim shall also be deemed an "Administrative Claim."

Pursuant to Section 1123(a)(1), Allowed Administrative Claims are not designated as a Class. The Holders of such unclassified Claims shall be paid in full under the Plan consistent with the requirements of Section 1129(a)(9)(A) and are not entitled to vote on the Plan. The amount of Administrative Claims for Debtor (excluding the Broker Compensation) as of the filing of this Disclosure Statement is estimated to be less than $200,000 before application of any retainers,[9] and is comprised of Debtor's legal fees from its counsel, the law firms of Garman Turner Gordon and Menlo Law Group P.C., as well as $19,000 in appraisal fees due to Cushman & Wakefield Western, Inc. The Brokers' compensation varies depending on the result achieved. In summary, the Brokers will receive, at closing, a fee equal to (i) four percent (4%) of the gross proceeds from the transaction up to $50 million; plus (ii) eight percent (8%) on the difference between the gross proceeds of the transaction and $50 million, plus reimbursement of expenses.

Unless payment is otherwise authorized by an Order of this Court, under the Plan, each Allowed Administrative Claim shall be paid upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon

---

[8] "Professional Fees" means the Administrative Claims for compensation and reimbursement submitted pursuant to Sections 328, 330, 331, or 503(b) of the Bankruptcy Code of Persons: (i) employed pursuant to an order of the Bankruptcy Court under Section 327, 328, or 1102 of the Bankruptcy Code; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Sections 363(b) or 503(b) of the Bankruptcy Code or by other Final Order.

[9] Garman Turner Gordon is holding a retainer of $109,358.

thereafter as practicable, (iii) the fourteenth (14th) day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and Debtor shall agree upon. For the avoidance of doubt, trade accounts payable, accrued expenses, and other liabilities of Debtor arising in the ordinary course of business after the Petition Date will continue to be paid in the ordinary course of business from Cash on hand based on the terms of the agreement with each respective vendor.

All requests for payment of Administrative Claims against Debtor and all final applications for allowance and disbursement of Professional Fees must be filed by the Administrative Claims Bar Date, or the Holders thereof shall be forever barred from asserting such Administrative Claims against Debtor and Debtor. The Administrative Claim Bar Date is defined as "[u]nless an alternate date is set by Final Order of the Bankruptcy Court, the first Business Day occurring on or after the fifteenth (15th) day after the Effective Date." All Professional Fees applications must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and all other orders governing payment of Professional Fees. Unless otherwise ordered by the Bankruptcy Court, from and after the Effective Date no estate professional shall be required to file fee applications with the Bankruptcy Court, and Debtor may pay all professionals in the ordinary course for fees and expenses incurred after the Effective Date.

**B.      Treatment of Priority Tax Claims.**

As set forth more specifically in the Plan, Priority Tax Claims include any Claim against Debtor entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, which includes certain tax obligations. Each Holder of an Allowed Priority Tax Claim, if any, will be paid in full in Cash by Debtor as follows:

(i)      On the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded, the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim on such date the lesser of: (i) their Pro Rata[10] share of the Remaining Cash on such date; and (ii) the outstanding,

---

[10] "Pro Rata" is defined in the Plan as the "ratio of an Allowed Claim or Allowed Equity Security in a particular class to the aggregate amount of all such Allowed Claims or Allowed Equity Securities in any such Class; except

unpaid balance of their Allowed Priority Tax Claim.

(ii)     Within fifteen (15) days after all Disputed Claims having been resolved, the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the lesser of: (i) their Pro Rata share of the Remaining Cash[11] and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Priority Tax Claims, plus interest at the Plan Interest Rate, which Distributions shall continue on the fifteenth (15) day after the end of each calendar quarter until all Allowed Priority Tax Claims have been paid in full.

(iii)     No Allowed Priority Tax Claim will be paid later than five years after the Petition Date.

(iv)     Until the Allowed Priority Tax Claim is paid in full, the unpaid balance shall accrue statutory interest from the Effective Date fixed at the applicable federal or state statutory rate in effect with respect to such Allowed Priority Tax Claim on the Petition Date.

As of the filing of this Disclosure Statement, no Priority Tax Claims have been asserted.

**C.     Class 1 – Builders Capital Claim.**

Class 1 consists of the Builders Capital Claim. The Builders Capital Claim is the Secured Claim held by Builders Capital (as assignee of Construction Loan Services II, LLC) pursuant to the Builders Capital Loan Documents, which pursuant to the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA, is secured by a first priority Lien on the Properties and the Heritage and Creekside Personal

──────────────── (continued)

that for the treatment of Classes 6, 7, and 8, Pro Rata shall refer to the ratio of Allowed Claim in Classes 6, 7, and 8, collectively."

[11] "Remaining Cash" is defined in the Plan as "the Cash held by the Reorganized Debtor excluding the Disputed Claim Reserve and the Operating Reserve." The "Disputed Claim Reserve" is "a reserve established by Reorganized Debtor to hold in a separate account Cash equal to the aggregate amount that would have been distributed on the Effective Date in accordance with the terms of the Plan on account of a Disputed Claim, plus interest and fees required under the Plan. With respect to any Secured Claim for which there is contractual interest or statutory interest, six (6) months of interest shall also be funded into the Disputed Claim Reserve for any such Disputed Secured Claim. The funds in the Disputed Claim Reserve may only be disbursed upon entry of an order of the Bankruptcy Court resolving a Disputed Claim and authorizing payment from the Disputed Claim Reserve. The Disputed Claim Reserve shall terminate upon all Disputed Claims being fully resolved and paid pursuant to the terms of the Plan to the extent they become Allowed Claims and any remaining funds distributed to Reorganized Debtor." The "Operating Reserve" is defined in the Plan as the "sum of $100,000 maintained by the Reorganized Debtor to pay expenses and fees incurred in the ordinary course prosecuting Avoidance Actions and Litigation Claims, resolving Disputed Claims, liquidating Debtor's Assets to the extent necessary to make Distributions due under the Plan, and operating the Reorganized Debtor."

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

9

Property.[12] As of the Petition Date, the amount of the asserted Builders Capital Claim was $25,887,017.00.

The Builders Capital Claim arises from the loan made by Construction Loan Services II, LLC to Debtor on or about September 21, 2023, which was memorialized by the Builders Capital Loan Documents, including the following: the Loan Agreement dated September 21, 2023, by and between Debtor, as borrower, and Construction Loan Services II, LLC, as lender; the Promissory Note dated September 21, 2023, in the amount of $19,126,568.83, in favor of Construction Loan Services II, LLC, as lender; the Deed of Trust, Security Agreement, Assignment of Leases and Rents, Assignment of Contracts and Plans, and Fixture Filing dated September 21, 2023, by Debtor, as trustor, and Construction Loan Services II, LLC, as beneficiary, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20230013621; the Unconditional Guaranty between Randolph F. Lamb, as guarantor, and Construction Loan Services II, LLC, as lender; the UCC-1 Financing Statement filed with the California Secretary of State on October 4, 2023, by Construction Loan Services, LLC, as File No. U230071169730; the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA; the assignment documents from Construction Loan Services II, LLC to Builders Capital; and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

In full and final satisfaction of such Allowed Claim, the Allowed Builders Capital Claim in Class 1 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 1 is Impaired under the Plan and therefore entitled to vote on the Plan.

**D.** **Class 2 – The TDA Secured Claim.**

Class 2 consists of the TDA Secured Claim, which is the Secured portion of the Claim

---

[12] "Heritage and Creekside Personal Property" is defined as "[a]ny and all personal property of any kind whatsoever, whether tangible or intangible, that is used or will be used in the construction, development, use, occupancy, or enjoyment of Creekside Village and/or Heritage Village, including the ten (10) affordable housing credits acquired from TDA in 2023 for use in the development of Heritage and Creekside."

held by TDA. As of the Petition Date, the amount of the asserted TDA Secured Claim was $6,994,241.37. Based on Debtor's appraisals, Debtor believes the TDA Claim to be fully secured. However, in an abundance of caution, Debtor has bifurcated the TDA Claim into a Secured Claim and unsecured Claim. The unsecured Claim portion of the TDA Claim, if any, is treated in Class 6.

The TDA Claim arises from the loan made by TDA to Debtor on or about September 26, 2023, which was memorialized by the TDA Loan Documents, including the following: the Loan Agreement dated September 26, 2023, by and between Debtor, as borrower, and TDA, as lender; the Purchase Money Promissory Note dated September 26, 2023, in the amount of $5,000,000, in favor of TDA, as lender; the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 26, 2023, by Debtor, as Borrower, and TDA, as Lender, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20230013622; the Continuing Guaranty between Randolph F. Lamb, as Guarantor, and TDA, as Lender; the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA, and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

In full and final satisfaction of the Allowed TDA Secured Claim, the Allowed TDA Secured Claim in Class 2 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 2 is Impaired under the Plan and the Holder of the Allowed Class 2 Claim is entitled to vote on the Plan.

**E.     Class 3 – Sortis Secured Claim.**

Class 3 consists of Sortis Secured Claim, which is the Secured portion of the Sortis Claim held by Sortis Income Fund Reit, Inc., as assignee of Sorfi, LLC ("Sortis"). The Sortis Secured Claim is equal to the value of The Landing Personal Property. The Landing Personal Property is "[a]ny and all personal property of any kind whatsoever, whether tangible or intangible, that is used or will be used in the construction, development, use, occupancy, or enjoyment of The Landing, including the ten (10) affordable housing credits acquired from TDA in 2022 for use in

the development of The Landing." The Sortis Claim is bifurcated into the Secured Claim portion (treated in Class 3) and the unsecured Claim portion of the Sortis Claim, which unsecured Claim is treated in Class 7.

The Sortis Claim arises from the loan made by Sortis to Debtor on or about June 29, 2022, which was memorialized by the Sortis Loan Documents, including the following: The Loan Agreement dated June 29, 2022, by and between Debtor and LP Monroe Street LLC, a California limited liability company, as borrower, and Sorfi, LLC, as lender, for a loan in the principal amount of $8,675,000.00; the Deed of Trust dated June 29, 2022, by Debtor, as trustor, and Sorfi, LLC, as beneficiary, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20220013766; the Assignment of Deed of Trust dated June 29, 2022, by Sorfi, LLC and Sortis, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20220013767; the guaranty granted by Randolph Lamb in favor of Sortis; the UCC-1 Financing Statement filed with the California Secretary of State on June 29, 2022, by Sortis, as File No. U220206286023; the Acknowledgment and Consent to Transfer dated August 26, 2025, by Debtor, Sortis, Tahoe Railyard, and Randolph Lamb; and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

In full and final satisfaction of Debtor's obligation on account of the Allowed Sortis Secured Claim, The Landing Personal Property shall be transferred to Tahoe Railyard in accordance with Section 5.1.4 of the Plan and Sortis' first position Lien in The Landing Personal Property shall be preserved and unaltered upon such transfer. Sortis shall retain only the Lien rights against The Landing and The Landing Personal Property (and not against property in which the Estate or Debtor has an interest) arising under the Sortis Loan Documents after the transfer. For the avoidance of doubt, upon the transfer provided in Section 5.1.4 of the Plan being completed, Sortis shall not receive any payment from Debtor on account of the Allowed Sortis Secured Claim.

Class 3 is Impaired under the Plan and the Holder of the Allowed Class 3 Claim is entitled to vote on the Plan.

## F. Class 4 – Secured Tax Claims.

Class 4 consists of the Secured Tax Claims, which include any Secured Claims held by a governmental unit for unpaid Taxes. Debtor believes the Secured Tax Claims total approximately $960,365.92. The Holder(s) of the Secured Tax Claims have not yet filed Proofs of Claim in the Chapter 11 Case. In full and final satisfaction of such Allowed Claim, the Allowed Secured Tax Claims in Class 4 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 4 is Impaired under the Plan and the Holders of the Class 4 Secured Tax Claims are entitled to vote on the Plan.

## G. Class 5 – Priority Unsecured Claims.

Class 5 is comprised of the Allowed Priority Unsecured Claims, which include Allowed Claims accorded priority in right to payment under Section 507(a) of the Bankruptcy Code. Debtor is not aware of any Priority Unsecured Claims. However, should there be any Allowed Class 5 Claims, they shall be treated as follows:

(i) on the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded and the Allowed Priority Tax Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Priority Unsecured Claim on such date the lesser of: (i) their Pro Rata share of the Remaining Cash[13] on such date; and (ii) the outstanding, unpaid balance of their Allowed Priority Unsecured Claim.

(ii) within fifteen (15) days after all Disputed Claims having been resolved and all Allowed Priority Tax Claims being paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Priority Unsecured Claim the lesser of: (i) their Pro Rata[14] share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Priority Claims, plus interest at the Plan Interest Rate, which Distributions shall continue on the

---

[13] As set forth above, "Remaining Cash" is defined in the Plan as "the Cash held by the Reorganized Debtor excluding the Disputed Claim Reserve and the Operating Reserve."

[14] As set forth above, "Pro Rata" is defined in the Plan as the "ratio of an Allowed Claim or Allowed Equity Security in a particular class to the aggregate amount of all such Allowed Claims or Allowed Equity Securities in any such Class; except that for the treatment of Classes 5 and 6, Pro Rata shall refer to the ratio of Allowed Claim in Classes 5 and 6, collectively."

fifteenth (15) day after the end of each calendar quarter until all Allowed Class 5 Claims have been paid in full.

Class 5 is Impaired under the Plan and the Holders of the Class 5 Allowed Priority Unsecured Claims are entitled to vote on the Plan.

**H.      Class 6 – TDA Unsecured Claim, Class 7 – Sortis Unsecured Claim, and Class 8 – General Unsecured Claims.**

Class 6 is comprised of the Allowed TDA Unsecured Claim, if any.  While Debtor does not expect there to be a TDA Unsecured Claim as Debtor expects the proceeds of the Effectuating Transaction will be sufficient to repay the Allowed TDA Claim, out of an abundance of caution, Debtor has included the unsecured portion of the Allowed TDA Claim, if any, in Class 6.

Class 7 is comprised of the Allowed Sortis Unsecured Claim, if any.  The Sortis Unsecured Claim is equal to the amount by which the Sortis Claim exceeds the sum of the values of The Landing and The Landing Personal Property, if any, calculated as of the date of the Confirmation Hearing.  Sortis contends that the outstanding balance of the Sortis Claim as of the Petition Date is $14,173,941.30.  As of the Confirmation Hearing, Debtor expects that to the extent not disallowed, any Allowed Sortis Unsecured Claim will be a small fraction of the asserted Sortis Claim.

Class 8 is comprised of the Allowed General Unsecured Claims, which includes all Claims that are not secured by a Lien or other charge against or interest in property in which the Estate has an interest and is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) a Priority Unsecured Claim; (iv) the TDA Unsecure Claim; or (v) the Sortis Unsecured Claim. General Unsecured Claims shall include all Claims arising under Section 502(g) of the Bankruptcy Code.  As of the filing of this Disclosure Statement, the asserted General Unsecured Claims total approximately $6,625,601.

Because TDA has sued and obtained relief against the guarantor under the TDA Loan Documents, the TDA Unsecured Claim (to the extent one exists) is separately classified from the Class 8 General Unsecured Claims.  Similarly, because Sortis has additional collateral in the

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

14

form of The Landing owned by Tahoe Railyard and because Randolph Lamb has guaranteed repayment of the Sortis Claim, the Sortis Unsecured Claim (to the extent one exists) is also separately classified from the Class 8 General Unsecured Claims. However, as non-priority, unsecured claims, the Class 6, Class 7, and Class 8 Claims shall receive the same treatment under this Plan.

Except to the extent that a Holder of an Allowed Class 6, Class 7, or Class 8 Claim agrees to less favorable treatment, each Holder of an Allowed Class 6 TDA Unsecured Claim, Allowed Class 7 Sortis Unsecured Claim, and/or an Allowed Class 8 General Unsecured Claim, shall, in full and final satisfaction of such Allowed Claim, be restructured and treated as follows:

(i) On the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded and all Allowed Priority Tax Claims and Allowed Class 5 Priority Unsecured Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Class 6, Class 7, or Class 8 Claim on such date, the lesser of: (i) their Pro Rata share of the Remaining Cash on such date; and (ii) the outstanding, unpaid balance of their Allowed Claim.

(ii) Within fifteen (15) days after all Disputed Claims having been resolved and all Allowed Priority Tax Claims and Allowed Class 5 Priority Unsecured Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Class 6, Class 7 Claim, or Class 8 Claim on such date, the lesser of: (i) their Pro Rata share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Claims, plus interest at the Plan Interest Rate.

(iii) To the extent there are any remaining Allowed Class 6, Class 7, or Class 8 Claims after completion of the payments required in (i) and (ii) above, the Reorganized Debtor shall make Pro Rata Distributions of the Remaining Cash held as of the last day of each calendar quarter, which payments shall be made on the fifteenth (15) day after the end of each calendar quarter until all Allowed Class 6, Class 7, and Class 8 Claims have been paid in full at the Plan Interest Rate.

(iv) Prior to any Distribution being made on account of Class 9 Equity Securities, the Allowed Class 6 TDA Unsecured Claim, Allowed Class 7 Sortis Unsecured Claim, and all

Allowed Class 8 General Unsecured Claims shall have been paid in full with interest at the Plan Interest Rate.

Class 6, Class 7, and Class 8 are Impaired under the Plan and are therefore entitled to vote on the Plan.

I.      **Class 9 – Equity Securities.**

Class 9 is comprised of the Allowed Equity Securities in Debtor.  On the Effective Date, the Holders of Equity Securities of Debtor shall retain all of their legal interests, unless modified in accordance with the terms of a Restructuring Transaction effectuated pursuant to the terms of this Plan.  All Allowed Claims shall be paid in full prior to any Equity Securities receiving any payments from the Reorganized Debtor, whether by distribution or otherwise.

Class 9 Equity Securities are Impaired under the Plan and are therefore entitled to vote on the Plan.

**V.**
**SUMMARY OF VOTING PROCESS**

A.      **Who May Vote to Accept or Reject the Plan.**

Generally, holders of allowed claims or Equity Securities that are "Impaired" under a plan are permitted to vote on the plan.  A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor.  An equity security represents an ownership stake in a debtor, such as a membership interest.  In order to vote, a creditor must first have an allowed claim.

The solicitation of votes on the Plan will be sought only from those Holders of Allowed Claims whose Claims are Impaired and which will receive property or rights under the Plan.  As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

B.      **Summary of Voting Requirements.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one Impaired Class of Claims; this excludes the votes of insiders.  Because the Plan will not become effective until Debtor completes the Effectuating Transaction and therefore payments on Allowed Claims

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

are delayed, all Holders of Claims and Equity Securities have been deemed "Impaired" by Debtor and are entitled to vote on the Plan.

A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan. A class of equity securities has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity securities of the class actually voting cast votes in favor of a plan.

Debtor is soliciting votes from Holders of Allowed Claims and Equity Securities in the following Classes:

| Class | Description | Treatment |
|-------|-------------|-----------|
| Class 1 | Builders Capital Claim | Impaired; Solicitation required. |
| Class 2 | TDA Secured Claim | Impaired; Solicitation required. |
| Class 3 | Sortis Secured Claim | Impaired; Solicitation required. |
| Class 4 | Secured Tax Claims | Impaired; Solicitation required. |
| Class 5 | Priority Unsecured Claims | Impaired; Solicitation required. |
| Class 6 | TDA Unsecured Claim | Impaired; Solicitation required. |
| Class 7 | Sortis Unsecured Claim | Impaired; Solicitation required. |
| Class 8 | General Unsecured Claims | Impaired; Solicitation required. |
| Class 9 | Equity Securities | Impaired; Solicitation required. |

**A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS AND EQUITY SECURITIES WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. DEBTOR BELIEVES THAT THE TREATMENT OF CREDITORS AND EQUITY SECURITIES UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS AND EQUITY SECURITIES, AND THUS DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS AND EQUITY SECURITIES VOTE IN FAVOR OF THE PLAN.**

. . .

. . .

. . .

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

## VI.
## INFORMATION ABOUT DEBTOR'S ASSETS AND THE CHAPTER 11 CASE

As set forth above, Debtor owns the Properties described as Heritage Village and Creekside Village. Heritage Village is Debtor's property located in Truckee, Nevada County, California, and situated within the confines of four assessor's parcels identified as 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000, which contain a total land area of 7.93 acres. The site is proposed for the development of 108 condominium units over ground floor retail. Creekside Village is Debtor's property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel 019-421-014-000 with the working address of 11158 Church Street, Truckee, Nevada County, California, 96161. This property contains 5.44 acres of vacant land proposed for the development of 49 single-family homes and attached townhomes. Based on Debtor's 2023 and 2026 appraisals, the fair market value of the Properties exceeds $65 million.

Debtor also solely owns all of the outstanding stock in Tahoe Railyard. As set forth above, Tahoe Railyard owns The Landing, which is real property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel numbers 019-421-005-000 and 019-421-006-000, which contain a total land area of 2.15 acres. Sortis holds a first position Lien on The Landing. With Sortis' consent, pre-petition on August 27, 2025, The Landing was transferred to Tahoe Railyard's wholly-owned subsidiary, Tahoe Railyard, in exchange for Tahoe Railyard's assumption of the obligations arising under the Sortis Loan Documents.

The Chapter 11 Case was filed because Builders Capital scheduled a foreclosure sale on the Properties for August 27, 2025. The Chapter 11 Case was filed on the morning of August 27, 2025, to preserve the equity in Debtor's Properties, effectuate a reorganization, and pay Debtor's Allowed Claims.

Debtor has been a good actor in its Chapter 11 Case having timely filed its schedules and statements; completed its initial debtor interview; retained its lawyers, appraiser, and Brokers; the U.S. Trustee conducted and has concluded Debtor's 341 meeting of creditors; to resolve a

dispute, Debtor and Builders' Capital entered into a stipulation treating the Chapter 11 Case as a single asset real estate case; Debtor has timely filed its status reports and attended the status hearing; and Debtor timely filed its Plan.

As Builders Capital is the first-position lienholder, Debtor additionally negotiated BC Stipulation with Builders Capital. As more fully set forth in the BC Stipulation, the BC Stipulation provides the Brokers with a priming lien for up to $40,000 in reimbursable expenses, provides for the Brokers to receive a reduced fee in the event of a Credit Bid Transaction, and establishes certain milestones to effectuate a Sale or Restructuring Transaction. The BC Stipulation was approved by the Bankruptcy Court on January 13, 2026 [ECF No. 90] and is included as **Exhibit 3**.

The retention of the Brokers, which was approved on January 13, 2026 [ECF No. 89], and the BC Stipulation pave the way for Debtor to effectuate the Sale or Restructuring Transaction to enable Debtor to perform the Plan of Reorganization, repay all Allowed Claims in full and reorganize. The Brokers have prepared detailed marketing materials, completed initial emails blasts, and are actively marketing the Properties.

## VII.
## DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN

### A. Means of Implementation of the Plan.

As previewed above, Debtor will implement its Plan by completing an Effectuating Transaction, which shall be either the closing of a Sale Transaction or Restructuring Transaction.

On the Effective Date, Debtor shall be reorganized pursuant to the terms of the Plan and shall continue to exist as a separate entity in accordance with applicable law. The Reorganized Debtor shall be managed by Lamb Partners, LLC, Debtor's current manager. Debtor's existing articles of organization and operating agreement (as amended, supplemented, or modified) will continue in effect for the Reorganized Debtor following the Effective Date, except to the extent that such documents are amended in conformance with the Plan or by proper corporate action after the Effective Date. Such amendments shall include a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

Bankruptcy Code.

On the Effective Date, except for the Assets[15] that are transferred in accordance with the terms of an Effectuating Transaction (which shall exclude The Landing Personal Property), the Debtor's Assets shall be transferred to, and vest in, the Reorganized Debtor free and clear of all Liens, Claims, and Equity Securities.

On the first (1st) Business Day after the Effective Date, the Reorganized Debtor shall transfer The Landing Personal Property to Tahoe Railyard, which transfer shall preserve and shall not alter Sortis' first position Lien in The Landing Personal Property.

For the avoidance of doubt, the Plan is intended to effectuate the terms of the BC Stipulation through the closing of either a Sale Transaction or a Restructuring Transaction. To that end:

- On or before April 6, 2026, Debtor shall have entered into either (i) a binding asset purchase agreement for a Sale Transaction, or (ii) one or more binding agreements whereby Debtor will complete a Restructuring Transaction.

- If Debtor does not satisfy the condition above on or before April 6, 2026, then Debtor shall: (i) effectuate the Credit Bid Transaction for the Properties, or (ii) obtain an order of the Bankruptcy Court extending the April 6, 2026, deadline.

- On or before June 4, 2026, Debtor shall: (i) have closed a sale or refinance of 100% of the Properties in a manner consistent with the BC Stipulation; (ii) effectuated the Credit Bid Transaction for the Properties; or (iii) obtained an order of the Bankruptcy Court extending the June 4, 2026, deadline.

- In a Restructuring Transaction, the proceeds of the transaction shall be in an amount sufficient to pay the Brokers' compensation discussed above and all Allowed Secured Claims in full.

In furtherance of a Sale Transaction within the timelines contemplated in the BC Stipulation, the Brokers intend to seek offers in early March 2026, negotiate the offers in March,

---

[15] The term "Assets" is defined in the Plan as "all of the assets, property, interests, and effects, real and personal, tangible and intangible, wherever situated, of Debtor, as they exist on the Effective Date."

and produce the binding agreement required under the BC Stipulation by April 6, 2026. Unless the April 6, 2026 deadline is extended, Debtor anticipates filing its sale procedures motion in March/April 2026, with an action, if applicable, in May 2026.

Should the Effectuating Transaction not produce sufficient funds to pay all unsecured Creditors in full, the Plan provides that quarterly Distributions shall be made on account of all Allowed Class 6, Class 7, and Class 8 Claims until such Allowed Claims are paid in full with interest at the Plan Interest Rate. The quarterly Distributions will be comprised of all of Debtor's Cash in excess of the $100,000 Operating Reserve. These payments will be funded by equity contributions, loans, operating revenue, and/or distributions from Debtor's wholly-owned subsidiary, Tahoe Railyard. Tahoe Railyard intends to develop The Landing, which development will produce the revenue (either through contributions, loans, operating revenue and/or distributions) to allow the Reorganized Debtor to fund the quarterly Distributions to satisfy the Allowed Class 6, Class 7, and Class 8 Claims.

As stated above, in the event of a Credit Bid Transaction, Debtor shall effectuate the Credit Bid Transaction pursuant to Section 363 and in accordance with the BC Stipulation, which has been approved by an Order of the Bankruptcy Court, and the Effective Date will not occur. Should Debtor be required to pursue a Credit Bid Transaction under the terms of the BC Stipulation and associated Order, Debtor will present the Court and creditors with evidence of its marketing and sale process in connection with seeking the appropriate Section 363 relief. In the event of a Credit Bid Transaction, the Plan will be deemed withdrawn or of no further force and effect. For the avoidance of doubt, the Debtor's membership interest in Tahoe Railyard shall not be part of the Credit Bid Transaction with Builder's Capital.

After the Plan goes effective, the Reorganized Debtor shall file with the Bankruptcy Court and serve upon all Creditors and potential Holders of Administrative Claims reasonably known to Debtor (whether or not disputed), a Notice of Effective Date of Plan, which shall include a notice of the Administrative Claim Bar Date. Additionally, on or before the fifteenth (15th) day after all of the Effective Date Distributions required by Sections 2 through 4 of the Plan have been tendered and all contested matters have been resolved, Reorganized Debtor shall

file a motion to close the Chapter 11 Case. Prior to the hearing on the motion seeking to close the Chapter 11 Case, Debtor's final report shall be filed.

As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of Debtor or Reorganized Debtor, as applicable, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or managers of Debtor or Reorganized Debtor. Additionally, to the extent required by the California Corporations Code, on or as soon as reasonably practicable after the Effective Date, a certified copy of the Plan and the Confirmation Order shall be filed with the California Secretary of State. From the Confirmation Date until the Effective Date, Debtor is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to applicable California law.

**B.** **Executory Contracts and Leases.**

    **1.** **Executory Contracts.**

Except for Executory Contracts and Unexpired Leases assumed pursuant to prior order of the Bankruptcy Court or set forth on the schedule of Assumed Executory Contracts and Unexpired Leases attached as Schedule 6.1 to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed rejected by Debtor on the Effective Date

    **2.** **Approval of Assumption or Rejection.**

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Bankruptcy Code Section 365, of the rejection by Debtor of each Executory Contract and Unexpired Lease to which Debtor is a party that is not listed on Schedule 6.1, not otherwise provided for in the Plan, and neither assigned, assumed and assigned, nor rejected by separate order of the Bankruptcy Court prior to the Effective Date; and (ii) rejection by Debtor of each

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

Executory Contract and Unexpired Lease to which Debtor is a party that is not listed on Plan Schedule 6.1. Upon the Effective Date, each counterparty to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to an assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption. To the extent applicable, all Executory Contracts or Unexpired Leases of Debtor assumed pursuant to Article 6 of the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," regardless of how such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by confirmation of the Plan.

### 3. Cure of Defaults.

Debtor shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to Section 6.1 of the Plan upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by Debtor, and after the Effective Date, Debtor; or (iii) the fourteenth (14th) Business Day after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment, or the Cure of a particular Executory Contract or an Unexpired Lease.

### 4. Objection to Cure Amounts.

Any party to an Executory Contract or Unexpired Lease who objects to the Cure amount determined by Debtor to be due and owing must file and serve an objection on Debtor's counsel no later than thirty (30) days after the Effective Date. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts paid by Debtor in accordance with Section 6.3 of the Plan. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption,

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

23

the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

### 5. Confirmation Order.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Article 6 of the Plan pursuant to Sections 1123 and 365 of the Bankruptcy Code as of the Effective Date. Notwithstanding the forgoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease, the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by Debtor.

### 6. Rejection Damages Claim Bar Date.

All proofs of claim with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be filed no later than the end of the first Business Day occurring on or after the fifteenth (15th) calendar day after the Effective Date. Any Claim not filed within such time shall be forever barred.

### C. Conditions to Confirmation and Effectiveness of the Plan.

Confirmation of the Plan is conditional upon the Confirmation Order being entered in form and substance reasonably acceptable to Debtor. The following are the conditions precedent to the occurrence of the Effective Date of the Plan:

- The Confirmation Order shall be a Final Order, except that Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order;

- No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal;

- All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonable acceptable to Debtor; and

- Debtor shall have obtained all required orders of the Bankruptcy Court, finalized

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

24

and executed all necessary documents, and taken all other required actions to close a Restructuring Transaction or a Sale Transaction on the Effective Date.

Debtor may waive any and all of the other conditions to effectiveness set forth in the Plan and without leave or order of the Bankruptcy Court and without any formal action; provided, however, in the event of a Credit Bid Transaction, the Effective Date will not occur.

**D.    Title to Property.**

Subject to the provisions of the Plan and as permitted by Section 1123(a)(5)(B) of the Bankruptcy Code, on the Effective Date, except to the extent certain Assets are transferred in accordance with the terms of an Effectuating Transaction, the Debtor's Assets shall be transferred to, and vest in, Reorganized Debtor free and clear of all Liens and Claims.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any Claim without the supervision of or approval of the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided herein, all Avoidance Actions and Litigation Claims shall be transferred to, and vested in, the Reorganized Debtor.  The Reorganized Debtor shall have the exclusive right to sue on, settle, or compromise any and all Avoidance Actions and Litigation Claims.  The Litigation Claims are identified on <u>Schedule 1.1.58</u> of the Plan.  As set forth above, in the event of a Credit Bid Transaction, the Plan will not go effective and the Avoidance Actions and the Litigation Claims will remain property of the Estate.

**E.    Discharge, Injunction, and Exculpation.**

It is important that all parties-in-interest closely review the Plan's discharge injunction and exculpation provisions.  Accordingly, they are set forth below verbatim.

- **Discharge.  On the Effective Date, unless otherwise expressly provided in the Plan and the Confirmation Order, Debtor shall be discharged from any and all Claims to the fullest extent provided in the Bankruptcy Code, including Sections 524 and 1141.  All**

consideration distributed under the Plan or the Confirmation Order shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of all Claims of any kind or nature whatsoever against Debtor or any of its Assets or properties, and regardless of whether any property shall have been distributed, transferred, or retained pursuant to the Plan on account of such Claims. Except as otherwise expressly provided by the Plan and the Confirmation Order, upon the Effective Date, Debtor shall be deemed discharged and released under and to the fullest extent provided under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code. Nothing herein shall be construed as effectuating a release of any Allowed Administrative Claims.

- **Compromise and Settlement.** The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of Debtor, its Estate, and all Holders of Claims and Equity Securities, (ii) fair, equitable and reasonable, (iii) made in good faith, and (iv) approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

- **Injunction.** From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim or Equity Security or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such Claims or terminated Equity Securities or rights: (i) commencing or continuing in any manner any action or other proceeding against Debtor, Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Debtor, Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any Lien or encumbrance against Debtor, Reorganized Debtor, or their

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

26

respective property; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to Debtor, the Reorganized Debtor, or their respective property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

- **Exculpation.** From and after the Effective Date, neither Debtor, Reorganized Debtor, their respective professionals, nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys, or agents, shall have or incur any liability, including derivative claims, but excluding direct claims, to any Holder of a Claim or Equity Security or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act in connection with causing Debtor to act in its Chapter 11 Case from the Petition Date through the Effective Date, including the pursuit of confirmation of the Plan or any prior plan or the substantial consummation of the Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of Debtor's counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.

- **Preservation of Litigation Claims.** Nothing in the discharge, injunction, or exculpation provisions shall release, impair, or enjoin the prosecution of any Litigation Claims preserved by the Plan, whether or not listed on <u>Schedule 1.1.58</u>, which shall solely vest in the Reorganized Debtor on the Effective Date.

**VIII.**
**<u>RISK FACTORS</u>**

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan and the transactions contemplated by the Plan involve the following limitations and risks, which should be taken into consideration.

A. **<u>Debtor Has No Duty to Update.</u>** The statements in this Disclosure Statement are made by Debtor as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

27

information set forth herein since that date. Debtor has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

**B.**      **Information Presented Is Based on Debtor's Books and Records and Is Unaudited.** While Debtor has endeavored to present information fairly in this Disclosure Statement, there is no assurance that Debtor's books and records upon which this Disclosure Statement is based are complete and accurate. Certain of the financial information contained herein has not been audited or reviewed.

**C.**      **Projections and Other Forward-Looking Statements Are Not Assured and Actual Results Will Vary.** Certain information in this Disclosure Statement is forward-looking and contains estimates and assumptions that might ultimately prove to be incorrect, and projections that may differ materially from actual future results. Debtor believes that the projections of future performance upon which the treatments under the Plan are based are reasonable and fairly represent the future performance of Debtor's business. However, there are uncertainties associated with all assumptions, projections, and estimates, and they should not be considered assurances or guarantees of the amount of funds that will be distributed or the amount of Claims in the various Classes that will be allowed.

**D.**      **Risk of Non-Performance by Tahoe Railyard.**

In the event that the Effectuating Transaction is insufficient to pay all Allowed Claims in full and subsequent Distributions must be funded through contributions, loans, operating revenue, and/or distributions from Tahoe Railyard's development of The Landing, the following additional risks are disclosed: (i) The Landing is the sole asset of Tahoe Railyard and does not currently generate any revenue, and is unlikely to generate revenue for 30-36 months, as it is a parcel of real property currently in its early stages of development; (ii) for a variety of reasons arising from this early stage of development, subject to receiving timely government permitting and approvals regarding its development, changes to and turmoil in the credit and equity markets, and other unforeseeable development related risks, there is risk that Tahoe Railyard may be unable to generate sufficient revenue to fund sufficient payments to retire Allowed Class 6, Class 7, and Class 8 Claims; (iii) there is risk that Tahoe Railyard may seek bankruptcy

protection, thereby impairing the Debtor's ability to fund sufficient payments to retire Allowed Class 6, Class 7, and Class 8 Claims; (iv) unexpected delays in development of The Landing may prolong or hinder Debtor's ability to make the Distributions; (v) there are not any agreements guaranteeing specific distributions by Tahoe Railyard to equity (i.e., the Debtor); and (vi) Tahoe Railyard has not agreed to grant new security interests or priority in payment to Debtor's existing creditors.

**E.** **No Legal or Tax Advice Is Provided to You by This Disclosure Statement.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Creditor should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning any Claim.

**F.** **No Admissions Made.** Nothing contained herein shall constitute an admission of any fact or liability by Debtor or any other party nor shall it be deemed evidence of the tax or other legal effects of the Plan on Debtor or on Holders of Claims.

**G.** **No Waiver of Right to Object or Right to Recover Transfers and Estate Assets.** Unless specifically provided in the Plan, a Creditor's vote for or against the Plan does not constitute a waiver or release of any claims or rights of Debtor (or any other party-in-interest) to object to that Creditor's Claim, or recover any preferential, fraudulent, or other voidable transfer of Estate assets, regardless of whether any claims or cause of action of Debtor or the Estate are specifically or generally identified herein.

**H.** **Confirmation of the Plan Is Not Assured.** Although Debtor believes the Plan will satisfy all requirements for Confirmation, the Bankruptcy Court might not reach that conclusion. It is also possible that modifications to the Plan will be required for Confirmation and that such modifications would necessitate a resolicitation of votes. Confirmation requires, among other things, a finding by the Bankruptcy Court that it is not likely that there will be a need for further financial reorganization and that the value of distributions to dissenting members of Impaired Classes of Creditors would not be less than the value of distributions such Creditors would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code ("Chapter 7"). Although Debtor believes that the Plan will not be followed by a need for further financial

reorganization and that dissenting members of Impaired Classes of Creditors will receive Distributions at least as great as they would receive in a liquidation under Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests have been met.

**I.** **The Effective Date or Substantial Consummation Date Might Be Delayed or Never Occur.** There is no certainty that the Effective Date will occur within the thirty (30) days required under the Plan. If the conditions precedent to the Effective Date do not occur, the Confirmation Order will be vacated. In that event, the Holders of Claims and Equity Securities would be restored to their respective positions as of the day immediately preceding the Confirmation Date, and Debtor's obligations for Claims would remain unchanged as of such day (except to the extent of any post-Effective Date payments).

**J.** **The Projected Value of Estate Assets Might Not Be Realized.** Debtor has projected the value of the Estate's Assets that would be available for payment of expenses and Distributions to Holders of Allowed Claims as set forth in the Plan. Debtor's projected value may not be realized.

**K.** **Allowed Claims in Various Classes May Exceed Projections.** Debtor has also projected the amount of Allowed Claims in each Class. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

**L.** **No Representations Outside of this Disclosure Statement Are Authorized.** No representations concerning or related to Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**IX.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCE**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to Debtor and certain Holders of Claims. The following

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

summary does not address the U.S. federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan. The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Department of the Treasury ("Treasury") regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof and all of which are subject to change. Changes in such rules or new interpretations thereof may have a retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties due to the lack of definitive judicial and administrative authority in a number of areas. No assurance can be given that legislative or administrative changes or court decisions will not be forthcoming which would require significant modification of the statements in this section. Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any tax aspects of the Plan. Therefore, no assurance can be given as to the position the IRS will take on the tax consequences of the transactions that are to occur in connection with the Plan.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to the particular circumstances of any Holder or to Holders subject to special income tax rules (such as regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, tax-exempt organizations (including pension funds), persons holding a Claim as part of an integrated constructive sale or straddle or part of a conversion transaction, and investors in pass-through entities). In addition, the summary does not include a summary of the consequences to Holders of Claims who are not "U.S. Persons" (as defined in the IRC) or who are tax-exempt Holders. However, there may be some potentially significant consequences to non-U.S. Persons which are not discussed below, and such non-U.S. Persons are encouraged to carefully consider their particular tax consequences with their own tax advisers.

This discussion assumes that the various debt and other arrangements to which each Debtor is a party will be respected for federal income tax purposes in accordance with their form. This discussion is a general summary of certain U.S. federal income tax aspects of the Plan and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.

**EACH HOLDER OF A CLAIM OR EQUITY SECURITY AFFECTED BY THE PLAN SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR EQUITY SECURITIES, INCLUDING UNDER ANY APPLICABLE STATE, LOCAL, OR FOREIGN LAW.**

**HOLDERS OF CLAIMS OR EQUITY SECURITIES ARE HEREBY NOTIFIED THAT: (i) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY SECURITIES FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (ii) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY SECURITIES SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**X.**
**CONFIRMATION OF THE PLAN**

A.      **Confirmation of the Plan.**

Pursuant to Section 1128(a), the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the U.S. Bankruptcy Court, Sacramento Division, 501 I Street, Sacramento, CA 95814, Courtroom 32, 6th Floor, **on June 30, 2026, at 11:00 a.m. prevailing Pacific Time**, which may be attended in person or by video or telephone as determined by the

Bankruptcy Court's rules. To the extent necessary, the Bankruptcy Court will schedule additional hearing dates.

**B.     Objections to Confirmation of the Plan.**

Section 1128(b) provides that any party-in-interest may object to confirmation of a plan. Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be timely filed with the Bankruptcy Court and served upon counsel for Debtor at the following address:

> **Garman Turner Gordon LLP**
> Attn: William M. Noall, Esq.
> Attn: Talitha Gray Kozlowski, Esq.
> 7251 Amigo St, Suite 210
> Las Vegas, NV  89119
> Tel:     (725) 777-3000
> Email:  wnoall@gtg.legal
>               tgray@gtg.legal

For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section 1129. In this regard, the Plan must satisfy, among other things, the following requirements.

**1.     Best interest of Creditors and liquidation analysis.**

Pursuant to Section 1129(a)(7), for the Plan to be confirmed it must provide that Creditors and Holders of Equity Securities will receive at least as much under the Plan as they would receive in a liquidation of Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each Holder of an Allowed Claim or Equity Security of such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under the Plan by the Holders of Allowed Claims in each Class of Creditors or Equity Securities equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7 of the Bankruptcy Code. Debtor believes that the Plan meets the Best Interest Test and provides

value which is not less than that which would be recovered by each such holder in a Chapter 7 bankruptcy proceeding.

Generally, to determine what Holders of Allowed Claims and Equity Securities in each impaired Class would receive if Debtor were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of Debtor's Assets in the context of a Chapter 7 liquidation case, which for unsecured Creditors would consist of the proceeds resulting from the disposition of the Assets of Debtor, including the unencumbered Cash held by Debtor at the time of the commencement of the liquidation case. Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Priority Unsecured Claims as may result from the use of Chapter 7 for the purpose of liquidation.

In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based on the liquidation of the non-exempt assets of Debtor. Such assets would include the same assets being treated under the Plan. However, the net proceeds from the collection of property of the Estate available for distribution to Creditors would be reduced by any commission payable to the Chapter 7 Trustee and the Trustee's attorney's and accounting fees, as well as the administrative costs of the Chapter 11 estate (such as the compensation for Chapter 11 professionals).

In a Chapter 7 case, the Chapter 7 Trustee would be entitled to seek a sliding scale commission based upon the funds distributed to creditors. Accordingly, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by Debtor because the Chapter 7 Trustee would be entitled to receive a commission in some amount for all funds distributed from the Estate and would incur the costs of retaining new professionals that would need to "get up to speed" to have the necessary knowledge base to complete the liquidation of Estate Assets and distributions to Holders of Allowed Claims and Equity Securities.

It is further anticipated that a Chapter 7 liquidation would result in significant delay in the payment to Holders of Allowed Claims. Among other things, a Chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Chapter 11 Case to Chapter 7. Hence, a Chapter 7 liquidation would not only delay distribution but also raises the prospect of additional claims that were not asserted in the Chapter

11 Case. Moreover, Claims that may arise in the Chapter 7 case or result from the Chapter 11 Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-Chapter 11 unsecured Claims.

The distributions from the Assets would be paid pro rata according to the amount of the aggregate Allowed Claims. Debtor believes that the most likely outcome under Chapter 7 would be the application of the "absolute priority rule." Under that rule, no junior creditor may receive any distribution until all senior creditors are paid in full, with interest, and no Equity Security Holder may receive any Distribution until all Allowed Claims are paid in full.

As set forth in the Liquidation Analysis[16] and accompanying notes annexed hereto as **Exhibit "2**,**"** in the event of conversion to Chapter 7, it is unlikely there will be any distribution to any Creditors other than Builders Capital. Thus, Debtor has determined that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class (other than Class 9, which has consented to its effective voluntary subordination) with no less of a recovery than they would receive if Debtor were liquidated under Chapter 7.

### 2.      Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of Debtor (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find by a preponderance of the evidence that Debtor will possess the resources and working capital necessary to meet its obligations under the Plan.

Because the value of the Properties exceeds $65 million, at the Confirmation Hearing, Debtor expects that it will be able to submit not only the valuation information, but also the efforts the Brokers have made to ensure the consummation of an Effectuating Transaction to demonstrate the feasibility of the Plan.

### 3.      Accepting impaired class.

---

[16] The Liquidation Analysis sets forth Debtor's best estimates as to value and recoveries in the event that the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code and Debtor's Assets are liquidated.

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

Since various Classes of Claims are impaired under the Plan, for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims (not including the votes of insiders of Debtor).

**4.      Acceptance of Plan.**

For an impaired Class of Claims to accept the Plan, those representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

**5.      Confirmation over a dissenting Class ("Cram Down").**

If there is less than unanimous acceptance of the Plan by Impaired Classes of Claims, the Bankruptcy Court nevertheless may confirm the Plan at Debtor's request. Section 1129(b) provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that (i) the Plan does not discriminate unfairly; and (ii) the Plan is fair and equitable with respect to the rejecting Class(es) of Claims or Equity Securities impaired under the Plan, the Bankruptcy Court may confirm the Plan despite the rejection of the Plan by a dissenting impaired Class of Claims or Equity Securities.

Debtor will request confirmation of the Plan pursuant to Section 1129(b) with respect to any Impaired Class of Claims that does not vote to accept the Plan. Debtor believes that the Plan satisfies all of the statutory requirements for Confirmation, that Debtor has complied with or will have complied with all the statutory requirements for Confirmation of the Plan, and that the Plan is proposed in good faith. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

**6.      Allowed Claims.**

You have an Allowed Claim if: (i) you or your representative timely file a Proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely filed a Proof of Claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and Allowed your Claim; (iii) your Claim is listed by Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no

objection has been filed to your Claim; or (iv) your Claim is listed by Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to Allow your Claim.

Under the Plan, the deadline for filing objections to Claims is thirty (30) days after the Effective Date. If your Claim is not an Allowed Claim, it is a Disputed Claim, and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018. If you are uncertain as to the status of your Claim or Equity Securities or if you have a dispute with Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of Debtor, and you should seek appropriate legal advice. Debtor and his professionals cannot advise you about such matters.

**7.      Impaired Claims and Equity Securities.**

Impaired Claims and Equity Securities include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Holder of the Claim or Equity Securities, or if the full amount of the Allowed Claims will not be paid under the Plan. Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan pursuant to Section 1126(f), and Debtor need not solicit the acceptances of the Plan of such Unimpaired Claims. Because of the delay in payment, all Classes are treated as Impaired under the Plan and therefore are entitled to vote on the Plan.

**8.      Voting procedures.**

**a.      Submission of ballots.**

All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a copy of this approved Disclosure Statement, and a copy of the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that was sent with this Disclosure Statement. The deadline for submitting your Ballot is stated on the Ballot. You should complete your Ballot and return it as follows:

Garman Turner Gordon LLP
Attn: Talitha Gray Kozlowski, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV  89119

(725) 777-3000 Telephone
Email: tgray@gtg.legal

b. **Incomplete ballots.**

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote to accept the Plan.

c. **Withdrawal of ballots.**

A Ballot may not be withdrawn or changed after it is cast unless authorized in writing by Debtor or the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

d. **Questions and lost or damaged ballots.**

If you have any questions concerning these voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Debtor's counsel as listed above regarding the submission of Ballots.

e. **2004 examinations.**

Nothing in the Disclosure Statement or the Plan alters the Creditors' rights to seek discovery in accordance with Bankruptcy Rule 2004.

f. **All Creditors' Rights Reserved.**

Nothing in this Disclosure Statement or the Court's initial approval of the Disclosure Statement under 11 U.S.C. § 1125 alters or impairs the rights of creditors to object to confirmation of the Plan on any basis, to seek discovery in connection with confirmation of the Plan, or waives, alters, or releases any creditors' rights under applicable law or the Bankruptcy Code.

**XI.**
**ALTERNATIVES TO THE PLAN**

Debtor believes that the Plan provides Creditors with the best and most complete form of recovery available. As a result, Debtor believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Case. Debtor believes not only that the Plan,

as described herein, fairly adjusts the rights of various Classes of Claims and Equity Securities and enables them to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims and Equity Securities of the various Classes will not result in a better recovery for any Class.

It is anticipated that confirmation of the Plan will only be denied if Debtor fails to consummate an Effectuating Transaction. In such case, under the BC Stipulation, the most likely outcome is the Credit Bid Transaction, whereby Builders Capital will tender a credit bid to acquire the Properties. Under this scenario, it is not anticipated that there will be any Distribution to unsecured Creditors and the Estate will be administratively insolvent. In stark contrast, if the Plan is confirmed and the Effectuating Transaction effectuated, it is expected that all Allowed Claims will be paid in full. ***Thus, all Impaired Classes are strongly encouraged to vote in favor of the Plan and support Debtor's efforts at consummating an Effectuating Transaction.***

## XII.
## RECOMMENDATION AND CONCLUSION

The Plan provides the best possible recovery for all Creditors as a whole, and therefore Debtor recommends that all Creditors who are entitled to vote on the Plan, vote to accept the Plan.

DATED: March 10, 2026.

DEBTOR: TRY TROUT AND INDUSTRIAL, LLC


*/s/ Randolph F. Lamb*
By: Manager, Lamb Partners, LLC
By: Randolph F. Lamb,
Manager of Lamb Partners, LLC

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

**Prepared and Submitted:**

GARMAN TURNER GORDON LP


By: */s/ Talitha Gray kozlowski*
    WILLIAM M. NOALL, ESQ.
    TALITHA GRAY KOZLOWSKI, ESQ.
    2751 Amigo Street, Suite 210
    Las Vegas, Nevada 89119
    *Attorneys for Debtor*

**APPENDIX**

EXHIBIT "1"        DEBTOR'S PLAN OF REORGANIZATION

EXHIBIT "2"        LIQUIDATION ANALYSIS

EXHIBIT "3"        BC STIPULATION

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

41

# EXHIBIT 1

# EXHIBIT 1

**35 PAGES**
GARMAN TURNER GORDON LLP
WILLIAM M. NOALL, ESQ. (CA Bar No. 122244)
Email: wnoall@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ. (NV Bar No. 9040)
(*Admitted Pro Hac Vice*)
Email: tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
Fax: 725.777.3112
*Attorneys for Debtor in Possession*
*Try Trout and Industrial, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | CASE No. 25-24548-B-1 |
| TRY TROUT AND INDUSTRIAL, LLC, a California limited liability company, | DCN: GTG-6 |
| Debtor in Possession. | Chapter 11 |
| | Judge: Hon. Christopher D. Jamie |
| | Place: Courtroom 32, 6th Floor Sacramento Division 501 I Street Sacramento, CA 95814 |

**<u>DEBTOR'S AMENDED PLAN OF REORGANIZATION</u>**

# TABLE OF CONTENTS

1.  DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME ...................................................................................................... 1

    1.1. Definitions. ............................................................................................ 1

2.  TREATMENT OF UNCLASSIFIED CLAIMS ............................................. 12

    2.1. General............................................................................................... 12

    2.2. Treatment of Administrative Claims. .............................................. 12

    2.3. Treatment of Priority Tax Claims.................................................... 12

    2.4. Requests for Payment. ...................................................................... 13

3.  DESIGNATION OF CLASSES OF CLAIMS AND EQUITY SECURITIES ............ 13

    3.1. Determination of Claims and Equity Securities Within Classes. .............................. 13

    3.2. Summary of Classification. ................................................................. 13

4.  TREATMENT OF CLASSES OF CLAIMS UNDER THIS PLAN ............................ 14

    4.1. Class 1 – Builders Capital Claim...................................................... 14

    4.2. Class 2 – TDA Secured Claim.......................................................... 14

    4.3. Class 3 – Sortis Secured Claim.. ...................................................... 14

    4.4. Class 4 – Secured Tax Claims. ......................................................... 14

    4.5. Class 5 – Priority Unsecured Claims................................................ 14

    4.6. Class 6 – TDA Unsecured Claim. ..................................................... 15

    4.7. Class 9 – Equity Securities. ............................................................... 16

5.  MEANS FOR IMPLEMENTATION OF PLAN.............................................. 16

    5.1. Plan Implementation Occurring on the Effective Date. ............................. 16

    5.2. No Corporate Or Governance Action Required. ...................................... 17

    5.3. Filing with California Secretary of State............................................. 17

6.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................... 18

    6.1. Executory Contracts.. ....................................................................... 18

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

i

| | | |
|---|---|---|
| 6.2. | Approval of Assumption or Rejection. | 18 |
| 6.3. | Cure of Defaults. | 18 |
| 6.4. | Objection to Cure Amounts. | 18 |
| 6.5. | Confirmation Order | 19 |
| 6.6. | Rejection Damages Claim Bar Date. | 19 |

**7. MANNER OF DISTRIBUTION OF PROPERTY UNDER THIS PLAN ................... 19**

| | | |
|---|---|---|
| 7.1. | Distributions. | 19 |
| 7.2. | Reserve. | 19 |
| 7.3. | Statements. | 19 |
| 7.4. | Further Authorization. | 19 |

**8. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ................................................................................................................. 19**

| | | |
|---|---|---|
| 8.1. | Conditions to Confirmation. | 19 |
| 8.2. | Conditions to Effectiveness | 19 |
| 8.3. | Waiver of Conditions. | 20 |

**9. TITLE TO PROPERTY; DISCHARGE; INJUNCTION ........................................ 20**

| | | |
|---|---|---|
| 9.1. | Vesting of the Assets | 20 |
| 9.2. | Preservation of Litigation Claims. | 20 |
| 9.3. | Discharge. | 20 |
| 9.4. | Compromise and Settlement. | 21 |
| 9.5. | Injunction. | 21 |
| 9.6. | Exculpation. | 21 |
| 9.7. | Preservation of Litigation Claims. | 21 |

**10. RETENTION OF JURISDICTION ....................................................................... 21**

| | | |
|---|---|---|
| 10.1. | Jurisdiction. | 21 |
| 10.2. | No Waiver. | 23 |

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

**11. MODIFICATION AND AMENDMENT OF PLAN** ...................................................... **23**

    11.1.    Modification and Amendment. ................................................................. 23

**12. MISCELLANEOUS** ............................................................................................... **23**

    12.1.    Objections to Claims and Disallowed Claims. ........................................ 23

    12.2.    Disputed Claims Reserve ........................................................................ 24

    12.3.    Effectuating Documents; Further Transactions; Timing. ......................... 24

    12.4.    Exemption from Transfer Taxes. ............................................................. 24

    12.5.    Revocation or Withdrawal of this Plan. ................................................... 25

    12.6.    Binding Effect. ....................................................................................... 25

    12.7.    Governing Law. ...................................................................................... 25

    12.8.    Modification of Payment Terms. ............................................................. 25

    12.9.    Delivery of Distributions; Undeliverable Distributions.. .......................... 25

    12.10.    Set Offs. ................................................................................................ 26

    12.11.    Notices. ................................................................................................. 26

    12.12.    Severability.. .......................................................................................... 27

    12.13.    Withholding and Reporting Requirements.. ............................................. 27

    12.14.    Post-Confirmation Reporting.. ................................................................ 27

    12.15.    Cramdown. ............................................................................................ 28

    12.16.    Quarterly Fees. ...................................................................................... 28

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

Try Trout and Industrial, LLC, debtor in possession (the "<u>Debtor</u>"), proposes this plan of reorganization (the "<u>Plan</u>") for the resolution of Debtor's outstanding Claims and Equity Securities (as these terms are defined herein). All Creditors, Equity Security Holders (as both terms are defined herein), and other parties-in-interest should refer to the Disclosure Statement (as this term is defined herein) for a discussion of Debtor's history, assets, historical financial data, and for a summary and analysis of this Plan and certain related matters. All Holders of Claims against the Debtor and Debtor's Equity Security Holders are encouraged to read this Plan, the Disclosure Statement, and the related solicitation materials in their entirety before voting to accept or reject this Plan.

Subject to the restrictions on modifications set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in <u>Article 11</u> to this Plan, Debtor expressly reserves the right to alter, amend, strike, withdraw, or modify this Plan one or more times before its substantial consummation.

## 1. DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**1.1.     Definitions.** For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this <u>Article 1</u>. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, in that order of priority. Whenever the context requires, such terms shall include the plural as well as the singular, the masculine gender shall include the feminine, and the feminine gender shall include the masculine. As used in this Plan, the following terms in bold have the meanings set for the below.

**1.1.1. Administrative Claim.** A Claim for any cost or expense of administration of the Chapter 11 Case allowed under Sections 503(b) or 507(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (ii) all Taxes arising between the Petition Date and the Effective Date, including those Taxes for which returns are not yet due; and (iii) all Professional Fees approved by the Bankruptcy Court pursuant to interim and final allowances. To the extent that a Claim is allowed pursuant to Sections 365(d)(3) and (d)(5) of the Bankruptcy Code, such Claim shall also be deemed an "<u>Administrative Claim</u>" under this paragraph.

**1.1.2.     Administrative Claim Bar Date.** Unless an alternate date is set by Final Order of the Bankruptcy Court, the first Business Day occurring on or after the fifteenth (15th) day after the Effective Date.

**1.1.3.     Affiliate.** This term has the meaning set forth in Section 101(2) of the Bankruptcy Code.

**1.1.4.     Allowed Administrative Claim.** An Administrative Claim as to which no objection has been filed or, if an objection has been filed, has been resolved by the allowance of such Administrative Claim by a Final Order of the Bankruptcy Court; or which requires payment in the ordinary course and as to which there is no Final Order of the Bankruptcy Court in effect which prohibits any such payment.

**1.1.5. Allowed Claim.** A Claim or any portion thereof that is not a Disputed Claim: (i) that is allowed pursuant: (w) to this Plan or Final Order of the Bankruptcy Court, (x) to any stipulation executed prior to the Confirmation Date and approved by the Bankruptcy Court, (y) to any stipulation with Debtor executed on or after the Confirmation Date and approved by the Bankruptcy Court, or (z) to any contract, instrument, or other agreement entered into or assumed in connection herewith; (ii) proof of which, requests for payment of which, or application for allowance of which, was filed or deemed to be filed on or before the Bar Date for filing proofs of Claim or requests for payment of Claims of such type against Debtor; or (iii) if no proof of Claim is filed, which has been or hereafter is listed by Debtor in the Schedules as liquidated in amount and not disputed or contingent; and in the case of (ii) or (iii), no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or the Bankruptcy Court has entered a Final Order Allowing all or a portion of such Claim.

**1.1.6. Allowed Equity Security.** An Equity Security as of the Record Date that: (i) is allowed pursuant to this Plan; (ii) is not disputed by Debtor; or (iii) if a Disputed Equity Security, which Equity Security has been allowed in whole or in part by Final Order of the Bankruptcy Court.

**1.1.7. Assets.** All of the assets, property, interests, and effects, real and personal, tangible and intangible, wherever situated, of Debtor, as they exist on the Effective Date.

**1.1.8. Avoidance Actions.** All avoidance, recovery, subordination, and other similar state and federal actions and causes of action preserved for the Estate under the Bankruptcy Code, including but not limited to those set forth in Sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, regardless of whether or not such action has been commenced prior to the Effective Date.

**1.1.9. Ballot.** The form of ballot or ballots that will be distributed with the Disclosure Statement to Holders of Claims entitled to vote under this Plan in connection with the solicitation of acceptances of this Plan.

**1.1.10. Bankruptcy Code.** The Bankruptcy Reform Act of 1978, Title 11, United States Code, as applicable to the Chapter 11 Case, as now in effect or hereafter amended, 11 U.S.C. §§ 101, *et seq.*

**1.1.11. Bankruptcy Court.** The United States Bankruptcy Court for the Eastern District of California, Sacramento Division, having jurisdiction over the Chapter 11 Case and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Orders of the United States District Court for the Eastern District of California, pursuant to 28 U.S.C. § 151.

**1.1.12. Bankruptcy Rules.** Collectively, the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court as applicable to the Chapter 11 Case, as now in effect or hereinafter amended.

**1.1.13. Bar Date.** The date or dates established by the Bankruptcy Court, the Bankruptcy Code, and/or the Bankruptcy Rules for the filing of proofs of Claim for all Creditors,

excepting therefrom, Administrative Claims. The deadline to file a non-governmental Proof of Claim asserting a pre-petition Claim was December 31, 2025.

    **1.1.14. BC Stipulation.** The *Stipulation and Order Regarding Payment of Allowed Contractual Compensation and Reimbursement of Expenses of Certain Court Appointed Real Estate Brokers* between Debtor and Builders Capital, which stipulation was approved by entry of an order of the Bankruptcy Court on January 13, 2026, at ECF No. 90.

    **1.1.15. Brokers.** Together, Keen-Summit Capital Partners LLC and Berkadia Real Estate Advisors Inc.

    **1.1.16. Broker Agreement.** The Retention Agreement by and between Debtor and the Brokers, which was approved by entry of an order of the Bankruptcy Court on January 13, 2026, at ECF No. 89.

    **1.1.17. Broker Compensation.** The fees and reimbursement of expenses due and payable to the Brokers pursuant to the terms of Sections III and IV of the Broker Agreement.

    **1.1.18. Builders Capital.** Builders Capital Finance, LLC, the assignee of Construction Loan Services II, LLC.

    **1.1.19. Builders Capital Claim.** The Secured Claim held by Builders Capital pursuant to the Builders Capital Loan Documents, which pursuant to the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA, is secured by a first priority Lien on the Properties and the Heritage and Creekside Personal Property .

    **1.1.20. Builders Capital Loan Documents.** The Loan Agreement dated September 21, 2023, by and between Debtor, as borrower, and Construction Loan Services II, LLC, as lender; the Promissory Note dated September 21, 2023, in the amount of $19,126,568.83, in favor of Construction Loan Services II, LLC, as lender; the Deed of Trust, Security Agreement, Assignment of Leases and Rents, Assignment of Contracts and Plans, and Fixture Filing dated September 21, 2023, by Debtor, as trustor, and Construction Loan Services II, LLC, as beneficiary, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20230013621; the Unconditional Guaranty between Randolph F. Lamb, as guarantor, and Construction Loan Services II, LLC, as lender; the UCC-1 Financing Statement filed with the California Secretary of State on October 4, 2023, by Construction Loan Services, LLC, as File No. U230071169730; the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA; the assignment documents from Construction Loan Services II, LLC to Builders Capital; and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

    **1.1.21. Business Day.** Any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

    **1.1.22. Cash.** The legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, negotiable instruments, wire transfers of immediately available funds, or other cash equivalents.

**1.1.23.  Causes of Action.**  All actions, causes of action, Litigation Claims, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims and any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case.

**1.1.24.  Chapter 11 Case.**  The case pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code involving Debtor, having case number 25-24548-B-1, including all adversary proceedings pending in connection therewith.

**1.1.25.  Claim.**  Any right to payment from Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured arising at any time before the Effective Date or relating to any event that occurred before the Effective Date, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.1.26.  Class.**  A category of Holders of Claims or Equity Securities as classified in this Plan.

**1.1.27.  Computation of Time.**  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.1.28.  Confirmation.**  The entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Case.

**1.1.29.  Confirmation Date.**  The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

**1.1.30.  Confirmation Hearing.**  The duly-noticed initial hearing held by the Bankruptcy Court to confirm this Plan pursuant to Section 1128 of the Bankruptcy Code, and any subsequent hearing held by the Bankruptcy Court from time to time to which the initial hearing is adjourned without further notice other than the announcement of the adjourned dates at the Confirmation Hearing or by a subsequent order of the Bankruptcy Court.

**1.1.31.  Confirmation Order.**  The order entered by the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

**1.1.32.  Contingent Claim.**  A Claim which is contingent, unmatured, or unliquidated on or immediately before the Confirmation Date.

**1.1.33.  Credit Bid Transaction.**  The sale or transfer of title of one or more Properties pursuant to Section 363 of the Bankruptcy Code to Builders Capital pursuant to a credit bid as set forth in the BC Stipulation.

**1.1.34. Creditor.** Any Holder of a Claim, whether or not such Claim is an Allowed Claim.

**1.1.35. Creekside Village.** Debtor's property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel 019-421-014-000 with the working address of 11158 Church Street, Truckee, Nevada County, California, 96161. The subject property contains 5.44 acres of vacant land proposed for the development of 49 single-family homes and attached townhomes.

**1.1.36. Cure.** The distribution on the Effective Date or as soon thereafter as practicable of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption of an Executory Contract or Unexpired Lease pursuant to Section 365(b) of the Bankruptcy Code, or with respect to any other debt instrument, in an amount equal to: (i) all unpaid monetary obligations due under such executory contract or unexpired lease or required to pay to bring current the debt instrument and thereby reinstate the debt and return to the pre-default conditions to the extent such obligations are enforceable under the Bankruptcy Code or applicable non-bankruptcy law; and (ii) with respect to any debt instrument, if a claim arises from a debtor's failure to perform any non-monetary obligation as set forth in Sections 1124(2)(C) and 1124(2)(D) of the Bankruptcy Code, payment of the dollar amount which compensates the Holder of such a claim for any actual pecuniary loss incurred by such Holder as a result of any such failure and the dollar amount of the Claim that is established by the Holder's sworn declaration and accompanying admissible evidence filed with the Bankruptcy Court and served upon Debtor's counsel on or before such date ordered by the Bankruptcy Court for the filing of objections to the disclosure statement.

**1.1.37. Debtor.** Try Trout and Industrial, LLC, the debtor in the captioned Chapter 11 Case pursuant to Section 1108 of the Bankruptcy Code.

**1.1.38. Disclosure Statement.** The disclosure statement that relates to this Plan, as amended, supplemented, or modified from time to time, describing this Plan that is prepared and distributed in accordance with, among others, Sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

**1.1.39. Disputed Claim or Disputed Equity Security.** A Claim or Equity Security or any portion thereof that is: (i) subject to timely objection interposed by Debtor or any party-in-interest entitled to file and prosecute such objection in the Chapter 11 Case, if at such time such objection has not been withdrawn or determined by Final Order; or (ii) a Claim that is listed by Debtor as disputed, unliquidated, or contingent in the Schedules, with respect to which no proof of claim has been timely filed; provided, however, that the Bankruptcy Court may estimate a Disputed Claim for purposes of allowance pursuant to Section 502(c) of the Bankruptcy Code. The term "Disputed," when used to modify a reference in this Plan to any Claim or Equity Security (or Class of Claims or Equity Security), shall mean a Claim or Equity Security (or any Claim or Equity Security in such Class) that is a Disputed Claim or Disputed Equity Security. In the event there is a dispute as to classification or priority of a Claim or Equity Security, it shall be considered a Disputed Claim or Disputed Equity Security in its entirety. Until such time as a Contingent Claim becomes fixed and absolute, such Claim shall be treated as a Disputed Claim and not an Allowed Claim for purposes related to allocations and distributions under this Plan.

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

5

**1.1.40.    Disputed Claim Reserve.**  A reserve established by Reorganized Debtor to hold in a separate account Cash equal to the aggregate amount that would have been distributed on the Effective Date in accordance with the terms of this Plan on account of a Disputed Claim, plus interest and fees required under the Plan.  With respect to any Secured Claim for which there is contractual interest or statutory interest, six (6) months of interest shall also be funded into the Disputed Claim Reserve for any such Disputed Secured Claim.  The funds in the Disputed Claim Reserve may only be disbursed upon entry of an order of the Bankruptcy Court resolving a Disputed Claim and authorizing payment from the Disputed Claim Reserve.  The Disputed Claim Reserve shall terminate upon all Disputed Claims being fully resolved and paid pursuant to the terms of the Plan to the extent they become Allowed Claims and any remaining funds distributed to Reorganized Debtor.

**1.1.41.    Distribution.**  Any distribution of Cash on account of an Allowed Claim by Debtor or Reorganized Debtor, whether directly or through a title company upon the closing of an Effectuating Transaction.

**1.1.42.    Distribution Funds.**  Shall mean the Cash contributed to fund the Disputed Claims Reserve and to make the Effective Date Distributions to Allowed Claims and Allowed unclassified Claims in accordance with this Plan.

**1.1.43.    Effective Date.**  The first (1st) Business Day on which all of the conditions set forth in Article 8 to this Plan have been satisfied or waived.  It is intended that the Effective Date shall be the date on which the Effectuating Transaction closes.

**1.1.44.    Effectuating Transaction.**  A Sale Transaction or a Restructuring Transaction.

**1.1.45.    Equity Security.**  An equity security as the term is defined in Section 101(16) of the Bankruptcy Code and includes the membership interests in Debtor and any warrants, options, redemption rights, dividend rights, liquidation preferences, rights to purchase any such Equity Security, or any other rights related thereto.

**1.1.46.    Estate.**  The Estate created for Debtor in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

**1.1.47.    Executory Contract.**  A contract to which Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code and that has not been terminated or otherwise concluded on the Effective Date.

**1.1.48.    Exhibits and Plan Schedules.**  All exhibits and schedules attached to this Plan or filed in a Plan supplement are incorporated into and are a part of this Plan as if set forth in full herein.

**1.1.49.    Final Decree.**  Pursuant to Rule 3022 of the Bankruptcy Rules, upon the administration of the Estate and effectuation of all Distributions under this Plan, the Final Order of the Bankruptcy Court closing the Chapter 11 Case.

**1.1.50.    Final Order.**  An order, judgment, or other decree of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of such court, that has not

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

been reversed, reconsidered, stayed, modified, or amended, that is in full force and effect, and as to which order or judgment: (i) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand, or certiorari is pending; (ii) any appeal taken or petition for certiorari or request for reconsideration or further review or rehearing filed: (a) has been resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, or certiorari was sought; or (b) has not yet been resolved by such highest court, but such order has not been stayed pending appeal. Notwithstanding the foregoing, the Confirmation Order shall specifically become a Final Order on the first (1st) Business Day that is fourteen (14) days after the entry of such Confirmation Order unless any appeal of such Confirmation Order was accompanied by a stay pending appeal.

**1.1.51. Final Report.** The final report filed by Debtor in accordance with Sections 1106(a)(1) and 704(a)(9) of the Bankruptcy Code.

**1.1.52. General Unsecured Claim.** A Claim that is not secured by a Lien or other charge against or interest in property in which the Estate has an interest and is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) a Priority Unsecured Claim, (iv) the TDA Unsecured Claim, or (v) the Sortis Unsecured Claim. General Unsecured Claims shall include all Claims arising under Section 502(g) of the Bankruptcy Code.

**1.1.53. Heritage Village.** Debtor's property located in Truckee, Nevada County, California, and situated within the confines of four assessor's parcels identified as 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000, which contain a total land area of 7.93 acres. The site is proposed for the development of 108 condominium units over ground floor retail to be identified as Heritage Village.

**1.1.54. Heritage and Creekside Personal Property**. Any and all personal property of any kind whatsoever, whether tangible or intangible, that is used or will be used in the construction, development, use, occupancy, or enjoyment of Creekside Village and/or Heritage Village, including the ten (10) affordable housing credits acquired from TDA in 2023 for use in the development of Heritage and Creekside.

**1.1.55. Holder.** A Person holding an Equity Security or Claim.

**1.1.56. Impaired.** Impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.1.57. Lien.** This term shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

**1.1.58. Litigation Claims.** All rights, claims, torts, liens, liabilities, obligations, actions, causes of action, Avoidance Actions, derivative actions, proceedings, debts, contracts, judgments, damages and demands whatsoever in law or in equity, whether known or unknown, contingent or otherwise, that Debtor or the Estate may have against any Person, including but not limited to, those listed on Schedule 1.1.58 hereto. Failure to list a Litigation Claim on Schedule 1.1.58 shall not constitute a waiver or release by Debtor and/or the Estate of such Litigation Claim.

**1.1.59. Operating Reserve**. The sum of $100,000 maintained by the Reorganized Debtor to pay expenses and fees incurred in the ordinary course prosecuting

Avoidance Actions and Litigation Claims, resolving Disputed Claims, liquidating Debtor's Assets to the extent necessary to make Distributions due under the Plan, and operating the Reorganized Debtor.

**1.1.60. Person.** An individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization or government, governmental unit, or any subdivision thereof or any other entity.

**1.1.61. Petition Date.** August 27, 2025, the date on which voluntary Chapter 11 petition was filed by Debtor, thereby commencing the Chapter 11 Case.

**1.1.62. Plan.** This plan of reorganization, either in its present form or as it may be amended, supplemented, or modified from time to time, including all exhibits and schedules annexed hereto or referenced herein.

**1.1.63. Plan Interest Rate.** The federal judgment rate of interest as of the Effective Date with respect to any Secured Claim to which no contract or statutory rate of interest applies and all unsecured Claims, or such other rate as determined to be appropriate by the Court at the Confirmation Hearing with respect to any Claim or Class of Claims.

**1.1.64. Priority Tax Claims.** Any and all governmental unit Claims accorded priority in right of payment under Section 507(a)(8) of the Bankruptcy Code.

**1.1.65. Priority Unsecured Claims.** Any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code except under Section 507(a)(2) and Section 507(a)(3).

**1.1.66. Professional Fees.** The Administrative Claims for compensation and reimbursement submitted pursuant to Sections 328, 330, 331, or 503(b) of the Bankruptcy Code of Persons: (i) employed pursuant to an order of the Bankruptcy Court under Sections 327, 328 or 1102 of the Bankruptcy Code; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Sections 363(b) or 503(b) of the Bankruptcy Code or by other Final Order.

**1.1.67. Proof of Claim.** A proof of Claim filed by a Creditor in accordance with Section 501 of the Bankruptcy Code and Bankruptcy Rule 3001.

**1.1.68. Properties.** Together, Heritage Village and Creekside Village.

**1.1.69. Pro Rata.** The ratio of an Allowed Claim or Allowed Equity Security in a particular class to the aggregate amount of all such Allowed Claims or Allowed Equity Securities in any such Class; except that for the treatment of Classes 6, 7, and 8, Pro Rata shall refer to the ratio of Allowed Claim in Classes 6, 7, and 8, collectively.

**1.1.70. Record Date.** The date of entry of the order approving the Disclosure Statement.

**1.1.71. Reinstated or Reinstatement.** These terms shall mean: (i) leaving unaltered the legal, equitable, and contract rights of the Holder of a Claim so as to leave such Claim

Unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (ii) notwithstanding any contract provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (a) Curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contract provision or such applicable law; and (d) not otherwise altering the legal, equitable, or contract rights to which such Claim entitles the Holder of such Claim; provided, however, that any contract right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants, or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required in order to accomplish Reinstatement.

**1.1.72. Rejection Damages Claim.** A Claim arising from Debtor's rejection of an Executory Contract or Unexpired Lease.

**1.1.73. Rejection Damages Claim Bar Date.** The end of the first (1st) Business Day occurring on or after the fifteenth (15th) day after the Effective Date.

**1.1.74. Remaining Cash.** The Cash held by the Reorganized Debtor excluding the Disputed Claim Reserve and the Operating Reserve.

**1.1.75. Reorganized Debtor.** Debtor as reorganized pursuant to this Plan on and after the Effective Date.

**1.1.76. Reorganized Debtor Organizational Documents.** The organizational documents for the Reorganized Debtor, which shall include any amendments to the articles of organization, the operating agreement, and all related corporate documents.

**1.1.77. Restructuring Transaction.** Any transaction, other than a Sale Transaction, involving the Debtor's pecuniary interests arising from or related or pertaining to (i) the restructuring of all or a portion of the Debtor's Secured Claims, and/or (ii) the raising of debt and/or equity capital and/or the closing of a joint-venture in order to: (a) refinance the Properties, (b) to recapitalize Debtor or an entity owned or controlled by Debtor, (c) to buy all or a portion of the Secured Claims currently encumbering the Properties, and/or (d) to an alternative transaction in an amount sufficient to fund this Plan. For the avoidance of doubt, completion of a Restructuring Transaction requires, subject to Section 12.8, payment to all Secured Claims with Liens on any of the Properties subject to the Restructuring Transaction in an amount equal to such Secured Creditors' Allowed Secured Claims calculated under Section 506 of the Bankruptcy Code, unless otherwise agreed by the Secured Creditor, and without reduction for the Broker's Restructuring Transaction Fee (as defined in the Broker Agreement). The Restructuring Transaction shall comply with the requirements of the Bankruptcy Code and shall be effectuated pursuant to Section 363 of the Bankruptcy Code and one or more orders of the Bankruptcy Court authorizing the transaction. For the avoidance of doubt, a Restructuring Transaction shall not include The Landing Personal Property, unless consented to in writing by Sortis.

**1.1.78. Rules of Interpretation.** For purposes of this Plan only: (i) any reference in this Plan to a contract, instrument, release, or other agreement or documents being in particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (iii) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan; (iv) the words "herein," "hereof," "hereto," and "hereunder" refer to this Plan in its entirety rather than to a particular portion of this Plan; (v) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and (vi) the rules of construction and definitions set forth in Sections 101 and 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply unless otherwise expressly provided.

**1.1.79. Sale Transaction.** The sale or transfer of title of one or more of the Properties pursuant to Section 363 of the Bankruptcy Code, solely excluding a Credit Bid Transaction. The Sale Transaction shall comply with the requirements of Section 363 of the Bankruptcy Code and shall be effectuated pursuant to one or more orders of the Bankruptcy Court authorizing the sale procedures and the terms of the sale.

**1.1.80. Secured Claim.** A Claim that is secured by an unavoidable Lien against property of the Estate to the extent of the value of any interest in such property of the Estate securing such Claim, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or to the extent of the amount of such Claim subject to setoff in accordance with Section 553 of the Bankruptcy Code, in either case as determined pursuant to Section 506(a) of the Bankruptcy Code.

**1.1.81. Secured Tax Claim.** A Secured Claim held by a governmental unit for unpaid Taxes.

**1.1.82. Schedules.** The schedules of assets and liabilities and any amendments thereto filed by Debtor with the Bankruptcy Court in accordance with Section 521(1) of the Bankruptcy Code.

**1.1.83. Sortis.** Sortis Income Fund Reit, Inc., as assignee of Sorfi, LLC.

**1.1.84. Sortis Loan Documents.** The Loan Agreement dated June 29, 2022, by and between Debtor and LP Monroe Street LLC, a California limited liability company, as borrower, and Sorfi, LLC, as lender, for a loan in the principal amount of $8,675,000.00; the Deed of Trust dated June 29, 2022, by Debtor, as trustor, and Sorfi, LLC, as beneficiary, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20220013766; the Assignment of Deed of Trust dated June 29, 2022, by Sorfi, LLC and Sortis, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20220013767; the guaranty granted by Randolph Lamb in favor of Sortis; the UCC-1 Financing Statement filed with the California Secretary of State on June 29, 2022, by Sortis, as File No. U220206286023; the Acknowledgment and Consent to Transfer dated August 26, 2025, by Debtor, Sortis, Tahoe Railyard, and Randolph Lamb; and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

**1.1.85. Sortis Claim.** The Claim held by Sortis pursuant to the Sortis Loan Documents.

**1.1.86. Sortis Secured Claim.** The portion of the Sortis Claim that is secured by a Lien on the Sortis Personal Property.

**1.1.87. Sortis Unsecured Claim.** An unsecured Claim equal to the amount by which the Sortis Claim exceeds the sum of the values of The Landing and The Landing Personal Property, calculated as of the date of the Confirmation Hearing.

**1.1.88. Taxes.** All income, franchise, excise, sales, use, employment, withholding, property, payroll, or other taxes, assessments of governmental charges, together with any interest penalties, additions to tax, fines, and similar amounts relating thereto, whether or not yet assessed or imposed, collected by, or due to any federal, state, local or foreign governmental authority.

**1.1.89. Tax Code.** The Internal Revenue Code of 1986, as amended.

**1.1.90. Tahoe Railyard.** Tahoe Railyard Devco Corp., Debtor's wholly owned subsidiary. Tahoe Railyard solely owns The Landing.

**1.1.91. TDA.** Truckee Development Associates, LLC.

**1.1.92. TDA Claim.** The Claim held by TDA pursuant to the TDA Loan Documents, which Claim is secured by a second-position deed of trust Lien on the Properties.

**1.1.93. TDA Loan Documents.** The Loan Agreement dated September 26, 2023, by and between Debtor, as borrower, and TDA, as lender; the Purchase Money Promissory Note dated September 26, 2023, in the amount of $5,000,000, in favor of TDA, as lender; the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 26, 2023, by Debtor, as trustor, and TDA, as beneficiary, recorded in the official records of the County Recorder of Nevada County as Instrument Number 20230013622; the Continuing Guaranty between Randolph F. Lamb, as guarantor, and TDA, as lender; the Subordination and Intercreditor Agreement dated September 21, 2023, between Construction Loan Services II, LLC and TDA; and all related loan documents and all amendments, modifications, or restatements to any of the foregoing documents.

**1.1.94. TDA Secured Claim.** The Secured Claim portion of the TDA Claim.

**1.1.95. TDA Unsecured Claim.** The unsecured Claim portion, if any, of the TDA Claim.

**1.1.96. The Landing.** Tahoe Railyard's property located in Truckee, Nevada County, California, and situated within the confines of assessor's parcel numbers 019-421-005-000 and 019-421-006-000, which contain a total land area of 2.15 acres.

**1.1.97. The Landing Personal Property.** Any and all personal property of any kind whatsoever, whether tangible or intangible, that is used or will be used in the construction, development, use, occupancy, or enjoyment of The Landing, including the ten (10) affordable housing credits acquired from TDA in 2022 for use in the development of The Landing.

**1.1.98.  Unexpired Lease.**  A lease of real property or personal property to which Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code**.**

**1.1.99.  Unimpaired.**  This term has the meaning as set forth in Section 1124 of the Bankruptcy Code and that has not been terminated or otherwise concluded on the Effective Date.

## 2.  TREATMENT OF UNCLASSIFIED CLAIMS

**2.1.  General.**  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Claims against Debtor set forth in this Article 2 are not classified within any Class.  The Holders of such Claims are not entitled to vote on this Plan.  The treatment of the Claims set forth in this Article 2 is consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code.

**2.2.  Treatment of Administrative Claims.**  Other than the Broker Compensation, each Allowed Administrative Claim shall be paid upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable, (iii) the fourteenth (14th) day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and Debtor shall agree upon.  For the avoidance of doubt, trade accounts payable, accrued expenses, and other liabilities of Debtor arising in the ordinary course of business after the Petition Date will continue to be paid in the ordinary course of business from Cash on hand based on the terms of the agreement with each respective vendor.  The Broker Compensation shall be paid in accordance with the terms of the Broker Agreement pursuant to the Bankruptcy Court order approving the Broker Agreement.

**2.3.  Treatment of Priority Tax Claims.**  Each Allowed Priority Tax Claim, if any, shall be paid in full in Cash by Debtor, as follows:

(i)       On the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded, the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim on such date the lesser of: (i) their Pro Rata share of the Remaining Cash on such date; and (ii) the outstanding, unpaid balance of their Allowed Priority Tax Claim.

(ii)       Within fifteen (15) days after all Disputed Claims having been resolved, the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the lesser of: (i) their Pro Rata share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Priority Tax Claims, plus interest at the Plan Interest Rate, which Distributions shall continue on the fifteenth (15) day after the end of each calendar quarter until all Allowed Priority Tax Claims have been paid in full.

(iii)       No Allowed Priority Tax Claim will be paid later than five years after the Petition Date.

(iv)       Until the Allowed Priority Tax Claim is paid in full, the unpaid balance shall accrue statutory interest from the Effective Date fixed at the applicable

federal or state statutory rate in effect with respect to such Allowed Priority Tax Claim on the Petition Date.

**2.4.     Requests for Payment.**  All requests for payment of Administrative Claims against Debtor and all final applications for allowance and disbursement of Professional Fees must be filed by the Administrative Claims Bar Date or the Holders thereof shall be forever barred from asserting such Administrative Claims against Debtor.  All Professional Fees applications must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and all other orders governing payment of Professional Fees. Unless otherwise ordered by the Bankruptcy Court, from and after the Effective Date, no professional shall be required to file fee applications with the Bankruptcy Court and Debtor may pay all professionals in the ordinary course for fees and expenses incurred after the Effective Date.

**3.   DESIGNATION OF CLASSES OF CLAIMS AND EQUITY SECURITIES**

**3.1.     Determination of Claims and Equity Securities Within Classes.**   Pursuant to this Plan and in accordance with Section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors and the Holders of Equity Securities (except unclassified Claims) are placed in the Classes described below.  A Claim or Equity Security is classified in a particular Class only to the extent that the Claim or Equity Security qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Equity Security qualifies within the description of such other Classes.  A Claim or Equity Security is also classified in a particular Class only to the extent that such Claim or Equity Security is an Allowed Claim or Allowed Equity Security in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  With respect to Classes of Claims described as Unimpaired under this Plan, except as otherwise provided under this Plan, nothing shall affect the rights and legal and equitable defenses of Debtor regarding such Claims, including but not limited to, all rights in respect of legal and equitable defenses to setoff or recoupment against such Claims.

**3.2.     Summary of Classification.**

| Class | Description | Treatment |
|-------|-------------|-----------|
| Class 1 | Builders Capital Claim | Impaired; Solicitation required. |
| Class 2 | TDA Secured Claim | Impaired; Solicitation required. |
| Class 3 | Sortis Secured Claim | Impaired; Solicitation required. |
| Class 4 | Secured Tax Claims | Impaired; Solicitation required. |
| Class 5 | Priority Unsecured Claims | Impaired; Solicitation required. |
| Class 6 | TDA Unsecured Claim | Impaired; Solicitation required. |
| Class 7 | Sortis Unsecured Claim | Impaired; Solicitation required. |
| Class 8 | General Unsecured Claims | Impaired; Solicitation required. |
| Class 9 | Equity Securities | Impaired; Solicitation required. |

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

13

## 4. TREATMENT OF CLASSES OF CLAIMS UNDER THIS PLAN

**4.1. Class 1 – Builders Capital Claim.** Class 1 consists of the Allowed Builders Capital Claim. In full and final satisfaction of such Allowed Claim, the Allowed Builders Capital Claim in Class 1 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 1 is Impaired under this Plan and the Holder of an Allowed Class 1 Claim is entitled to vote on this Plan.

**4.2. Class 2 – TDA Secured Claim.** Class 2 consists of the Allowed TDA Secured Claim. In full and final satisfaction of such Allowed Claim, the Allowed TDA Secured Claim in Class 2 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 2 is Impaired under this Plan and the Holder of an Allowed Class 2 Claim is entitled to vote on this Plan.

**4.3. Class 3 – Sortis Secured Claim.** Class 3 consists of the Allowed Sortis Secured Claim. In full and final satisfaction of Debtor's obligation on account of the Allowed Sortis Secured Claim, The Landing Personal Property shall be transferred to Tahoe Railyard in accordance with Section 5.1.4 of this Plan and Sortis' first position Lien in The Landing Personal Property shall be preserved and unaltered upon such transfer. Sortis shall retain only the Lien rights against The Landing and The Landing Personal Property (and not against property in which the Estate or Debtor has an interest) arising under the Sortis Loan Documents after the transfer. For the avoidance of doubt, upon the transfer provided in Section 5.1.4 of this Plan being completed, Sortis shall not receive any payment from Debtor on account of the Allowed Sortis Secured Claim.

**4.4. Class 4 – Secured Tax Claims.** Class 4 consists of the Secured Tax Claims. In full and final satisfaction of such Allowed Claim, the Allowed Secured Tax Claims in Class 4 shall be paid in full on the Effective Date through the closing of the Effectuating Transaction.

Class 4 is Impaired under this Plan and the Holders of the Class 4 Secured Tax Claims are entitled to vote on this Plan.

**4.5. Class 5 – Priority Unsecured Claims.** Class 5 is comprised of the Allowed Priority Unsecured Claims. In full and final satisfaction of such Allowed Claims, the Allowed Priority Unsecured Claims in Class 5, if any, shall be treated as follows:

(i)      On the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded and the Allowed Priority Tax Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Priority Unsecured Claim on such date the lesser of: (i) their Pro Rata share of the Remaining Cash on such date; and (ii) the outstanding, unpaid balance of their Allowed Priority Unsecured Claim.

(ii)      Within fifteen (15) days after all Disputed Claims having been resolved and all Allowed Priority Tax Claims being paid in full, the Reorganized Debtor

shall pay each Holder of an Allowed Priority Unsecured Claim the lesser of: (i) their Pro Rata share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Priority Claims, plus interest at the Plan Interest Rate, which Distributions shall continue on the fifteenth (15) day after the end of each calendar quarter until all Allowed Class 5 Claims have been paid in full.

Class 5 is Impaired under this Plan and the Holders of the Class 5 Allowed Priority Unsecured Claims are entitled to vote on this Plan.

**4.6.     Class 6 – TDA Unsecured Claim, Class 7 – Sortis Unsecured Claim, and Class 8 – General Unsecured Claims.**  Class 6 is comprised of the Allowed TDA Unsecured Claim, if any.  Class 7 is comprised of the Allowed Sortis Unsecured Claim, if any.  Class 8 is comprised of the Allowed General Unsecured Claims.  Because TDA has sued and obtained relief against the guarantor under the TDA Loan Documents, the TDA Unsecured Claim (to the extent one exists) is separately classified from the Class 8 General Unsecured Claims. Similarly, because Sortis has additional collateral in the form of The Landing owned by Tahoe Railyard and because Randolph Lamb has guaranteed repayment of the Sortis Claim, the Sortis Unsecured Claim (to the extent one exists) is also separately classified from the Class 8 General Unsecured Claims. However, as non-priority, unsecured claims, the Class 6, Class 7, and Class 8 Claims shall receive the same treatment under this Plan.

Except to the extent that a Holder of an Allowed Class 6, Class 7, or Class 8 Claim agrees to less favorable treatment, each Holder of an Allowed Class 6 TDA Unsecured Claim, Allowed Class 7 Sortis Unsecured Claim, and/or an Allowed Class 8 General Unsecured Claim, shall, in full and final satisfaction of such Allowed Claim, be restructured and treated as follows:

(i)     On the fifteenth (15th) Business Day after the Disputed Claim Reserve is funded and all Allowed Priority Tax Claims and Allowed Class 5 Priority Unsecured Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Class 6, Class 7, or Class 8 Claim on such date, the lesser of: (i) their Pro Rata share of the Remaining Cash on such date; and (ii) the outstanding, unpaid balance of their Allowed Claim.

(ii)     Within fifteen (15) days after all Disputed Claims having been resolved and all Allowed Priority Tax Claims and Allowed Class 5 Priority Unsecured Claims are paid in full, the Reorganized Debtor shall pay each Holder of an Allowed Class 6, Class 7, or Class 8 Claim on such date, the lesser of: (i) their Pro Rata share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed Claims, plus interest at the Plan Interest Rate.

(iii)     To the extent there are any remaining Allowed Class 6, Class 7, or Class 8 Claims after completion of the payments required in (i) and (ii) above, the Reorganized Debtor shall make Pro Rata Distributions of the Remaining Cash held as of the last day of each calendar quarter, which payments shall be made on the fifteenth (15) day after the end of each calendar quarter until

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

15

all Allowed Class 6, Class 7, and Class 8 Claims have been paid in full at the Plan Interest Rate.

(iv)     Prior to any Distribution being made on account of Class 9 Equity Securities, the Allowed Class 6 TDA Unsecured Claim, the Allowed Class 7 Sortis Unsecured Claim, and all Allowed Class 8 General Unsecured Claims shall have been paid in full with interest at the Plan Interest Rate.

Class 6, Class 7, and Class 8 are Impaired under this Plan and are therefore entitled to vote on this Plan.

**4.7.     Class 9 – Equity Securities.**   On the Effective Date, the Holders of Equity Securities of Debtor shall retain all of their legal interests, unless modified in accordance with the terms of a Restructuring Transaction effectuated pursuant to the terms of this Plan.   All Allowed Claims shall be paid in full prior to any Equity Securities receiving any payments from the Reorganized Debtor, whether by distribution or otherwise**.**

Class 9 Equity Securities are Impaired under this Plan and are therefore entitled to vote on this Plan.

**5.   MEANS FOR IMPLEMENTATION OF PLAN**

**5.1.     Plan Implementation Occurring on the Effective Date.** On the Effective Date, except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, the following events shall occur:

**5.1.1.   Reorganized Debtor.**   On the Effective Date, Debtor shall be reorganized pursuant to the terms of this Plan and shall continue to exist as a separate entity in accordance with applicable law.   The Reorganized Debtor shall be managed by Lamb Partners, LLC, Debtor's current manager.

**5.1.2.   Articles of Organization and Operating Agreement.**   Debtor's existing articles of organization and operating agreement (as amended, supplemented, or modified) will continue in effect for Reorganized Debtor following the Effective Date, except to the extent that such documents are amended in conformance with this Plan or by proper corporate action after the Effective Date.   Such amendments shall include a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

**5.1.3.   Vesting of Assets in Reorganized Debtor.**   On the Effective Date, except for the Assets that are transferred in accordance with the terms of an Effectuating Transaction (which shall exclude The Landing Personal Property), the Debtor's Assets shall be transferred to, and vest in, the Reorganized Debtor free and clear of all Liens, Claims, and Equity Securities.

**5.1.4.   Transfer of The Landing Personal Property.**   On the first (1st) Business Day after the Effective Date, the Reorganized Debtor shall transfer The Landing Personal Property to Tahoe Railyard, which transfer shall preserve and shall not alter Sortis' first position Lien in The Landing Personal Property.

**5.1.5.  Effectuating Transaction.**  This Plan is intended to effectuate the terms of the BC Stipulation through the closing of either a Sale Transaction or a Restructuring Transaction.

**5.1.5.1.**  On or before April 6, 2026, Debtor shall have entered into either (i) a binding asset purchase agreement for a Sale Transaction, or (ii) one or more binding agreements whereby Debtor will complete a Restructuring Transaction.

**5.1.5.2.**  If Debtor does not satisfy the conditions of Section 5.1.5.1 of this Plan on or before April 6, 2026, then Debtor shall: (i) effectuate the Credit Bid Transaction, or (ii) obtain an order of the Bankruptcy Court extending the April 6, 2026 deadline.

**5.1.5.3.**  On or before June 4, 2026, Debtor shall: (i) have closed a sale or refinance of 100% of the Properties in a manner consistent with the BC Stipulation; (ii) effectuate the Credit Bid Transaction; or (iii) obtain an order of the Bankruptcy Court extending the June 4, 2026 deadline.

**5.1.5.4.**  In a Restructuring Transaction, the proceeds of the transaction shall be in an amount sufficient to pay the Broker Compensation and all Allowed Secured Claims in full.

**5.1.6.  Credit Bid Transaction.**  In the event of a Credit Bid Transaction, Debtor shall effectuate the Credit Bid Transaction pursuant to Section 363 and in accordance with the BC Stipulation and the Effective Date will not occur.  Debtor will promptly seek appropriate relief and that the Plan will be deemed withdrawn or of no further force and effect.

**5.1.7.  Notice of Effectiveness.**  When the steps contemplated by Section 8 have been completed, Reorganized Debtor shall file with the Bankruptcy Court and serve upon all Creditors and potential Holders of Administrative Claims reasonably known to Debtor (whether or not disputed), a Notice of Effective Date of Plan, which shall include a notice of the Administrative Claim Bar Date.

**5.1.8.  Final Decree.**  On or before the fifteenth (15th) day after all of the Effective Date Distributions required by Sections 2 through 4 of the Plan have been tendered and all contested matters have been resolved, Reorganized Debtor shall file a motion to close the Chapter 11 Case.  Prior to the hearing on the motion seeking to close the Chapter 11 Case, the Final Report shall be filed.

**5.2.  No Corporate Or Governance Action Required.**  As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by this Plan; and (ii) the other matters provided for under or in furtherance of this Plan involving corporate action to be taken by or required of Debtor or Reorganized Debtor, as applicable, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or managers of Debtor or Reorganized Debtor.

**5.3.  Filing with California Secretary of State.**  To the extent required by the California Corporations Code, on or as soon as reasonably practicable after the Effective Date, a certified copy of this Plan and the Confirmation Order shall be filed with the California Secretary of State.

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

17

From the Confirmation Date until the Effective Date, Debtor is authorized and directed to take any action or carry out any proceeding necessary to effectuate this Plan pursuant to applicable California law.

## 6. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1.** **Executory Contracts**. Except for Executory Contracts and Unexpired Leases assumed pursuant to prior order of the Bankruptcy Court or set forth on the schedule of Assumed Executed Contracts and Unexpired Leases attached as Schedule 6.1 hereto (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed rejected by Debtor on the Effective Date.

**6.2.** **Approval of Assumption or Rejection**. Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Bankruptcy Code Section 365, of the rejection by Debtor of each Executory Contract and Unexpired Lease to which any of Debtor is a party that is not listed on Schedule 6.1, not otherwise provided for in this Plan, and neither assigned, assumed and assigned, nor rejected by separate order of the Bankruptcy Court prior to the Effective Date; and (ii) rejection by any of Debtor of each Executory Contract and Unexpired Lease to which any of Debtor is a party that is not listed on Schedule 6.1. Upon the Effective Date, each counter party to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to an assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption. To the extent applicable, all Executory Contracts or Unexpired Leases of Debtor assumed pursuant to this Article 6 shall be deemed modified such that the transactions contemplated by this Plan shall not be a "change of control," regardless of how such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by confirmation of this Plan.

**6.3.** **Cure of Defaults**. Debtor shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to Section 6.1 of this Plan upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by Debtor, and after the Effective Date, the Reorganized Debtor; or (iii) the fourteenth (14th) Business Day after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease assumed pursuant to this Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment, or the Cure of a particular Executory Contract or an Unexpired Lease.

**6.4.** **Objection to Cure Amounts**. Any party to an Executory Contract or Unexpired Lease who objects to the Cure amount determined by Debtor to be due and owing must file and serve an objection on Debtor's counsel no later than thirty (30) days after the Effective Date. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts paid by Debtor in accordance with Section 6.3 of this Plan. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

18

Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

**6.5. Confirmation Order**. The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in this Article 6 pursuant to Sections 1123 and 365 of the Bankruptcy Code as of the Effective Date. Notwithstanding the forgoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease, the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by Debtor.

**6.6. Rejection Damages Claim Bar Date**. All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease pursuant to this Plan shall be filed no later than Rejection Damages Claim Bar Date. Any Claim not filed within such time shall be forever barred.

## 7. MANNER OF DISTRIBUTION OF PROPERTY UNDER THIS PLAN

**7.1. Distributions**. The Reorganized Debtor shall be responsible for making, or causing to be made, the Distributions required to be made on and after the Effective Date pursuant to the terms of this Plan.

**7.2. Reserve**. Reorganized Debtor shall establish and maintain the Disputed Claim Reserve.

**7.3. Statements**. Reorganized Debtor shall maintain a record of the names and addresses of all Holders of Allowed Claims as of the Effective Date for purposes of mailing Distributions to them. Reorganized Debtor may rely on the name and address set forth in Debtor's Schedules and/or Proofs of Claim and the ledger and records regarding Holders of Equity Securities as of the Record Date as being true and correct unless and until notified otherwise in writing. Debtor shall file all tax returns and other filings with governmental authorities on behalf of Debtor and the Assets it holds**.**

**7.4. Further Authorization.** Debtor or Reorganized Debtor, as applicable, shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to, the provisions of this Plan.

## 8. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

**8.1. Conditions to Confirmation**. The following are conditions precedent to confirmation of the Plan:

**8.1.1.** The Confirmation Order shall have been entered and be in form and substance reasonably acceptable to Debtor.

**8.2. Conditions to Effectiveness**. The following are conditions precedent to the occurrence of the Effective Date:

**8.2.1.** The Confirmation Order shall be a Final Order, except that Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order;

**8.2.2.** No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal;

**8.2.3.** All documents necessary to implement the transactions contemplated by this Plan shall be in form and substance reasonable acceptable to Debtor; and

**8.2.4.** Debtor shall have obtained all required orders of the Bankruptcy Court, finalized and executed all necessary documents, and taken all other required actions to close a Restructuring Transaction or a Sale Transaction on the Effective Date.

**8.3.** **Waiver of Conditions.** Debtor may waive any and all of the other conditions to effectiveness set forth in the Plan and specifically <u>Sections 8.1 and 8.2</u> above without leave or order of the Bankruptcy Court and without any formal action; provided, however, in the event of a Credit Bid Transaction, the Effective Date will not occur.

## 9. TITLE TO PROPERTY; DISCHARGE; INJUNCTION

**9.1.** **Vesting of the Assets.** Subject to the provisions of this Plan and as permitted by Section 1123(a)(5)(B) of the Bankruptcy Code, on the Effective Date, except to the extent certain Assets are transferred in accordance with the terms of an Effectuating Transaction, the Debtor's Assets shall be transferred to, and vest in, Reorganized Debtor free and clear of all Liens and Claims.

On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any Claim without the supervision of or approval of the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

**9.2.** **Preservation of Litigation Claims**. In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided herein, all Avoidance Actions and Litigation Claims shall be transferred to, and vested in, the Reorganized Debtor. The Reorganized Debtor shall have the exclusive right to sue on, settle, or compromise any and all Avoidance Actions and Litigation Claims.

**9.3.** **Discharge**. On the Effective Date, unless otherwise expressly provided in the Plan and the Confirmation Order, Debtor shall be discharged from any and all Claims to the fullest extent provided in the Bankruptcy Code, including Sections 524 and 1141. All consideration distributed under this Plan or the Confirmation Order shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of all Claims of any kind or nature whatsoever against Debtor or any of its Assets or properties, and regardless of whether any property shall have been distributed, transferred, or retained pursuant to this Plan on account of such Claims. Except as otherwise expressly provided by this Plan and the Confirmation Order, upon the Effective Date, Debtor shall be deemed discharged and released under and to the fullest extent provided under

Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code. Nothing herein shall be construed as effectuating a release of any Allowed Administrative Claims.

**9.4. Compromise and Settlement.** The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in this Plan are (i) in the best interests of Debtor, its Estate, and all Holders of Claims and Equity Securities, (ii) fair, equitable and reasonable, (iii) made in good faith, and (iv) approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

**9.5. Injunction.** From and after the Effective Date, and except as provided in this Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim or Equity Security or other right of an Equity Security Holder that is terminated pursuant to the terms of this Plan are permanently enjoined from taking any of the following actions on account of any such Claims or terminated Equity Securities or rights: (i) commencing or continuing in any manner any action or other proceeding against Debtor, Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Debtor, Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any Lien or encumbrance against Debtor, Reorganized Debtor, or their respective property; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to Debtor, the Reorganized Debtor, or their respective property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of this Plan or the Bankruptcy Code.

**9.6. Exculpation.** From and after the Effective Date, neither Debtor, Reorganized Debtor, their respective professionals, nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys, or agents, shall have or incur any liability, including derivative claims, but excluding direct claims, to any Holder of a Claim or Equity Security or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act in connection with causing Debtor to act in its Chapter 11 Case from the Petition Date through the Effective Date, including the pursuit of confirmation of this Plan or any prior plan or the substantial consummation of this Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of Debtor's counsel with respect to their duties and responsibilities under this Plan or in the context of the Chapter 11 Case.

**9.7. Preservation of Litigation Claims.** Nothing in the discharge, injunction, or exculpation provisions shall release, impair, or enjoin the prosecution of any Litigation Claims preserved by the Plan, whether or not listed on <u>Schedule 1.1.58</u>, which shall solely vest in the Reorganized Debtor on the Effective Date.

## 10. RETENTION OF JURISDICTION

**10.1. Jurisdiction.** Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

and Debtor after the Effective Date to the maximum extent permitted by law, including, without limitation, jurisdiction to:

**10.1.1.** Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Disputed Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims;

**10.1.2.** Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

**10.1.3.** Resolve any matters related to the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which Debtor is party and to hear, determine, and, if necessary, liquidate any Claims arising there from or Cure amounts related thereto;

**10.1.4.** Insure that Distributions to Holders of Allowed Claims, or if applicable, Equity Securities are accomplished pursuant to the provisions of this Plan;

**10.1.5.** Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications or motions involving Debtor or Debtor's present or former Assets that may be pending on the Effective Date or commenced thereafter as provided for by this Plan;

**10.1.6.** Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, expressly including an Effectuating Transaction, and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan or the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

**10.1.7.** Decide or resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of any Final Order, this Plan, the Confirmation Order, or any Person's obligations incurred in connection with this Plan or the Confirmation Order;

**10.1.8.** Modify this Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code and Section 11.1 of this Plan or modify any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order or Debtor; or remedy any defect or omission or reconcile any inconsistency in any Final Order, this Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan, to the extent authorized by the Bankruptcy Code;

**10.1.9.** Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any person with consummation, implementation, or enforcement of any Final Order, this Plan, or the Confirmation Order, except as otherwise provided herein;

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

22

**10.1.10.** Enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**10.1.11.** Determine any other matters that may arise in connection with or relate to this Plan, any Final Order, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, any Final Order, or Confirmation Order, except as otherwise provided herein;

**10.1.12.** Enter the Final Decree;

**10.1.13.** Hear and decide Litigation Claims and continue to hear and decide pending Litigation Claims and any other claim or cause of action of Debtor; and

**10.1.14.** Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

**10.2.    No Waiver.**  Nothing contained in this <u>Article 10</u> shall constitute a waiver by any Person of the right to assert that the Bankruptcy Court lacks jurisdiction over any matter set forth in this <u>Article 10</u>.

## 11. MODIFICATION AND AMENDMENT OF PLAN

**11.1.    Modification and Amendment.**  Prior to Confirmation, Debtor may alter, amend, or modify this Plan under Section 1127(a) of the Bankruptcy Code at any time.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in Section 1101(2) of the Bankruptcy Code, Debtor may, under Section 1127(b), (c), and (d) of the Bankruptcy Code, alter, amend, or modify this Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, to make appropriate adjustments and modifications to this Plan or the Confirmation Order as may be necessary to carry out the purposes and effects of this Plan so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under this Plan.

## 12. MISCELLANEOUS

**12.1.    Objections to Claims and Disallowed Claims.**

**12.1.1.    Authority to File Objections to Claims.**  After the Effective Date, objections to Claims or Equity Securities shall be made and objections to Claims and Equity Securities made previous thereto shall be pursued by Reorganized Debtor or any other party properly entitled to do so after notice to Debtor and approval by the Bankruptcy Court.  Any objections to Claims made after the Effective Date shall be filed and served not later than the first (1st) Business Day that is thirty (30) calendar days after the Effective Date; provided, however, that such period may be extended by order of the Bankruptcy Court.

**12.1.2.    Resolution of Objections After Effective Date.**  From and after the Effective Date, Reorganized Debtor may litigate to judgment, propose settlements of, or withdraw

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

23

objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court irrespective of whether Debtor or Reorganized Debtor was the Person that filed the objection.

**12.1.3. Late-Filed Claims.** No Proof of Claim filed after the Bar Date or, as applicable, the Administrative Claim Bar Date, shall be allowed, and all such Proofs of Claims are hereby disallowed in full. After the Bar Date or the Administrative Bar Date, as applicable, no Creditor shall be permitted to amend any Claim or Proof of Claim to increase the claimed amount and any such amendment shall be disallowed to the extent of the late-filed increase in the claimed amount.

**12.2. Disputed Claims Reserve.** To facilitate Distributions to Holders of Allowed Claims, and solely to the extent there are Disputed Claims in any Class, Reorganized Debtor shall set aside in the Disputed Claim Reserve an amount equal to the Distributions that would be paid on the Effective Date to the Holders of such Disputed Claims if such Disputed Claims were Allowed Claims, plus interest and fees as set forth in Section 4 of this Plan, pending the allowance or disallowance of such Disputed Claims. In the event Reorganized Debtor wishes to deposit or hold a lesser amount than required herein and is unable to reach an agreement with the Holder of the Disputed Claim on the amount to be deposited or held, the Bankruptcy Court shall fix the amount after notice and hearing. Upon Final Order with respect to a Disputed Claim, the Holder of such Disputed Claim, to the extent it has been determined to be an Allowed Claim, shall receive, as set forth in Section 4 of this Plan, or if not defined in Section 4, as soon as reasonably practicable after the claim becomes an Allowed Claim, that payment or Distribution to which it would have been entitled if the portion of the Claim so allowed had been allowed as of the Effective Date.

**12.3. Effectuating** Documents; Further Transactions; Timing. Debtor or Reorganized Debtor, as applicable, are both authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any securities issued, transferred, or canceled pursuant to this Plan. All transactions that are required to occur on the Effective Date under the terms of this Plan shall be deemed to have occurred simultaneously. Debtor or Reorganized Debtor, as applicable, are both authorized and directed to do such acts and execute such documents as are necessary to implement this Plan.

**12.4. Exemption from Transfer Taxes.** Pursuant to Section 1146 of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of Estate property; (ii) the creation, modification, consolidation, or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, or connection with this Plan or the Confirmation Order; (iii) the making, assignment, modification, or recording of any lease or sublease; or (iv) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to the foregoing including, without limitation, all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the issuance of the Equity Securities, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment and the appropriate state of local government officials or agents shall be, and hereby are, directed to forego the collection of any

such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

**12.5.　Revocation or Withdrawal of this Plan.**  Debtor reserves the right to revoke or withdraw this Plan at any time prior to its substantial consummation.  If this Plan is withdrawn or revoked, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtor or any other Person nor shall the withdrawal or revocation of this Plan prejudice in any manner the rights of Debtor or any Person in any further proceedings involving Debtor.  In the event this Plan is withdrawn or revoked, nothing set forth herein shall be deemed an admission of any sort and this Plan and any transaction contemplated thereby shall be inadmissible into evidence in any proceeding.

**12.6.　Binding Effect.**  This Plan shall be binding upon, and shall inure to the benefit of Debtor, Reorganized Debtor, and the Holders of all Claims and Equity Securities and their respective successors and assigns notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under this Plan, (ii) has filed a proof of claim or interest in this Chapter 11 Case, or (iii) failed to vote to accept or reject the Plan or voted to reject the Plan.

**12.7.　Governing Law.**  Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any contract, instrument, release, or other agreement entered into in connection with this Plan or in any document which remains unaltered by this Plan, the rights, duties, and obligations of Debtor and any other Person arising under this Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California without giving effect to California's choice of law provisions.

**12.8.　Modification of Payment Terms.** Debtor or the Reorganized Debtor, as applicable, reserve the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Allowed Claim at any time after the Effective Date upon the prior written consent of the Holder whose Allowed Claim treatment is being adversely affected.

**12.9.　Delivery of Distributions; Undeliverable Distributions.**  Distributions to Holders of Allowed Claims and Equity Security Holders shall be made: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if the Debtor has been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Reorganized Debtor, as applicable, after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Debtor or Reorganized Debtor has not received a written notice of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtor is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  Nothing contained in this Plan shall require the Debtor or Reorganized Debtor to attempt to locate any Holder of an Allowed Claim or Equity Security.

Any Person that fails to claim a Distribution returned as undeliverable within ninety (90) days from the date upon which a Distribution is first made to such Person shall forfeit all rights to any Distribution under the Plan.  Persons that fail to claim the Distribution shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor, the Disputed Clim Reserve, the

Reorganized Debtor, or against any Holder of an Allowed Claim to whom Distributions are made by the Reorganized Debtor. Undeliverable Distributions shall not be entitled to any interest, dividends, or other accruals of any kind. Any check that is not cashed or otherwise deposited within ninety (90) days after the check's date shall be deemed an undeliverable Distribution under this Plan.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable Distribution within ninety (90) days after the first attempted delivery shall have its Claim for such undeliverable Distribution expunged and shall be forever barred from asserting any such Claim against the Debtor, the Estate, the Reorganized Debtor, the Disputed Claims Reserve, or their respective property. In such cases, any Cash held for distribution on account of such Claims shall be property of the Reorganized Debtor, free of any restrictions thereon, and shall revert to the account from which such payment was originally issued to be distributed pursuant to the Plan. Nothing contained in the Plan shall require the Debtor or Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

Similarly, checks or drafts issued pursuant to this Plan to Persons holding Allowed Claims and not presented for payment within ninety (90) days following mailing thereof to the last known address of such Person shall be deemed nonnegotiable thereafter. Any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Debtor, the Estate, the Disputed Claims Reserve, the Reorganized Debtor, and their respective property. Any Distribution which is deemed nonnegotiable shall vest or revest in the Reorganized Debtor and be available for Distribution consistent with the Plan.

Subject to the terms of this Plan, undeliverable Distributions shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable.

**12.10. Set Offs.** Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim (before any Distribution is made on account of such Claim or Equity Security), claims of any nature whatsoever that Debtor may have against the Holder of such Claim to the extent such Claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such Claim that it may have against such Holder.

**12.11. Notices.** Any notice required or permitted to be provided under this Plan shall be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight courier service, freight prepaid as follows:

    If to Debtor:                  Try Trout and Industrial, LLC
                                       Attn: Randolph F. Lamb
                                       P.O. Box 2247
                                       Menlo Park, CA 94026

With a copy to: Garman Turner Gordon LLP
Attn: William M. Noall, Esq.
Talitha Gray Kozlowski, Esq.
7251 Amigo St, Suite 210
Las Vegas, NV 89119
Tel: (725) 777-3000
Email: wnoall@gtg.legal
tgray@gtg.legal

With a copy to: Menlo Law Group, PC
Attn: Jennifer Hagan, Esq.
1300 El Camino Real, Suite 100
Menlo Park, CA 94025
Tel: (650) 322-8498
Email: jenniferh@menlolawpc.com

**12.12. Severability.** If any provision of this Plan is determined by the Bankruptcy Court to be invalid, illegal, or unenforceable or this Plan is determined to be not confirmable pursuant to Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of Debtor or the Reorganized Debtor, as applicable, shall have the power to alter and interpret such term to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.13. Withholding and Reporting Requirements.** In connection with this Plan and all instruments and securities issued in connection therewith and Distributions thereon, Debtor or the Reorganized Debtor, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. Debtor or Reorganized Debtor, as applicable, shall be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements. Notwithstanding any other provision of this Plan, each Holder of an Allowed Claim that has received a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such Distribution.

**12.14. Post-Confirmation Reporting.** Until the entry of the final decree closing the Chapter 11 Case, Debtor or the Reorganized Debtor, as applicable, shall comply with the Bankruptcy Code and Bankruptcy Rules post-confirmation reporting requirements. Additionally, Debtor or Reorganized Debtor, as applicable, shall file post-confirmation quarterly operating reports detailing receipts and disbursements (along with ending cash balance) for each calendar

quarter from the date of confirmation until dismissal, conversion, or entry of a final decree closing the case no later than twenty (20) days after the expiration of the reported quarter.

**12.15. Cramdown.** In the event that any Impaired Class is determined to have rejected this Plan in accordance with Section 1126 of the Bankruptcy Code, Debtor may invoke the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of this Plan. Debtor reserve the right to modify this Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

**12.16. Quarterly Fees.** Debtor or Reorganized Debtor, as applicable, shall pay all quarterly fees payable to the Office of the United States Trustee consistent with the sliding scale set forth in 28 U.S.C. § 1930(a)(6), and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules**.**

DATED this 26th day of February, 2026.

**DEBTOR**

TRY TROUT AND INDUSTRIAL, LLC

*/s/ Randolph F. Lamb*

Randolph F. Lamb, Manager of Lamb Partners, LLC, Designated Representative

Prepared and submitted:

GARMAN TURNER GORDON LLP

By: */s/ Talitha Gray Kozlowski*

WILLIAM M. NOALL, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Debtor*

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

28

**SCHEDULE 1.1.58**
**TO PLAN OF REORGANIZATION**

**CERTAIN PRESERVED POTENTIAL CAUSES OF ACTION**

All defined terms used herein shall have the meanings set forth in the Plan. The following is a non-exhaustive list of potential Litigation Claims for which Debtor may hold a claim or cause of action. Debtor reserve their right to modify this list to amend or add parties or causes of action, but disclaim any obligation to do so.

1.　　The Avoidance Actions.

2.　　All claims against Adam Cohen and Saxon Spencer Capital, Inc.

3.　　Claims against Keith Dudum under Chapter 5 of the Bankruptcy Code resulting from the recordation of a judgment lien within the 90-day preference period.

4.　　Any and all claims against Brett Mlinarich, James Lacey, and Matthew Costello, including, but not limited to breach of fiduciary duty, defamation of business, misappropriation of trade secrets and confidential information, conversion of confidential plans and financial records, tortious interference with contract, tortious interference with economic advantage, conspiracy to commit trade secret theft, violation of B&P Code 17200.

5.　　Litigation Claims arising out of or in connection with Debtor's continuing business, property, or operations before or after the Effective Date.

6.　　All other rights, privileges, claims, actions, or remedies of Debtor existing on the Effective Date, whether arising at law or in equity.

In addition to the possible causes of action and claims listed above, Debtor has or may have, in the ordinary course of their business, numerous causes of action and Claims or rights against contractors, subcontractors, vendors, suppliers, and others with whom it deals in the ordinary course of its business (the "Ordinary Course Claims"). With respect to all the Ordinary Course Claims and all other Litigation Claims, Debtor reserves for the benefit of Reorganized Debtor, the recipient of the Assets, the right to enforce, sue on, settle, or compromise (or decline to do any of the foregoing). Debtor also has, or may have, and is retaining for the benefit of the Reorganized Debtor, various claims or causes of action arising under or pursuant to its insurance policies, and all rights arising under, relating to, or in connection with such policies are expressly reserved and retained.

There may also be other Litigation Claims which currently exist or may subsequently arise that are not set forth herein because the facts underlying such Litigation Claims are not currently known or sufficiently known by Debtor. The failure to list any such unknown Litigation Claim herein is not intended to limit the right to pursue any unknown Litigation Claim to the extent the facts underlying such unknown Litigation Claim become more fully known in the future.

Unless Litigation Claims against any individual or entity are expressly waived, relinquished, released, compromised, or settled by the Plan or any Final Order, Debtor expressly

reserves for the benefit of the Reorganized Debtor as the recipient of the Assets, all Litigation Claims, including, without limitation, all unknown Litigation Claims for later adjudication and therefore no preclusion doctrine (including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches) shall apply to such Litigation Claims after the confirmation or consummation of the Plan.  In addition, Debtor expressly reserve for the benefit of the Reorganized Debtor, the right to pursue or adopt any claims alleged in any lawsuit in which Debtor is a defendant or an interested party, against any individual or entity, including plaintiffs and co-defendants in such lawsuits.  Debtor reserve for the benefit of the Reorganized Debtor only, all Ordinary Course Claims arising after the Effective Date.

**SCHEDULE 6.1**
**PLAN OF REORGANIZATION**

**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.  The Broker Agreement, to the extent determined to be an Executory Contract.

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

# EXHIBIT 2

# EXHIBIT 2

**Try Trout and Industrial, LLC**

| Assets | Assumptions | Fair Market Value | Secured Claim(s) | Net Value | Deficiency Claim | % Recovery |
|---|---|---|---|---|---|---|
| Creekside Village | 1, 2, 3, 4 | $ 25,300,000.00 | $ 31,148,643.50 | $ - | $ - | |
| Heritage Village | 5, 2, 3, 4 | $ 42,500,000.00 | $ 31,148,643.50 | $ - | $ - | |
| Preserved Litigation Claims | 6 | $ - | $ - | $ - | $ - | |
| Scheduled Assets (other than real property parcels) | 7, 8, 9 | nominal | unknown | $ - | $ - | |
| | | | | | | |
| * Total Value Available to Unsecured Claims | | | | $ - | | 0% |
| | | | | | | |
| **Priority Unsecured Claims** | | | | | | |
| Priority Claims | 10 | | $ - | | | |
| Administrative Claims | | | | | | |
| Chapter 11 Administrative Claims and Professional Fees through the Effective Date (Estimate Only) | 11, 12 | | $ 200,000.00 | | | |
| Priority tax claims (Estimate Only) | | | $ - | | | |
| Theoretical Chapter 7 Professional Fees and Expenses | | | $ 40,000.00 | | | |
| | | | | $ 240,000.00 | | |
| | | | | | | |
| * Total Value Available to Non-Priority Unsecured Claims: | | | | $ - | | 0% |
| | | | | | | |
| * Total Unsecured Non-Priority Unsecured Claims: | 13 | | | $ 6,625,601.36 | | |
| | | | | | | |
| * Estimated Dividend on Non-Priority Unsecured Claims | | | | $ - | | 0% |

* Including deficiency claims

0 For purposes of this Chapter 7 Liquidation Analysis, it is assumed hypothetically that the Plan could not ultimately be confirmed at the confirmation hearing and, on or about May 1, 2026 (the "Conversion Date"), the Chapter 11 Case of this Debtor is converted to a proceeding under Chapter 7 of the Bankruptcy Code (the "Chapter 7 Case"). In connection with the hypothetical commencement of the Chapter 7 Case, it is assumed that on or about the Conversion Date, a Chapter 7 trustee is appointed to, among other things, manage the liquidation process, complete a claims analysis, defend against causes of action and/or claims asserted against Debtor, and distribute the liquidation proceeds and other assets ultimately realized in accordance with the priorities established by the Bankruptcy Code. This Chapter 7 Liquidation Analysis should be read in conjunction with the *Disclosure Statement to Accompany Debtor's Plan of Reorganization* ("Disclosure Statement"), and all undefined, capitalized terms shall have the meanings ascribed to them in the *Debtor's Plan of Reorganization* ("Plan") [ECF No. 63], and in the Disclosure Statement, in that sequence.

1 Identified in ECF No. 19, Schedules A/B, as valued at $26,250,000.00 pursuant to a prepetition appraisal. Debtor's December 2025 appraisal values the Creekside property at an "as-is" value of $25,300,000, with a significantly increased value upon a bulk sale and/or development. In the event of a Chapter 7 conversion, the property will have not sold and will be foreclosed upon or subject to a credit bid by Builders Capital, producing no value for other creditors.

2 Identified in ECF No. 17, Schedule D, as secured debt in the amount of $23,194,036.28 related to a deed of trust in favor of Builders Capital; $6,994,241.30 related to second priority deed of trust in favor of Truckee Development Associates, LLC; and a $960,365.92 tax lien of Nevada County Treasurer.

3 Pursuant to the BC Stipulation [ECF No. 64], Builders Capital's rights to credit bid at any sale of the Debtor's property parcels are not impaired and are preserved. In the event a Effectuation Transaction is not timely completed, the Debtor has stipulated that Builders Capital is authorized to make a credit bid in the maximum amount of its outstanding debt (plus additional interest or charges permitted under the Bankruptcy Code); and the Debtor unconditionally commits to a closing of a sale of the Debtor's real property to Builders Capital for a credit bid.

4 This Liquidation Analysis assumes that the Debtor has failed to sell its real property, the Debtor has failed to achieve a restructuring, the Debtor's Plan failed, and the Case was converted. This Liquidation Analysis assumes that Builders Capital will take title to the Debtor's property pursuant to a credit bid.

| | |
|---|---|
| 5 | Identified in ECF No. 19, Schedules A/B, as valued at $39,510,000.00 pursuant to a prepetition appraisal.  Debtor's 2026 appraisal values the Heritage property at an "as-is" value of $42,500,000. In the event of a Chapter 7 conversion, the property will have not sold and will be foreclosed upon or subject to a credit bid by Builders Capital, producing no value for other creditors. |
| 6 | The estate has certain complex tort litigation claims which have not been filed.  However, without the benefit of the Debtor's principals to prosecute these claims, no value has been attributed to Debtor's claims in this Liquidation Analysis, as it is assumed that a trustee of an administratively insolvent chapter 7 estate would not prosecute them. |
| 7 | Builders Capital asserts it has a blanket lien secured by all of the Debtor's assets, except for The Landing Personal Property, which is fully encumbered by the deed of trust held by Sortis Income Fund Reit, Inc. ("Sortis"). |
| 8 | It is assumed that Builder's Capital's security interest extends to the other scheduled assets of the Debtor, rendering them a net value of zero for other creditors. |
| 9 | The Debtor has a 100% ownership interest in Tahoe Railyard Devco Corp.  The subsidiary's primary asset is several parcels of real property that taken together are referred to as the Landing.  These parcels are encumbered, because the subsidiary assumed the Debtor's obligations under the deed of trust held by Sortis in the amount of approximately $14,089,650.00.   The Sortis loan was in default on the Petition Date.  *See* Debtor's Periodic Report [ECF No. 36]. |
| 10 | See ECF No. 17, Schedule E.  No priority proofs of claim have been filed to date. |
| 11 | This is the estimate of all professionals employed by the estate (including Debtor's general counsel and special counsel), through the effective date, but does not include the Brokers' fees and expenses (as further described in Assumption No. 12). |
| 12 | Pursuant to the Retention Agreement for the Brokers, the Brokers' fees will be paid out of the sale proceeds.  However should a conversion to Chapter 7 occur, it would be because the Debtor did not succeed in a Sale Transaction or a Restructuring Transaction and therefore Builders Capital would take the Debtor's property in a credit bid, in accordance with the terms of the BC Stipulation [ECF No. 64]. Pursuant to the Brokers' Retention Agreement, the Brokers' reduced commission on Builders Capital's credit bid and the Brokers' expenses (which expenses are capped at $40,000 and subject to 11 U.S.C. § 330 review), would both be paid by Builders Capital.  *See* Employment |
| 13 | Identified in ECF No. 17, Schedule F.  In addition, the asserted $1,360,250.00 judgment lien of Mr. Keith Dudum is avoidable, and as such, is treated as unsecured and included here. |

# EXHIBIT 3

# EXHIBIT 3

**25 PAGES**
GARMAN TURNER GORDON LLP
WILLIAM M. NOALL, ESQ. (CA Bar No. 122244)
Email: wnoall@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ. (NV Bar No. 9040)
(*Admitted Pro Hac Vice*)
Email: tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
Fax: 725.777.3112
*Attorneys for Debtor Try Trout
and Industrial, LLC*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | CASE No. 25-24548-B-1 |
| TRY TROUT AND INDUSTRIAL, LLC, | DCN: GTG-7 |
| Debtor.[1] | Chapter 11 |
| | **STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS** |
| | Judge:  Hon. Christopher D. Jamie |
| | [No hearing requested] |

Try Trout and Industrial, LLC, debtor and debtor-in-possession ("Debtor") and Builders Capital Finance, LLC ("BC"), by and through their undersigned counsel, hereby stipulate and agree as follows based upon the following Recitals:

**RECITALS**

---

[1] The Debtor in this case, along with the last four digits of Debtor's federal tax identification number, is: Try Trout and Industrial, LLC (5535).  The Debtor's business address is P.O. Box 2247 Menlo Park, CA 94026.

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

A. Debtor owns two separate development projects in Truckee, California, referred to as Heritage Village and Creekside Village (collectively, the "Projects"). By stipulation, the Projects are being treated as "single asset real estate" under Title 11, United States Code (the "Bankruptcy Code"). *See* ECF No. 46 and Paragraph N, *infra*.

B. The Heritage Village project is situated within the confines of four assessor's parcels identified as 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000, which contain a total land area of 7.93 acres. The site is proposed for the development of 108 for-sale condominium units over ground floor retail. Heritage Village will feature 22 floorplans ranging in size from 433 to 2,997 square feet.

C. The Creekside Village project is situated within the confines of assessor's parcel 019-421-014-000 and consists of 5.44 acres of vacant land proposed for the development of 49 single-family homes and attached townhomes, which will feature ten floorplans ranging in size from 1,393 to 2,891 square feet.

D. Secured debt encumbers both projects.

E. Builder's Capital Finance, LLC ("BC") holds a valid, perfected, first priority secured claim and lien against the projects arising from a September 21, 2024 loan agreement in the original principal amount of $19,126,568.83.

F. Debtor stipulates to the validity, priority, and extent of BC's first position lien and security interest on the Projects. Notwithstanding the foregoing, Debtor reserves any objections to the calculation of the amount of BC's secured claim or deficiency (if any), except as set forth herein with respect to BC's credit bid rights.

G. Truckee Development Associates, LLC ("TDA") holds a second position lien and security interest on Debtor's property. TDA is not a party to this Stipulation.

H. A subordination agreement exists between Debtor, BC, and TDA.

I. Debtor commenced the above captioned chapter 11 case ("Reorganization Case") in this Court on August 27, 2025 (the "Petition Date").

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

2

J. The Reorganization Case was commenced prior to a foreclosure sale scheduled by BC for August 27, 2025/the Petition Date.

K. On July 2, 2025, fifty-six (56) days prior to the Petition Date, and within the ninety-day preference period, Keith Dudum recorded an abstract of judgment against the Projects with the Nevada County Recorder in the face amount of $1,374,884.59 (the "Judgment").

L. Debtor stated in its *First Status Conference Report* that it has been exploring all options to maximize the value of the estate and has determined to file a plan that includes a sale of the Projects, with an alternative restructuring option in the form of a joint venture with a new finance partner.

M. Debtor continues to manage its property as a debtor and debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108..

N. Debtor has maintained communication with BC through its counsel. Debtor represents it has also done so with regard to TDA through its counsel.

O. Debtor has stipulated with BC that for so long as BC's allowed claim against Debtor has not been satisfied, Debtor's primary activity shall be deemed to be the business of owning "single asset real estate" as defined in Bankruptcy Code Section 101(51B), and this reorganization case shall be treated and managed accordingly.

P. Debtor has negotiated a joint retention agreement ("Brokerage Agreement") with two (2) brokerage firms who will work as a joint team to market and sell the Projects. A true and correct copy of the Brokerage Agreement is attached hereto as **Exhibit 1** and incorporated herein by this reference.

Q. The real estate brokers are Keen-Summit Capital Partners LLC and Berkadia Real Estate Advisors Inc. (collectively, the "Real Estate Broker Professionals").

R. The Real Estate Broker Professionals were selected after consultation with BC and TDA.

S. The Brokerage Agreement is expressly subject to approval by the Court after notice

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

3

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

and a hearing and the Court's approval of this Stipulation and Order.

T.   The purpose of this Stipulation and Order is to establish a mandatory framework under which the Projects will be professionally marketed by the Brokers for sale or refinance to close by June 4, 2026, or else immediately close a sale of the Projects to BC pursuant to a credit bid.   Additionally, the purpose of this Stipulation and Order is to provide compensation and expense reimbursement to the Real Estate Broker Professionals in the event that (i) the sale of the Projects yields less than the aggregate value of all valid liens on the Projects plus Debtor's closing fees and costs and/or (ii) Debtor transfers one or both Projects, however such transfer is effectuated, whether by means of a deed in lieu, credit bid, or otherwise to: (x) BC or its assign, or (y) a liquidating trust or other entity created for the benefit of the creditors upon the effective date of a confirmed Chapter 11 Plan, as to which BC reserves all rights.,

**STIPULATION**

The Parties stipulate and agree as follows,

1.   The above Recitals are true and correct.

2.   BC agrees that in the event that the Projects, or either of them, are sold with Court approval under either a plan of reorganization or a Section 363 sale during the term of the Brokerage Agreement, other than a sale to BC or its assign for a credit bid only, and the highest and best all cash bid submitted is not greater than the aggregate value of all liens on the Property plus Debtor's share of the closing fees and costs pursuant to the purchase and sale agreement providing for the sale, plus the compensation and expense reimbursement due the Real Estate Broker Professionals under the Brokerage Agreement, then BC agrees that the cash proceeds of the sale shall be used (i) first, to pay Debtor's share of the closing fees and costs pursuant to the Court approved purchase and sale agreement, (ii) second, to pay the compensation and expense reimbursement due the Real Estate Broker Professionals under the Brokerage Agreement at the closing of the sale, and (iii) third, to pay BC and TDA, in accordance with the priority of their claims as provided under the Intercreditor Agreement and as calculated under the Bankruptcy

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

4

Code.

3.     BC agrees that in the event that the Projects, or either of them, are sold with Court approval under a plan of reorganization or a Section 363 sale during the term of the Brokerage Agreement in a manner consistent with the terms of paragraph III.D.1.a-b of the Brokerage Agreement, then BC agrees that it shall pay, at the closing of the sale, the  compensation and expense reimbursement due the Real Estate Broker Professionals under paragraph III.A.2 of the Brokerage Agreement.

4.     Debtor agrees that the rights of the BC under Bankruptcy Code Section 363(k) to credit bid at any sale of the Projects, or either of them, are preserved.

5.     BC agrees not to object to sales of the Projects based solely on Debtor's inability to satisfy Bankruptcy Code Section 363(f)(3), subject in all respects to BC's credit bid rights. For the avoidance of doubt, BC does not waive any objection rights it otherwise holds, but rather, the intent of this paragraph is to confirm that BC will place a credit bid in excess of any competing all cash bid which is not greater than the aggregate value of all liens on the Projects for purposes of Bankruptcy Code Section 363(f)(3). Without in any way limiting the foregoing, BC expressly reserves and retains any objections to approval of a sale based upon (i) challenges to the Debtor's business judgment in selecting the highest and best offer, (ii) disagreements regarding financing, inspection, or other contingencies requested by a buyer and agreed to by the Debtor, (iii) challenges to the adequacy of marketing efforts by the Brokers; (iv) Debtor's failure to provide all notices of the sale required under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and (v) any proposal to sell property free and clear of the BC's' liens pursuant to Bankruptcy Code Sections 363(f)(1), 363(f)(4), or 363(f)(5).  For the avoidance of doubt, nothing in this stipulation requires BC to consent to any sale or refinance for an amount less than the aggregate value of all liens on the Projects. This paragraph shall be construed in the light most favorable to non-waiver.

. . .

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

6. Debtor stipulates that BC is authorized to make a credit bid in the maximum amount of 100% of its outstanding debt as of the date of any auction or sale of the Property, with any additional interest or charges permitted under the Bankruptcy Code. Debtor's Schedule D disclosed BC's claim as $23,194,036.28 as of the Petition Date, but marked the claim as disputed. BC will file a formal proof of claim on or before January 2, 2026.

7. BC consents to a limited surcharge of its collateral under Bankruptcy Code Section 506(c) solely for the reasonable, necessary costs and expenses incurred by the Broker for the benefit of the Projects, provided however, that (i) BC reserves the right to challenge whether any such costs and expenses were reasonable and necessary to accomplish the purpose of the Brokers' retention, (ii) such costs and expenses and any associated surcharge shall not exceed $40,000, and (iii) Debtor shall not seek to surcharge BC's collateral for any costs or expenses of the bankruptcy estate except as expressly set forth herein.

8. Under any and all circumstances, on or before April 6, 2026, Debtor shall have entered into either (i) a binding asset purchase agreement for a Sale Transaction (as defined in the Broker Agreement) or (ii) one or more binding agreements whereby Debtor will complete a Restructuring Transaction (as defined in the Broker Agreement).

9. If Debtor does not satisfy the conditions of Paragraph 8 of this Stipulation on or before April 6, 2026, then Debtor shall: (i) unconditionally commit to closing a sale of the Property to BC for a credit bid with no further marketing period or (ii) obtain an order of the Bankruptcy Court extending this deadline, as to which BC may object.

10. Under any and all circumstances, on or before June 4, 2026, Debtor shall: (i) have closed a sale or refinance of 100% of the property constituting the Projects in a manner consistent with this Stipulation; (ii) unconditionally commit to closing a sale of the Projects to BC for a credit bid with no further marketing period; or (iii) obtain an order of the Bankruptcy Court extending this deadline, as to which BC may object.

. . .

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

6

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

107271843.1

11. BC has not agreed to any potential stalking horse protections such as break up fees. All details of an auction or sale process not otherwise set forth herein or in the Brokerage Agreement, including (without limitation) the agreed amount of earnest money deposits or the acceptance of contingencies, are subject to Debtor's business judgment after consultation with BC, and otherwise subject to approval by the Bankruptcy Court after notice and hearing.

12. Except as may be expressly set forth herein, no term of this Stipulation and Order shall be deemed or construed to amend, override, or waive any term of the Intercreditor Agreement, or any other existing agreements between Debtor, BC, Randolph Lamb (including his guarantee of Debtor's obligations to BC), and/or any other third party.

**IT IS SO STIPULATED.**

Dated this 26th day of November 2025.

GARMAN TURNER GORDON        POLSINELLI PC

By: */s/ Talitha Gray Kozlowski*
    WILLIAM M. NOALL, ESQ.
    TALITHA GRAY KOZLOWSKI, ESQ.
    7251 Amigo Street, Suite 210
    Las Vegas, Nevada 89119

    *Attorneys for Try Trout & Industrial LLC*

By: */s/ Michael L. Schuster*
    MICHAEL L. SCHUSTER, ESQ.
    1401 Lawrence Street, Suite 2300
    Denver, CO 80202

    *Attorneys for Builders Capital Finance, LLC*

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT APPROVED REAL ESTATE BROKERS

7

107271843.1

**BROKERAGE AGREEMENT**
(Attach)

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

STIPULATION REGARDING PAYMENT OF ALLOWED CONTRACTUAL
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN TO-BE COURT
APPROVED REAL ESTATE BROKERS

8

107271843.1

RETENTION AGREEMENT

*Between*
Try Trout and Industrial, LLC

*and*
Keen-Summit Capital Partners LLC and Berkadia Real Estate Advisors Inc.

Date: November 24, 2025

In consideration of the mutual agreements herein contained and subject to the entry of the "Order" (as defined below), "Company" (as defined below) hereby retains "Brokers" (as defined below) to act as Company's real estate advisor upon the terms and conditions set forth herein.

I.      **Definitions**.

The following terms as used herein have the following meanings.

A.      "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of California.

B.      "Berkadia" means Berkadia Real Estate Advisors Inc.

C.      "Brokers" mean Berkadia and Keen.

D.      "Code" means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

E.      "Credit Bid Proceeds" means the Gross Proceeds in the context of a sale pursuant to a Secured Creditor's credit bid under Code Section 363(k), and shall be equal to the lesser of (i) the amount such Secured Creditor is required to offset its secured claim against the purchase price of the Property pursuant to Code Section 363(k) or (ii) the highest all cash bid submitted by a party other than a Secured Creditor, plus the reimbursement of reasonable out of pocket expenses incurred under **Section IV** below

F.      "Company" means Try Trout and Industrial, LLC.

G.      "Effective Date" means the date of mutual execution of this Agreement, subject to entry of an Order.

H.      "Gross Proceeds" means the sum of the total consideration transferred to, or for the benefit of, Company and shall be inclusive of, but not limited to, cash or its equivalent, value of debt assumed or released, liabilities assumed or released, forfeited deposits, and any other consideration, paid or payable, directly or indirectly, in connection with a Transaction. The computation of Gross Proceeds as well as the computation of Brokers' fee shall not be affected by the costs of advertising, Company's legal fees, break-up fees, Brokers' expenses nor any closing costs and/or adjustments, including but not limited to adjustments and/or payments of whatever kind to lienholders, secured parties or offerors.

I.      "Keen" means Keen-Summit Capital Partners LLC.

J.      "Order" shall mean an Order issued by the Bankruptcy Court approving this Agreement.

107272173.1

K.    "Property" or "Properties" refers individually or collectively to the parcels of fee-owned, real property listed on Schedule "**A**" attached hereto and incorporated by reference, inclusive of all plans, designs, permits, licenses and other intellectual property related or pertaining to the "Property", which list of real property and affiliated intellectual property may be supplemented without a further Order of the Bankruptcy Court.

L.    "Restructuring Transaction" means any transaction, other than a Sale Transaction, involving the Company's pecuniary interests arising from or related or pertaining to Brokers' services rendered under this Agreement, including, but not limited to:

1.    the restructuring of all or a portion of Company's secured debt, and/or

2.    the raising of debt and/or equity capital and/or the closing of a joint-venture in order to:

a)    refinance a Property,

b)    to recapitalize the Company or an entity owned or controlled by Company,

c)    to buy all or a portion of the secured debt currently encumbering a Property, and/or

d)    to fund a plan of reorganization in the Bankruptcy.

For the avoidance of doubt, completion of a Restructuring Transaction requires payment to all Secured Creditors with liens on any Property subject to the Restructuring Transaction in an amount equal to such Secured Creditors' secured claim calculated under Code Section 506, unless otherwise agreed by the Secured Creditor, and without reduction for the Restructuring Transaction Fee.

M.    "Sale Transaction" means the sale or transfer of title of one or more Properties pursuant to Code Section 363, whether within or without a Chapter 11 Plan.

N.    "Secured Creditor" means Builders Capital Finance, LLC and Truckee Development Associates, LLC, separately and collectively.

**II.**    **Services.**

    **A.**  **Authority**

107272173.1

1. Brokers shall have the sole and exclusive authority to represent Company, on an exclusive right to sell basis, in the negotiation of Sale Transactions or Restructuring Transactions; provided, however, that the Brokers acknowledge that pre-petition Company retained Lever Capital Partners on a non-exclusive basis to facilitate either a refinancing or a joint venture to pay existing Secured Creditors and administrative claims and to develop the property ("Lever Capital"). Lever Capital shall not be involved in the sale or restructure of the Projects and shall not be entitled to any compensation from property of the estate.

2. In order to coordinate our efforts with respect to possible Sale Transactions and Restructuring Transactions, during the term of this Agreement neither the Company nor any representative thereof (other than Brokers and Lever Capital) will initiate discussions with a third party regarding a Sale Transaction or Restructuring Transaction except through Brokers. If the Company, its management, or any of its professional advisors receives an inquiry regarding a Sale Transaction or Restructuring Transaction, it will promptly advise Brokers of such inquiry in order that Brokers may evaluate the inquiry and assist the Company in any resulting negotiations.

3. Company shall retain the complete discretion to accept or reject any proposed Sale Transaction or Restructuring Transaction.

4. The Company and each Broker hereby acknowledges and agrees that although Berkadia and Keen are being engaged under this Agreement as co-advisors to Debtor: (i) each Broker's obligations under this Agreement shall be separate from each other and shall not be joint and several, and as such (ii) neither Broker shall be liable to the Company or to any other third parties for the other Broker's acts or omissions related or pertaining to this Agreement and/or the Transaction.

B. **Marketing Services**

Brokers' services may include those generally described below, as appropriate. Brokers will:

1. On request, review pertinent documents and will consult with Company's counsel, as appropriate;

2. Coordinate with Company in the development of due diligence materials, the cost of which shall be Company's sole responsibility; provided, however, the Brokers may advance the costs to expedite the marketing process in an amount not to exceed $40,000;

3. Develop, subject to Company's review and approval, a marketing plan and implement each facet of the marketing plan;

4. Communicate regularly with prospects and maintain records of communications;

5. Solicit offers for a Sale Transaction or Restructuring Transaction;

107272173.1

6.    Assist Company in evaluating, structuring, negotiating and implementing the terms and conditions of a proposed Sale Transaction or Restructuring Transaction;

7.    Develop and implement, subject to Company's review and approval, an auction plan, including arranging auction logistics, assisting Company's counsel with auction bid procedures, assisting the Company to qualify bidders, and running the auction at the offices of Garman Turner Gordon or such other location that may be designated by the Company;

8.    Communicate regularly with Company and its professional advisors in connection with the status of its efforts; and

9.    Work with Company's attorneys responsible for the implementation of the proposed Sale Transaction or Restructuring Transaction, reviewing documents, negotiating and assisting in resolving problems which may arise.

III.  **Compensation.**

  A.  <u>Sale Transaction Fee.</u>

    1.  IF CASH SALE: As and when Company closes a Sale Transaction, except upon a Secured Creditor's credit bid subject to Section III.A.2 of this Agreement, whether such Sale Transaction is completed individually or as part of a package or as part of a sale of all or a portion of Company's business, then Brokers shall have earned compensation per Sale Transaction equal to: (i) four percent (4%) of the "Gross Proceeds" from the Transaction up to $50 million; plus (ii) eight percent (8%) on the difference between the Gross Proceeds of the Transaction and $50 million (the "Sale Transaction Fee"), to be shared equally between the Brokers, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Sale Transaction Fee shall be paid as a buyer closing obligation on the HUD-1 settlement statement, and the proceeds due to Secured Creditors shall be reduced by the amount of the Sale Transaction Fee.

    2.  IF CREDIT BID SALE: As and when Company closes a Sale Transaction upon a Secured Creditor's credit bid pursuant to Code Section 363(k), whether such Sale Transaction is completed individually or as part of a package or as part of a sale of all or a portion of Company's business, then Brokers shall have earned a Sale Transaction Fee per Sale Transaction equal to: (i) one-half of one percent (0.5%) of the Credit Bid Proceeds from the Sale Transaction up to the maximum amount of such credit bid; plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Sale Transaction Fee shall be paid in cash on or before the closing date by the Secured Creditor who completes the Sale Transaction pursuant to a credit bid.

  B.  Restructuring Transaction Fee. As and when Company closes a Restructuring Transaction, whether such Restructuring Transaction is completed individually or as part of a package or as part of a restructuring of all or a portion of Company's business, then Brokers shall have earned compensation per Restructuring Transaction equal to: (i) four percent (4%) of the "Gross Proceeds" from the Transaction up to $50 million; plus (ii)

107272173.1

eight percent (8%) on the difference between the Gross Proceeds of the Restructuring Transaction and $50 million (the "Restructuring Transaction Fee"), to be shared equally between the Brokers, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below. The Restructuring Transaction Fee and cost reimbursement shall be paid by the Debtor as part of the Restructuring Transaction, and shall not reduce the amounts which must be paid to satisfy each Secured Creditor's secured claim as calculated under Code Section 506 in order to effectuate the Restructuring Transaction, unless otherwise agreed by such Secured Creditor.

C.    For the purposes of clarity, the Brokers are entitled to the Sale Transaction Fee or Restructuring Transaction Fee in the event that Lever Capital or any third-party produces a Transaction. Neither Lever Capital nor any such third party shall be entitled to any compensation from property of the estate.

D.    "Come Hell or Highwater Fee".

1.    For the avoidance of doubt, once engaged and work has commenced on one or more of the Properties, then Brokers shall earn either a Sale Transaction Fee or a Restructuring Transaction Fee, plus the reimbursement of their reasonable out of pocket expenses, as set forth in **Section IV** below.

2.    Unless otherwise agreed in writing by Builders Capital Finance, LLC ("BC") and/or ordered by the Bankruptcy Court after notice and hearing, if Debtor has not closed one or more Sale Transactions resulting in transfers of 100% of the Debtor's interest in the Projects on or before June 4, 2026 (with binding agreements to be executed no later than April 6, 2026), or if Debtor has not closed a Restructuring Transaction on or before June 4, 2026, then Debtor shall promptly close a Sale Transaction pursuant to BC's credit bid under Code Section 363(k), and the Brokers shall thereupon be entitled to their resulting Sale Transaction Fee.

E.    <u>Timing of Payment.</u> All Transaction Fees and expense reimbursements shall be paid simultaneously with the closing or other consummation of each Sale Transaction or Restructuring Transaction.  Company hereby authorizes and instructs any escrow agent or counsel (without need for further authorization or permission) to pay Brokers the fees earned in strict compliance with the provisions of this Agreement, time being of the essence, and consistent with all other provisions of this Agreement.  The rights provided by this paragraph and the Order approving same shall be deemed to supplement and not supersede other rights provided to Brokers.

F.    <u>Notwithstanding anything to the contrary contained herein, there shall be no payments to the Brokers unless and until the Bankruptcy Court enters an order approving the Brokers' fees and expenses pursuant to Bankruptcy Code Section 328(a).</u>

G.    <u>Survival:</u>  In the event Company and any third party should enter into an agreement providing for a Sale Transaction or Restructuring Transaction before the expiration of this Agreement and the closing does not occur until after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Brokers shall be entitled to a fee in accordance with the terms of this Agreement.  If Company, after the expiration of said period, arranges for a

107272173.1

Transaction with a third party whom Brokers solicited or otherwise introduced to a Property or introduced to the Company or with whom Brokers dealt in connection with a Property or Company prior to said expiration, and the contract signing or closing takes place within twelve (12) months after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Brokers shall be entitled to a fee in accordance with the terms of this Agreement.

IV.  **Expenses.**

A.  All reasonable out of pocket costs and expenses incurred by Brokers in connection with performing the services required by this Agreement, including but not limited to travel, lodging, FedEx, UPS or other overnight carrier, postage, photocopying charges, and the fees and reasonable expenses of counsel, etc., shall be advanced by Brokers for the benefit of Company and its creditors. Brokers' expenses shall not exceed $40,000, without the prior written consent of Company and BC.

B.  With regards to the marketing of a Property, Brokers shall prepare a marketing plan and budget, subject to the Company's review and approval. Brokers shall be under no obligation to incur marketing expenses until such time as Company has approved the marketing plan and budget.

C.  BC consents to a limited surcharge of its collateral under Bankruptcy Code Section 506(c) solely for the reasonable, necessary costs and expenses incurred by the Broker for the benefit of the Projects, provided however, that (i) BC reserves the right to challenge whether any such costs and expenses were reasonable and necessary to accomplish the purpose of the Brokers' retention, (ii) such costs and expenses and any associated surcharge shall not exceed $40,000, and (iii) Debtor shall not seek to surcharge BC's collateral for any costs or expenses of the bankruptcy estate except as expressly set forth herein.

D.  Brokers shall not be responsible for any out-of-pocket due diligence costs and expenses, if any, including but not limited to updating appraisals, title reports, surveys, environmental reports, property condition assessments, etc.

V.  **Company Responsibilities.**

A.  Upon the Effective Date, Company will deliver to Brokers a list of all brokers, principals, tenants, or other prospects who have expressed an interest in using or acquiring a Property along with all correspondence and other records that relate to any such interest.

B.  With respect to the Property, Company warrants and represents that it will immediately inform Brokers as to:

1.  any known or suspected risk of environmental hazard or contamination; and

2.  any known, existing or pending violation(s) of federal, state or local environmental laws or regulations.

Company shall have the continuing obligation to assess the accuracy of the representations contained herein and to advise Brokers in writing as soon as it becomes aware of any inaccuracy, inconsistency, incompleteness or change of circumstances and

107272173.1

to correct same.  Additionally, if Company has ordered environmental reports or studies, as soon as such become available, Company will immediately provide a true and complete copy of such reports to Brokers and Brokers are hereby authorized to disseminate such reports to prospects.

C.     Company shall maintain the Property and shall furnish utilities and public liability insurance as well as casualty/property insurance covering the Properties.  Company shall cause Brokers to be covered as an Additional Insured under all policies of General Liability insurance and any Umbrella insurance policies and to waive subrogation against Brokers for injury or damage insured under all such casualty and public liability insurance.

D.     Physical Conditions.  Company acknowledges that Brokers are not obligated to and have not made an independent investigation of the physical conditions of the Properties, including, but not limited to, the condition of any improvements on the Properties, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "Physical Conditions").  All documents and materials, investigations, reports and information with respect to the Physical Conditions shall be prepared by or for Company and shall be furnished to prospective purchasers on behalf of Company, who (as between the Company and Brokers) shall be solely responsible for same.  During the Covid-19 pandemic, Brokers reserves the right, in its sole discretion, to determine whether or not to travel to a Property.

E.     Accurate & Complete Information:

1.     Company shall make available to Brokers all information reasonably requested by Brokers for the purpose of enabling Brokers to perform its obligations pursuant to this Agreement.  All information provided by Company shall be materially accurate and complete at the time it is furnished and Company shall, as soon as it becomes aware of any inaccuracy or incompleteness in any information then or later provided to Brokers, promptly advise Brokers in writing of such inaccuracy or incompleteness and correct the same.  In performing its services hereunder, Brokers shall under all circumstances be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all information that has been furnished to it by, or on behalf of, the Company and shall have no obligation to verify the accuracy or completeness of any such information and shall not be responsible for the inaccuracy or incompleteness of any information provided to Brokers.

2.     Company covenants that when Brokers present offering materials to Company for review and approval, Company will promptly and diligently review same for accuracy and completeness and will advise Brokers, in writing, of any corrections or modifications.  Once Brokers has revised such offering materials in a manner consistent with Company's recommendations, Company shall promptly review and approve, in writing, such offering materials before Brokers disseminates same.  Brokers shall be under no obligation: (A) to disseminate offering materials that it has reason to believe are inaccurate or are materially misleading, and (B) to disseminate such offering materials until such time as Brokers receives Company's written approval of same.

107272173.1

F.    Within 3 business days of the Effective Date, Company shall file an application with the Bankruptcy Court for, and will use its best efforts to obtain, an Order.  With respect to the application and Order:

1.    Company acknowledges that this Agreement in its entirety will be attached to and made a part of Company's application to the Bankruptcy Court and will be referenced to in the Order.

2.    The application shall seek an Order authorizing the employment of Brokers as of the date of this Agreement, as professional persons pursuant to Section 327 of the Code (with compensation subject to the standard of review of Section 328(a) of the Code and not any other standard, including that provided in Section 330 of the Code).  The employment application and the Order shall be provided to Brokers sufficiently in advance of their filing, and must be acceptable to Brokers in their sole discretion.  In the event that the Bankruptcy Court does not enter an order acceptable to Brokers, Brokers shall have no further obligations under the terms of this Agreement.

3.    Company agrees that an Order approving Brokers' retention incorporates by reference this entire Agreement inclusive of the below provisions even if not specifically mentioned in the Order.  Company agrees that:

a)    none of the fees payable to Brokers hereunder shall constitute a "bonus" under applicable law;

b)    Brokers are exempt from the requirement to keep time records (unless Brokers services are being billed by the hour);

c)    Brokers are exempt from the necessity of filing a fee application;

d)    Brokers' fees and expenses shall be treated as administrative expense claims in the Company's bankruptcy case;

e)    Brokers' fees and expenses shall be entitled to a carve-out for payment pursuant to the terms of this Agreement;

f)    Consistent with Section 504(a) of the Bankruptcy Code, Brokers may not share or agree to share any compensation or reimbursement with another person or any compensation or reimbursement received by another person under Section 502(b)(2) or 503(b)(4) of the Bankruptcy Code;

g)    The terms and conditions of this Agreement are "reasonable."  If the Order authorizing the employment of Brokers is obtained, Company shall pay all fees and expenses as promptly as possible in accordance with the terms of this Agreement and the Order without the need for further application to or order of the Bankruptcy Court; and

h)    The Bankruptcy Court has and shall retain core jurisdiction to hear and determine all matters arising from the implementation of this Agreement, and neither the Company nor Brokers shall be required

107272173.1

to seek authorization from any other jurisdiction with respect to the relief granted by the Order approving this Agreement.

4. If Company obtains an order of the Bankruptcy Court authorizing financing or cash collateral use and such order requires the submission of a budget by Company delineating its post-petition expenditures, such budget shall expressly include all amounts projected to be paid to Brokers pursuant to the terms of this Agreement. In addition, any stipulation or order for financing or cash collateral use shall include all amounts to be paid to Brokers pursuant to the terms of this Agreement among any carve-out to be provided professionals in the Company's bankruptcy case.

5. The effectiveness of this Agreement is expressly conditioned upon the entry of an order by the Bankruptcy Court approving the **STIPULATION AND ORDER REGARDING PAYMENT OF ALLOWED CONTRACTUAL COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN COURT APPROVED REAL ESTATE BROKERS.** This Agreement shall be null and void if the Bankruptcy Court does not approve the subject stipulation.

6. The terms of **Section V.F** are solely for the benefit and protection of Brokers and may be waived, in whole or in part, only by Brokers.

**VI. Miscellaneous.**

A. Terms & Conditions. The terms and conditions set forth on **Schedule B** attached hereto are incorporated by reference. The provisions of this section of the Agreement shall survive the termination of this Agreement.

B. Notice. Any correspondence or required notice shall be addressed as follows and shall be sent by email and/or by UPS, FedEx, or similar overnight delivery service with proof of delivery. Such notice shall be effective as of the earlier of (i) the date when the recipient confirms receipt of the email, or (ii) the date of actual receipt of the overnight delivery. A notice shall be effective only upon receipt (or refusal by the intended recipient to accept delivery). Any notice which is received on a Saturday, Sunday or legal holiday, or after 5:00 pm prevailing local time at the place of receipt, shall be deemed received on the next business day.Such notice shall be addressed as follows (or to such other address as the parties hereto may designate in writing in the manner set forth herein and as updated from time to time):

If to Brokers, to:     Keen-Summit Capital Partners LLC
15th Floor
3 Columbus Circle
New York, NY 10019
ATTN: Harold Bordwin
Telephone: (914) 980-8555
Email: hbordwin@Brokers-Summit.com

107272173.1

|  |  |
|---|---|
| With a copy to: | Keen-Summit Capital Partners LLC<br>1 Huntington Quadrangle, Suite 2C04<br>Melville, NY 11747<br>ATTN: Matt Bordwin<br>Telephone: (646) 381-9202<br>Email: mbordwin@keen-summit.com |
| With a copy to: | Berkadia Real Estate Advisors Inc.<br>1 Post Street #1000<br>San Francisco, CA 94104<br>ATTN: Jason Parr<br>Telephone: (415) 407-2106<br>Email: jason.parr@berkadia.com |
| If to Company: | Try Trout and Industrial, LLC<br>P.O. Box 2247<br>Menlo Park, CA  94026<br>ATTN: Randolph Lamb<br>Telephone: (650) 208-4195<br>Email: randy@lpgdevelopment.com |
| With a copy to: | Garman Turner Gordon LLP<br>7251 AMIGO STREET, SUITE 210<br>LAS VEGAS, NV 89119<br>Telephone: 725 777 3000<br>ATTN : Talitha Gray Kozlowski<br>Email: tgray@Gtg.legal<br>ATTN: William Noall<br>Email: wnoall@Gtg.legal |

If the foregoing correctly sets forth the agreement between the Company and Brokers, please sign, date and return the enclosed copy of this Agreement, whereupon it shall become our binding agreement.

| **AGREED & ACCEPTED**<br>This ___ day of November, 2025 | **AGREED & ACCEPTED**<br>This ___ day of November, 2025 |
|---|---|
| **KEEN-SUMMIT CAPITAL PARTNERS LLC** | **TRY TROUT AND INDUSTRIAL, LLC** |
| By: _____<br>Harold J. Bordwin<br>as Co-President | By: _____<br>Name: Randolph Lamb<br>Title: Managing Member of Lamb Partners, LLC,<br>its Manager |

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 11 of 17*

**AGREED & ACCEPTED**
This _____ day of November, 2025

**BERKADIA REAL ESTATE ADVISORS INC.**

By: _____
Name:
Title:

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*

107272173.1

**SCHEDULE A**

**Property**

**Creekside Village**
Residential Property
11158 Church Street
Truckee, Nevada County, California 96161
APN: 019-421-014-000

**Heritage Village**
Residential Property
11189 Church Street
Truckee, Nevada County, California 96161
APNs: 019-421-011-000, 019-421-012-000, 019-421-021-000 and 019-421-022-000

107272173.1

**SCHEDULE B**

**TERMS & CONDITIONS**

I.    **Announcement**.    Brokers may, at their option and expense, place announcements and advertisements or otherwise publicize Brokers' role (which may include the reproduction of the Company's logo and a hyperlink to the Company's web site) on Brokers' internet web site and in such newspapers and periodicals and in its marketing materials as it may choose stating that Brokers has acted as advisor to the Company with respect to the Transactions.

II.   **Authority**.   The parties hereto warrant and represent that this Agreement has been approved by all requisite corporate action and that the party executing this Agreement has full power and authority to do so.

III.  **Construction**.

  A.    Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

  B.    This Agreement shall be construed fairly as to all parties and there shall be no presumption against the party who drafted this Agreement in the interpretation of this Agreement.  By executing or otherwise accepting this Agreement, Company and Brokers acknowledge and represent that they are represented by and have consulted with legal counsel with respect to the terms and conditions contained herein.

IV.   **Counterparts**.This Agreement may be executed in two or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Facsimile and electronic transmission (including the email delivery of documents in Adobe PDF format) of any signed original counterpart or retransmission of any signed facsimile transmission shall be deemed the same as the delivery of the original.

V.    **Dispute Resolution.**

  A.    Choice of Law; Jury Trial.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to any principles of conflict of laws.  To the extent permitted by law, the parties to this Agreement waive any right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of Brokers pursuant to, or the performance by Brokers of the services contemplated by, this Agreement.

  B.    Attorneys' Fees.  If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and arbitration and/or court costs.

  **C.**    Bankruptcy Court Jurisdiction.  The Bankruptcy Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation or

107272173.1

execution of this Agreement. Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from, this Agreement or Brokers' services hereunder, shall be settled by the Bankruptcy Court. The Bankruptcy Court shall be limited to awarding compensatory damages and the parties hereto hereby waive their right to seek punitive, consequential, exemplary or similar types of special damages.

    **D.**     <u>Survival</u>. The provisions of this section of the Agreement shall survive the termination of this Agreement.

**VI.**     **Electronic Communications**. The parties hereto may communicate with each other by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. The parties hereto each accept the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices).

**VII.**     **Entire Agreement**. This Agreement contains the entire agreement between the parties hereto, and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Agreement will alter the covenants, agreements and undertakings herein set forth. This Agreement shall not be modified in any manner, except by an instrument in writing executed by the parties.

**VIII.**     **Force Majeure**. Brokers shall have no obligation to travel or engage in in-person meetings if, in the exercise of Brokers' judgement, to do so would create an unacceptable risk of Covid-19 infection. Brokers shall have no liability for delays, failure in performance, or damages due to acts or omissions of civil or military authorities, acts or omissions of communications carriers, acts of god, civil disturbances, epidemics, explosion, fire, fuel or energy shortages, lightning, pandemics, power surges or failures, strikes or labor disputes, telecommunications failure, war, water, or other causes beyond Brokers' control whether or not similar to the foregoing.

**IX.**     **Good Faith**. The parties hereto shall deal with each other fairly and in good faith so as to allow each party to perform its duties and earn the benefits of this Agreement and shall not interfere, prevent or prohibit the other, in any manner, prior to or during the term of this Agreement from carrying out its duties and obligations under the Agreement.

**X.**     **Indemnification**.

    A.     The Company shall defend, indemnify and hold harmless Brokers and their affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons (Brokers and each such entity or person being an "Indemnified Party") from and against any and all losses, claims, damages, expenses and liabilities (including but not limited to counsel fees and disbursements in connection with the investigation of, preparation for, or defense of any pending or threatened claim) (collectively, "Losses"), as incurred, to which such Indemnified Party may become subject, related to or arising out of activities performed by or on behalf of an Indemnified Party pursuant to this Agreement, any transactions contemplated hereby, the Indemnified Party's role in connection therewith, the Physical Conditions of the Property or Properties, and/or Company's title to the Property or Properties and/or the marketability of such title. The Company shall have no obligation to indemnify and hold harmless an Indemnified Party for any Losses found in a final judgment by a Court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by the Indemnified Party in

bad faith or from the Indemnified Party's gross negligence or willful misconduct in performing the services described.

B.     Bankruptcy Protocol: Notwithstanding anything to the contrary:

1.     All requests of Brokers for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Bankruptcy Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought, <u>provided, however</u>, that in no event shall any Broker be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

2.     In no event shall Brokers be indemnified if the Company or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, a Broker's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

3.     In the event that Brokers seeks reimbursement for attorneys' fees from the Company pursuant to the indemnity provisions in the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in each Broker's own applications for approval of indemnity payments (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of Sections 330 and 331 of the Bankruptcy code without regard to whether such attorney has been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

4.     Broker shall not seek or be entitled to a surcharge of any secured lender's collateral in respect of the Company's indemnity obligations.

C.     The Company also agrees that Brokers, their affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons shall not be liable (whether directly or indirectly, in contract or tort or otherwise) to the Company or its security holders or creditors, for any matter, cause or thing related to or arising out of the engagement of Brokers pursuant to, or the performance by Brokers of the services contemplated by, this Agreement, except to the extent that Brokers are found in a final judgment by a Court of competent jurisdiction to have acted or failed to act in bad faith or with gross negligence or willful misconduct in performing the services described in this Agreement.

D.     The provisions of this **Section X** shall be in addition to any liability that the Company may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Company.  These provisions shall be governed by the law of the State of California, without regard to its conflict of law principles, and shall be operative in full force and effect regardless of any termination or expiration of this Agreement.

107272173.1

XI.    **Legal Forms.** Brokers may provide Company and/or its legal counsel with sample forms of commonly used documents, including but not limited to retention applications, forms of court orders, non-disclosure agreements, bidding procedures, lease modification agreements, lease termination agreements, etc. If provided, these forms are provided as a courtesy only. Brokers does not provide legal services. Any forms provided to Company and/or its legal counsel should be reviewed and amended by Company's legal counsel to reflect the legal advice of Company's legal counsel.

XII.    **Multiple Clients**. From time to time, Brokers, or one of its related entities, may and shall have the right to advise or provide services to several industry participants, some of which may be competitors of the Company. The Company, its directors and shareholders, waive any right to commence any action, suit or proceeding or make any demand, complaint or claim against Brokers, its subsidiaries or affiliates, or their partners, directors, officers or other personnel, that arises out of Brokers', or one of its related entities', right to advise or provide services to industry competitors of the Company.

XIII.    **No Time Records**. The services to be provided by Brokers pursuant to this Agreement are transactional in nature and except with respect to hourly fees, for which Brokers will maintain contemporaneous time records in half-hour increments and not on a project category basis, Brokers will not be billing Company by the hour nor keeping a record of its time spent on behalf of Company.

XIV.    **Relationship**.

     A.    Brokers' role shall be as the Company's agent and Brokers hereby acknowledges their fiduciary responsibilities to Company. Nevertheless, Company shall remain fully responsible for all decisions and matters as to which Brokers' advice is sought. Brokers are assuming no management responsibilities. Company acknowledges and agrees that its engagement of Brokers hereunder does not and is not intended to confer rights upon any person not a party hereto, including but not limited to any security holders or creditors of Company's bankruptcy estate.

     B.    Brokers' duties hereunder run solely to the Company. All advice, written or oral, provided by Brokers to the Company pursuant to this Agreement is intended solely for the use and benefit of the Company, which agrees that such advice may not be disclosed publicly or made available to third parties without the prior written consent of Brokers. Brokers may condition the granting of such prior written consent upon obtaining a non-reliance letter and release from any such third parties.

     C.    The provisions of this section of the Agreement shall survive the termination of this Agreement.

XV.    **Successors and Assigns/Change of Control**. Upon the commencement of this Agreement, it shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.The Company's obligations hereunder shall survive any change in control or ownership of the Company.In the event the proceeding is converted from the Chapter 11 to Chapter 7, this Agreement shall remain in full force and effect. The provisions of this section of the Agreement shall survive the termination of this Agreement.

XVI.    **Term of Agreement.**

107272173.1

*Try Trout and Industrial, LLC*
*Keen-Summit and Berkadia*
*November 24, 2025*
*Page 17 of 17*

A.      Subject to the approval of the Bankruptcy Court, the term of Brokers' retention shall be from the date of Company's execution of this Agreement through the confirmation of a plan of reorganization, the closing of all Transactions contemplated by this Agreement or for a period of twelve (12) months, whichever comes first, which term can be extended pursuant to the same terms and conditions and by the mutual consent of the parties without the need for further application to the Bankruptcy Court.

B.      This Agreement shall be binding upon the Company only upon approval of the Bankruptcy Court.  If, for any reason, this Agreement is not so approved upon terms acceptable to Brokers, then this Agreement shall be deemed to be terminated and Brokers shall have an allowed *quantum meruit* claim for its services.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

107272173.1